UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF NEW HAMPSHIRE

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
Brendan Kelly,                           *
   Plaintiff                             *
                                         *
v.                                       *          Civil Action No: 1:15-cv-234-JL
                                         *
Liberty Insurance Corporation            *
d/b/a Liberty Mutual,                    *
   Defendant                             *
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**BRENDAN KELLY'S MEMORANDUM OF LAW
IN SUPPORT OF OBJECTION TO
LIBERTY INSURANCE CORPORATION'S MOTION FOR SUMMARY JUDGMENT**

## I. <u>Introduction</u>

Liberty seeks summary judgment on its claim that it is not obligated to provide uninsured motorist coverage to plaintiff Brendan Kelly based on a purported rejection of UM coverage by a document which was hidden from view in Liberty's underwriting file, and which was not attached, disclosed, referenced, or incorporated in the insurance policy at issue.

In basing its demand for summary judgment on that invisible rejection form, Liberty ignores the plain language of its own insurance policy, ignores unresolved and disputed fact questions about the validity of the purported rejection form, and ignores the legislative intent and purposes behind New Hampshire's uninsured motorist statute, R.S.A. 264:15.

Even more troubling, and perhaps more important, is that Liberty ignores its duty to provide its insureds with an insurance policy which clearly and unambiguously discloses what coverages are and are not provided. Indeed, Liberty's argument attempts to divert attention from

1

the primary question before the Court: 'Read as a whole as would a person of ordinary intelligence in the position of the insured, does Liberty's insurance policy clearly and unambiguously notify the policy's insureds that the UM coverage otherwise guaranteed by R.S.A. 264:15 was rejected?' Even if the rejection form that Liberty kept hidden in its underwriting file was validly authorized and executed, nothing in the Liberty policy notifies insureds in the position of the plaintiff that the statutory UM coverage was rejected. Instead, Liberty's policy plainly states that there are no extrinsic agreements or documents affecting or changing the coverage terms.

Liberty argues that it should be permitted to issue wholly misleading policies to its insureds. From Liberty's policy, an employee driver in the position of Brendan Kelly could not know that UM coverage had been rejected. He could not know that the otherwise automatic protections of R.S.A. 264:15 did not apply to him. The results of Liberty's failure to include notice of any rejection of UM coverage not only violates R.S.A. 264:15, but also deprives all of the non-named insureds under the policy, including the plaintiff, of the opportunity to protect themselves by obtaining their own UM coverage or refusing to use the underinsured company vehicles.

The New Hampshire legislature did not intend for New Hampshire drivers to be kept in the dark about whether they have UM coverage. To the contrary, the purpose of R.S.A. 264:15 is to enable drivers of New Hampshire vehicles to know that their UM coverage is equivalent to the auto liability coverage, or that such coverage was rejected for an umbrella or excess policy. Because Liberty's policy does not demonstrate any rejection of UM coverage and, indeed, prohibits consideration of agreements outside of the policy, by operation of law R.S.A. 264:15 adds UM coverage.

2

Liberty would have this Court decide that an insurer may keep its insureds in the dark as to whether statutory UM coverage has been rejected; that an insurer may vary the terms of its policy by means of an extrinsic document despite clear language in its policy limiting the policy's terms to those stated within its four corners; and that an insurer may issue a policy which on its face contravenes the requirements of R.S.A. 264:15. Such a result would contravene long-standing principles of insurance policy construction and contract law, would undermine the purpose of New Hampshire's uninsured motorist law, and would violate the basic obligation of fairness to its insureds.

## II.  Statement of Material Facts

### A.    The Collision

The materials facts about the collision underlying Brendan Kelly's claim for coverage under Liberty's insurance policy are not in dispute. On December 10, 2013, a car driven by George Motard crossed into Brendan Kelly's lane of travel and struck the truck he was driving head-on. (Exhibit 1, Affidavit of Brendan Kelly.) At the time of the accident, Kelly was in the course of his employment for Plum Creek Timber Company, and was operating a truck owned by Plum Creek that was registered and principally garaged in New Hampshire. (Exhibit 1.) Kelly was not at fault for the collision. (Exhibit 1.)

There is also no dispute that as a result of the collision, Kelly sustained serious and permanent injuries, including severe fractures to bones in his left leg. (Exhibit 1.) He has undergone eight separate surgeries and will likely require additional surgery. (Exhibit 1.) His medical bills to date exceed $450,000 and he will incur additional medical expenses. (Exhibit 1.) As a result of the injuries from the collision, Brendan Kelly is permanently disabled. (Exhibit 1.)

3

**B.**     **Status of Insurance**

    **1.**     **Underlying Coverage**

    The underlying insurance policy facts are also undisputed. At the time of the accident,

Motard was insured by Progressive Casualty Insurance under a policy which provided auto

liability limits of $100,000. Kelly's employer, Plum Creek, carried its primary auto insurance

through ACE American Insurance Company, with auto liability and UM coverage limits of

$1,000,000. (Exhibit 2, p. 2, ACE Policy, Declarations; Exhibit 3, p. 3, Liberty Policy Schedule of

Underlying Insurance). ACE's UM coverage was provided via a "New Hampshire Uninsured

Motorist Coverage" endorsement. (Exhibit 4.)  Although both Progressive and ACE have

tendered their policy limits to Kelly,[1] the value of the plaintiff's claim exceeds the amounts of

coverage provided under those two policies.

    **2.**     **Liberty's Umbrella Coverage Detailed in Relevant Part**

    Defendant Liberty admits that it insured Plum Creek at the time of the accident under a

Commercial Liability Umbrella policy with limits of $5,000,000 per occurrence. (Defendant's

Second Amended Answer, ¶ 13, 17; Exhibit 3, p. 2)  Brendan Kelly is "an insured" because the

Liberty policy includes as "insureds" employees acting within the scope of their employment, as

well as persons using a "covered auto" with Plum Creek's permission. (Exhibit 3, Section II(2)(a)

and (f), pp. 57-58.)  Brendan Kelly falls within both definitions.

    The declarations page of Liberty's policy states that "we agree with you to provide the

insurance <u>as stated in this policy</u>." (Exhibit 3, p. 2, emphasis added.) The Declarations part of the

---

[1] Progressive paid $100,000 to the plaintiff. ACE set off the Progressive coverage amount against its $1,000,000 limits and tendered $900,000 to Kelly. Liberty consented to the plaintiff's acceptance of these tenders.

policy further states that "[t]hese Declarations and any Declaration Extension Schedules, together with the Coverage Form and any Endorsement(s) <u>complete this policy</u>." (Exhibit 3, p. 3, emphasis added.) <u>The policy specifically identifies the forms and endorsements included in the policy</u> and incorporates them by reference, stating "Forms and Endorsements attached to this policy: See Attached Schedule." (Exhibit 3, p. 3.) Immediately following the declarations pages is a two-paged Schedule of Forms and Endorsements which lists 22 separate forms, coverage extensions, limitations, exclusions and endorsements by their form number. (Exhibit 3, pp. 4-5.)

> Liberty's policy also specifies that:

> [t]his policy contains <u>all of the agreements</u> between you and us concerning the insurance afforded.  This policy's terms can be amended or <u>waived only by endorsement issued by us and made a part of this policy.</u>

(Exhibit 3, Coverage Form Section IV(15), p. 65, emphasis added.)

> Liberty's policy does not disclose any rejection of statutory UM coverage.  Nothing in the Liberty policy specifies or discloses that the named insured expressly rejected the uninsured motorist coverage otherwise mandated and automatically included in the policy under New Hampshire law. The policy does not include any rejection form or endorsement evidencing rejection of R.S.A. 264:15's UM coverage. The policy's "Schedule of Forms and Endorsements" does not list any rejection of coverage form or endorsement regarding the rejection of statutory UM coverage for New Hampshire. (Exhibit 3, pp. 4-5.)

> Discovery produced by Liberty shows that Brendan Kelly's claim for UM coverage was assigned to Liberty claims representative Joseph P. Covert at some point before August 5, 2014. (Exhibit 5, Email from Joseph Covert to Lisa Duetsch/Plum Creek dated August 5, 2014.) The rejection form was buried so deeply that Mr. Covert was unable to determine from the policy

itself whether statutory UM coverage had been rejected in writing; over five (5) weeks after

receiving notice of the plaintiff's claim, Mr. Covert was still in the process of working with

Liberty's internal underwriters "to confirm we obtained the appropriate rejection forms."

(Exhibit 6, email from Joseph Covert to ACE representative Paul E. Stuart, dated Sept. 15, 2014.)

### III.  Jurisdiction and Applicable Law

The Court's jurisdiction is based on diversity of citizenship under 28 U.S.C. §1332. In

diversity actions, the substantive law of New Hampshire applies to questions of statutory

construction and insurance contract interpretation. *See Hansen v. Sentry Ins. Co.*, 756 F.3d 53, 57

(1st Cir. 2014).

The plaintiff seeks declaratory judgment under R.S.A. 491:22-a. Pursuant to R.S.A.

491:22-c, the remedy of declaratory judgment is available in this Court to determine the coverage

of an insurance policy under R.S.A. 491:22 *et seq*. The insurer bears the burden of proving the

non-existence of coverage. R.S.A. 491:22-a; *Rivera v. Liberty Mutual Fire Ins. Co.*, 163 N.H.

603, 606 (2012); *EnergyNorth Nat. Gas, Inc. v. Century Indem. Co.*, 452 F.3d 44 (1st Cir. 2006).

### IV.  Argument

**A.     Liberty is not entitled to judgment as a matter of law and Liberty's policy must
provide the UM coverage mandated by R.S.A. 264:15 because (1) there are genuine
issues of material fact regarding the claimed rejection; (2)  the rejection form does
not fairly or properly notify insureds that statutory UM coverage was rejected; (3)
the policy's language misleads insureds into believing that there has been no
rejection; and (4) Liberty's submission of its UM rejection form to the New
Hampshire Insurance Department effectively admits that the rejection form should
have been included as part of the policy's language.**

> **(1)     Genuine issues of material fact about the validity of the purported rejection
> form preclude summary judgment in Liberty's favor.**

Summary judgment is not appropriate unless "there is no genuine dispute as to any

material fact and the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a).

The party moving for summary judgment bears the responsibility of demonstrating the absence of

a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986); *Libertarian*

*Party of New Hampshire v. Gardner*, 759 F. Supp. 2d 215, 220-21 (D.N.H. 2010), aff'd, 638 F.3d

6 (1st Cir. 2011).

 Liberty argues that it need not provide the UM coverage required by R.S.A. 264:15

because it had a signed rejection form <u>somewhere</u> in its underwriting file.

 As an initial matter, Liberty has not established that the form was actually signed by a

properly authorized representative of Plum Creek Timber Company, Inc. Courts considering the

validity of a rejection of UM coverage have looked for <u>specific evidence of authority</u> to determine

whether the individual purporting to reject UM coverage can validly do so when the named

insured is a corporation or legal entity. *See, e.g., Stinton v. Old Republic Ins. Co.*, No. C15-4019-

LTS, 2016 WL 521153 at *5 (N.D. Iowa Feb. 10, 2016)(court relied on testimony that vice

president was acting with corporation's express authority); *Bergeron v. Liberty Mutual Insurance*

*Co.*, 92 So.3d 645, 648 (La. 2012)(specific evidence that signing individual was authorized to

make insurance decisions for corporation and to accept or reject UM coverage). An employee

with the title of "risk manager" does not necessarily have the authority to decide to reject UM

coverage or to execute a UM rejection document on behalf of a business entity. *See, e.g.,*

*Dismormeaux v. Lalonde*, 578 So.2d 226, 230 (La. 1991). Thus, a purported rejection was held

invalid where the authority of the person signing the rejection form was not proven. *See Shirley v.*

*Centennial Ins. Co.*, 829 So. 2d 593, 596 (La. 2002).

 Here, it is Liberty's burden to prove that the rejection of UM coverage on which it bases

its claim was validly executed by a person with authority to reject UM coverage for Plum Creek. Liberty submits no evidence on that material fact question. The rejection form offered by Liberty is extreme in its brevity. On its face it does not identify any insurance policy number, a legible name of the person signing the form, or the position or authority under which the form is signed. There is no indication of the signor's relationship to the corporate entity for which the individual is signing, nor is there a certification or representation that the signor is authorized to act for the corporation. (Exhibit 7, Rejection Form.)

Liberty's only evidence on this fact question is an affidavit from Lisa Duetsch which states that she was employed at Plum Creek's "Manager, Risk & Insurance," and that she signed the rejection form in that capacity. (See Liberty's Exhibit C to Declaration of Lavinia M. Weizel, Esq.)  Lisa Deutsch does not state, and Liberty does not offer any evidence, that Lisa Deutsch was authorized by the corporation to make the decision to reject UM coverage or to sign a rejection form on Plum Creek's behalf. Indeed, <u>Liberty has offered no evidence at all</u> as to who was responsible for making the decision to reject statutory UM coverage and to save the $900 that it would have cost to provide Plum Creek's drivers in New Hampshire with the $5,000,000 worth of coverage for which Plum Creek insured itself.  Thus, Liberty has not established that the named insured validly rejected UM coverage, as required by R.S.A. 264:15.[2]

**(2)      Even if the rejection were deemed valid, the plaintiff is entitled to statutory UM coverage because Liberty hid the rejection from insureds, and the Liberty policy does not put insureds on notice that the coverage otherwise**

---

[2] The plaintiff sought discovery from Liberty, including the deposition of Lisa Duetsch, on the material issue of whether the decision to reject UM coverage was made and the form was signed by someone authorized to do so for Plum Creek. This Court stayed that discovery and the plaintiff has been prevented from developing any evidence on that issue. Regardless, it is Liberty's burden to prove the validity of the rejection on which it relies, and it has failed to do so.  As a result, this genuine issue of material fact precludes summary judgment in Liberty's favor.

**mandated by R.S.A. 264:15 was rejected.**

In its motion, Liberty argues that the plaintiff is trying to "create coverage" where none exists. Liberty also claims it was not required to attach a UM rejection form to its umbrella policy. Liberty would have this Court ignore the fact that it is the New Hampshire Legislature, by enacting R.S.A. 264:15, that "created" UM coverage in every auto liability policy in the first instance, and that the Legislature conditioned the exception from that coverage for umbrella policies only upon an express rejection "in writing."

Liberty's position would mean that umbrella insurers would be permitted to deprive insureds of R.S.A. 264:15's mandatory UM coverage while keeping the fact of rejection hidden from them, without indicating in the policy that the coverage was rejected, and without giving insureds any notice that the statutory coverage does not apply to them. This result is contrary to well-accepted principles of New Hampshire law, contrary to the purposes of R.S.A. 264:15, and contrary to an insurer's duty of good faith and fair dealing toward its insureds.

Examination of  New Hampshire R.S.A. 264:15 demonstrates the fallacy of Liberty's position. New Hampshire R.S.A. 264:15 automatically inserts UM coverage into every insurance policy that provides auto liability coverage for a vehicle registered or principally garaged in New Hampshire.  The statute also automatically grafts UM coverage into excess and umbrella policies "unless the named insured rejects such coverage in writing." R.S.A. 264:15. The goal of the statute is to broaden protection for insureds injured in accidents involving uninsured motorists. *Rivera v. Liberty Mut. Fire Ins. Co.*, 163 N.H. 603, 608 (2012). The protections of R.S.A. 264:15 are to be construed liberally in favor of insureds to accomplish its legislative purpose. Id. at 607.

The statute's requirement that a rejection be "in writing" to be effective becomes

meaningless in this situation where Liberty seeks to rely on a written rejection form it had hidden in its underwriting files, and which it failed to attach, incorporate, mention or disclose in the policy. Although the statute does not expressly require that the rejection form itself be attached to the policy, the statute conditions avoidance of mandatory UM coverage on the existence of that "writing." As a result, the "writing" requirement logically implies a requirement of documentary notice of rejection. The "writing" requirement would have no purpose in the statute if insureds under the policy, such as the plaintiff here, have no way to know that a writing exists or that the statutory coverage was rejected by document kept secret by the insurer.

The New Hampshire Legislature added the "in writing" requirement to the statute in 2007. S.B. 38 (2007 Sess.). During that legislative process, the Senate committee approving the amendment considered evidence that the "in writing" requirement was "crucial" so that "the insured shouldn't be made to believe they have coverage and then find out that they don't." *An Act Relative to Uninsured or Hit-and-Run Motor Vehicle Coverage: Hearing on S.B. 38 Before the Senate Committee on Commerce, Labor, and Consumer Protection*, 2007 Session (statement of Attorney Robert Hunt). The "writing" was seen as a way to "help people to know what their coverage is and, down the road if they have to demonstrate they'd have their coverage to have that writing available to demonstrate it." *Id*.

The purpose of R.S.A. 264:15 would be defeated if an insurer were allowed to hide any rejection of UM coverage from the policy's insureds and not include, incorporate, or reference such rejection in the umbrella policy. Otherwise, a non-named insured employee such as Brendan Kelly would not know, and indeed would have no way to know, if UM coverage for his work vehicle had been rejected. He would not know if his employer had insured itself to a far greater

extent than it had insured him. He would have no opportunity to obtain his own UM coverage to protect himself, or to refuse to drive a work vehicle that did not have UM coverage equivalent to its liability coverage. Moreover, a non-named insured would be not just be deprived of the protection of R.S.A. 264:15; he would be in a <u>worse</u> position because he would have no way to know whether the automatic UM coverage of R.S.A. 264:15 applied to him or not.

   The facts in this case illustrate the problematic result of Liberty's position. It is notable that after the plaintiff submitted his claim to Liberty, Liberty's own claims representative had difficulty determining that the required written rejection forms existed. Over five (5) weeks after receiving notice of the plaintiff's claim, Joseph Covert advised the underlying insurer, ACE, that he was still trying "to confirm we obtained the appropriate rejection forms." (Exhibit 7.)  It should not be difficult or impossible for an insured under the policy, and/or for an insurance company claims representative, to locate written proof in the policy if statutory UM coverage has been rejected. Reading the "in writing" provision in the statute to require written notice in the policy itself gives effect to the words and purpose of the statute. It increases clarity for insureds. It also prevents the unfair and illogical result urged by Liberty.

   If an insurer wants to exclude or limit coverage, it must do so through clear and unambiguous policy language. *Great Am. Dining, Inc.*, 164 N.H. at 623.  New Hampshire law does not allow insurers to mislead their insureds about what coverages their policies provide. The New Hampshire Supreme Court has repeatedly emphasized that the insurer controls the language of the insurance policy.  *See, e.g., Great Am. Dining, Inc. v. Philadelphia Indem. Ins. Co.*, 164 N.H. 612, 624 (2013);  *Coakley v. Maine Bonding & Cas. Co.*, 136 N.H. 402, 410 (1992).

   Even if Plum Creek submitted a validly authorized rejection form to Liberty, it was

11

Liberty's obligation to produce an umbrella policy that clearly and unambiguously disclosed to the policy's insureds that the statutory UM coverage had been rejected. Liberty could have written notice of the rejection into the policy in a variety of easy ways:  Liberty could have attached the rejection form to the policy; it could have attached an endorsement mentioning, describing or incorporating an express rejection of coverage pursuant to R.S.A. 264:15; it could have referenced the rejection of UM coverage on its declarations page. Liberty did none of these things. Instead, Liberty buried the rejection form in the depths of its underwriting files and produced a policy which gave the insureds no hint that UM coverage otherwise guaranteed under R.S.A. 264:15 had been rejected.

Liberty argues that the plaintiff seeks to impose additional language not found in R.S.A. 264:15. To the contrary, Liberty's reading of the statute would render the "rejection in writing" requirement meaningless, because it would result in an insured (and the insurer's own claims representatives) being unable to tell from the policy whether UM coverage was or was not rejected.  The requirement of a written rejection is also meaningless if, as here, an insurer need not reveal that rejection to the insured until after he submits a claim for UM coverage. However, the court should not adopt an interpretation that renders statutory language superfluous and irrelevant. *State v. Duran*, 158 N.H. 146, 155 (2008). Nor should the court interpret statutory language in a manner that would lead to an absurd result. *Id*.

Further, Liberty misconceives or misrepresents the plaintiff's position as arguing that the rejection of UM coverage under R.S.A. 264:15 "can only be effectuated by way of endorsement." (See Liberty's Memorandum of Law in Support of Motion for Summary Judgment, p. 15.)  The plaintiff has never argued, and does not argue now, that an endorsement is necessary to reject UM

12

coverage under R.S.A. 264:15. New Hampshire law requires that an insurer provide its insureds with a policy that clearly states what coverages are and are not afforded. If Liberty wants to avoid providing the UM coverage mandated by R.S.A. 254:15, then its policy must clearly and unambiguously notify the policy's insureds that the statutory coverage was affirmatively rejected. Whether an insurer does so by attaching the rejection form, a separate endorsement, or by some other means of specifically referencing or incorporating a written rejection of UM coverage, it is for Liberty to make that rejection plainly evident in the policy.

In sum, the plaintiff's reading of the "writing" requirement gives meaning to the statute's words, furthers the purpose of the statute, and gives effect to the long-standing requirement that insurers must clearly and unambiguously disclose the terms of coverage in their policies. The plaintiff's reading also makes common sense: an insured should be able to look at his insurance policy and know what coverage is and is not provided. If statutorily mandated UM coverage is to be excluded by written rejection, it makes sense that the fact of the written rejection required by R.S.A. 264:15 should be specifically evident from the policy itself. Consequently, R.S.A. 264:15 must be construed to mean that an insurer must attach or otherwise expressly disclose in the policy if UM coverage has been rejected under R.S.A. 264:15.

### (3)     Liberty's umbrella policy language is actively misleading because it affirmatively implies that there has not been a rejection of the UM coverage otherwise required by R.S.A. 264:15.

In relying on an external rejection form as the basis for denying statutory UM coverage to the plaintiff, Liberty also ignores the specific language of its own insurance policy. Liberty's umbrella policy is actively misleading because it affirmatively states that there are no outside agreements or documents varying the terms stated in the policy. The silence in the policy as to

13

any rejection of UM coverage, coupled with the guarantee that there are no outside documents affecting the policy, would reasonably lead an insured to believe that there is no "rejection in writing" and that the automatic UM coverage provided by R.S.A. 264:15 applied to him.

The interpretation of insurance policy language is a question of law. *Great Am. Ins. Co. v. Christy*, 164 N.H. 196, 200 (2012). The court's interpretation of an insurance policy must begin with an examination of the insurance policy's language. *Id.* The Court must read the policy "as would a reasonable person in the position of the insured based on a more than casual reading of the policy as a whole." *Bartlett v. Commerce Ins. Co.*, 167 N.H 521, 530 (2015).

An insurance policy is presumed to contain all the terms of the agreement for insurance and to be the final form of the parties' binding agreement unless the policy specifies otherwise. *See* 17A Couch on Ins. § 253:66 (3d ed.) "The liability of an insurer and the extent of the loss under a policy of liability... insurance must be determined, measured, and limited by the terms of the contract." *Stillman v. N. Am. Life & Cas. Co.*, 698 F. Supp. 13, 15 (D.N.H. 1988). Where the terms of a policy are clear and unambiguous, the court must give the policy's language its natural and ordinary meaning. *Bartlett v. Commerce Ins. Co.*, 167 N.H. at 531. The court does not need to examine the parties' reasonable expectations of coverage when a policy is clear and unambiguous; absent ambiguity, the court's search for the parties' intent is limited to the words of the policy. *Id.* Because the object of insurance is to provide protection to the insured and because the insurer controls the language in its policy, if there are ambiguities in the policy's language the court should construe the policy in favor of the insured. *Trombly v. Blue Cross Blue Shield of New Hampshire/Vermont*, 120 N.H. 764, 771 (1980).

Liberty's umbrella policy clearly and unambiguously defines its boundaries and states

14

where the policy terms are to be found. The Declarations page states "we agree with you to provide the insurance <u>as stated in this policy</u>." (Exhibit 3, p. Declarations, page 2, emphasis added.) The Declarations part of the policy further states that "[t]hese Declarations and any Declaration Extension Schedules, together with the Coverage Form and any Endorsement(s) <u>complete this policy</u>." (Exhibit 3, p. 3, emphasis added.)  The policy specifically identifies the forms and endorsements included in the policy and incorporates them by reference: "Forms and Endorsements attached to this policy: See Attached Schedule." (Exhibit 3, p. 3.) An attached Schedule of Forms and Endorsements lists 22 separate forms, coverage extensions, limitations, exclusions and endorsements by their form number. (Exhibit 3, pp. 4-5.)  None of those forms or endorsements reflect an express written rejection of statutory UM coverage.

The Liberty policy further provides:

> [t]his policy contains <u>all of the agreements</u> between you and us concerning the insurance afforded.  This policy's terms can be amended or <u>waived only by endorsement issued by us and made a part of this policy.</u>

(Exhibit 3, Coverage Form Section IV(15), p. 65, emphasis added.)

Liberty's express policy terms prevent the application for insurance[3] and any associated documents, such as rejection forms, from being considered as part of the insurance contract. As a result of Liberty's clear and unambiguous language, a reasonable person in the position of the

---

[3] In New Hampshire, applications are not automatically made part of liability insurance policies. By statute, applications for life insurance are made a part of life insurance contracts. R.S.A. 408:9. No such provisions apply to motor vehicle or liability insurance contracts. To the extent that New Hampshire courts have held that an application is part of a liability policy, they have done so because the application was attached to the policy or because the policy expressly incorporated the application by reference. *See, e.g.*, *U.S. Fid. & Guar. Co. v. Snierson*, 91 N.H. 363 (1941). If an insurer intends to make the application part of the contract, it must clearly express that intention in the contract, and any doubt is resolved against inclusion of the application. 72 Couch on Insurance §18:1 (3d ed.); *see also* 616 Williston on Contracts §49:41 (4th ed.)(Failure to attach application to policy precludes insurer from asserting defenses based on the application.)

insured reading the policy would understand that no extrinsic documents affect or vary the policy's terms.

Every person is presumed to know the law. *See e.g., Lennartz v. Oak Point Associates, P.A.*, 167 N.H. 459, 463 (2015); *Bennett v. Town of Hampstead*, 157 N.H. 477, 485 (2008). As a result, a reasonable person in the position of the insured would know that UM coverage is automatically provided in any umbrella policy providing auto liability coverage <u>unless</u> there is a rejection in writing.  A reasonable person would see that this umbrella policy does not include a rejection form or an endorsement reflecting the rejection of statutory UM coverage. He would find no reference whatsoever to the rejection of the coverage otherwise mandated by R.S.A. 264:15.  In addition, he would see that the policy "contains all of the agreements" concerning the insurance afforded, and he would know that there are no extrinsic documents affecting the policy's coverage. Even if a reasonable person were looking to find out whether statutory UM coverage had been rejected, a reasonable person in the position of the insured would find no evidence of rejection, and would be led to believe that there is no written rejection outside of the policy, either.[4]

Liberty's failure to attach or reference the rejection, along with Liberty's promise that the policy's terms are contained within its four corners, lead a reasonable person to believe that R.S.A. 264:15 applies to provide UM coverage. Given that Liberty itself defined the terms of this policy, Liberty must be bound by its unambiguous policy language which limits the terms of coverage to those stated in the policy. It cannot now rely on a document outside of the policy to

---

[4] See Liberty's claim adjuster's struggle in so doing at p. 6, *supra*, and Exhibit 6.

vary the policy's coverage.

> **(4)    Liberty's submission of the UM rejection form to the New Hampshire Insurance Department constitutes an admission that the form should have been attached to the insurance policy.**

Liberty argues that the New Hampshire Insurance Department approved its UM Rejection Form, and that somehow approval of that blank document proves that Liberty's use of the form in this case complies with New Hampshire law. Neither the facts nor insurance law support Liberty's leap in logic.

R.S.A. 412:5, applicable to forms for property and casualty insurance, requires that "every insurer ... shall file policy forms, endorsements, and other contract language" with the New Hampshire Insurance Department. R.S.A. 412:5(I)(emphasis added). The specific language of that statute, especially the use of the words "and other contract language," shows that it was designed to have the Insurance Department review and ultimately approve forms, endorsements and language that are intended to go to insurance consumers as part of a submitting insurer's insurance policy. The submissions and approvals are required to achieve several purposes, among them the protection of the public and policyholders from misleading policy language and practices, and from policy provisions that are inconsistent with public policy. R.S.A. 412:1. By its express terms, the statute does not require submission or approval of forms which will not be part of the insurance policy. As a result, submission of a form to the Insurance Department tells the Department that the insurer intends the form to be part of "the contract's language." See R.S.A. 412:5(I).

Liberty admits that it submitted its UM rejection form to the New Hampshire Insurance Department as part of its submission of its entire commercial umbrella policy form. (See Liberty's

Memorandum of Law in Support of Motion for Summary Judgment, p. 12.) This judicial

admission is confirmed by Liberty's listing of the UM rejection form among all of the policy

forms submitted to the New Hampshire Insurance Department as Liberty's "new Commercial

Umbrella Product." (Exhibit 8, Liberty's Index of Forms Submitted to New Hampshire Insurance

Department.)

      Given the language of R.S.A. 412:5, Liberty's submission of the UM rejection form to the

New Hampshire Insurance Department <u>constituted Liberty's representation to the department that</u>

<u>it intended to use the form as part of "the contract's language.</u>" It also constitutes Liberty's

admission here that the rejection form should have been part of the umbrella policy.

      The New Hampshire Insurance Department's approval of the blank form means at most

that the Insurance Department approved of Liberty's use of that rejection form <u>as part of the</u>

<u>insurance policy</u>. Approval of the blank UM rejection form, standing alone, says nothing about

the propriety or legitimacy of Liberty's failure to include or reference the form in its policy, its

hiding the form in its closed underwriting file, and its reliance on the form to deny UM coverage

while keeping the existence of the form secret from insureds under the policy. (Exhibit 9,

Affidavit of Melinda Gehris, Esq.)

      Liberty's failure to disclose a rejection of UM coverage in its policy is misleading, unfair

to the insureds under the policy, inconsistent with the purposes of R.S.A. 264:15, and inconsistent

with its own conduct before the New Hampshire Insurance Department. Simply put, Liberty's

attempt to rely on a form outside of the policy's four corners to vary the policy's coverage

contradicts its own plain and unambiguous policy language. Under these circumstances, Liberty

should not be permitted to use that hidden rejection to avoid the automatic UM coverage provided

by R.S.A. 264:15.

**B.    The "auto coverages" exclusion in Liberty's policy does not clearly and unambiguously eliminate UM coverage.  In fact, it extends UM coverage by making its auto coverage parallel to that provided in the underlying policy.**

> **(1)    Liberty relies on "general exclusionary" language in its policy to support its argument that it need not provide UM coverage to the plaintiff.**

Again, Liberty glosses over fundamental principles of insurance policy construction and would have this court reach a result which is not supported by New Hampshire law or by the plain language of its own policy.

Liberty's policy includes an exclusion for "Auto Coverages" which contains two sub-parts. Exclusion 2(f) provides that the policy's insurance does not apply to:

> Auto Coverages
>
> (1) "Bodily injury" or "property damage" arising out of the ownership, maintenance, use or entrustment to others (including in the supervision, hiring, employment, training, or monitoring of others by the insured) of any "auto". Use includes operation and "loading or unloading." This exclusion does not apply, however, if the "bodily injury" or "property damage" is covered by "underlying insurance." Coverage provided will follow the terms, definitions, conditions, and exclusions of underlying insurance, subject to the policy period, limits of insurance, premium and all others terms, definitions, conditions and exclusions of this policy, except that the coverage provided will be no broader than the coverage provided by "underlying insurance."
>
> (2) Any loss, cost or expense payable under or resulting from a first party physical damage coverage, no-fault law, personal injury protection or auto medical payments coverage, or uninsured or underinsured motorist law, except to the extent coverage is specifically provided by endorsement to this policy.

(Exhibit 3, p. 46, emphasis added.)

Liberty argues that this exclusion breaks out two separate categories of automobile exposures, with section 2f(1) pertaining to third-party claims, and section 2f(2) pertaining to first

party claims, and that both operate to exclude UM coverage for the plaintiff.  Liberty's position is not consistent with the exclusions' language or with R.S.A. 264:15.

First, the terms "first-party" and "third party" claims are not defined or explained anywhere in the Liberty policy. Where terms are not defined in the policy, the Court must construe them in context, in the light of "what a more than casual reading of the policy would reveal to an ordinarily intelligent insured." *Mellin v. N. Sec. Ins. Co., Inc*., 167 N.H. 544, 547 (2015).  Moreover, any exclusion of coverage must be stated in language "so clear... as to create no ambiguity that might affect the insured's reasonable expectations." *Attorneys Liab. Prot. Soc'y, Inc. v. Whittington Law Associates, PLLC,* 961 F. Supp.2d 367, 372 (D.N.H. 2013), appeal dismissed (Sept. 18, 2013), *quoting Progressive N. Ins. Co. v. Concord Gen. Mut. Ins. Co.*, 151 N.H. 649, 653 (2005).

Liberty's general exclusionary provisions must be read in the context of the entire policy. As discussed above, a reasonable person of ordinary intelligence reading the Liberty policy would have no reason to know whether statutory UM coverage had been rejected, and would have reason to believe from Liberty's express language that no such rejection of UM coverage existed outside of the four corners of the policy. As a result, the policy must be read as if it includes the automatic UM coverage grafted onto the policy by R.S.A. 264:15 in the absence of a written rejection.

**(2)      Section 2(f)(1) of the policy provides UM coverage because it specifically "provides" coverage to follow the auto coverages in the underlying ACE policy.**

Liberty's interpretation of section 2f(1) is not supported by that paragraph's language. Nothing within section 2f(1) limits its applicability to "third-party claims." Moreover, even though Liberty's insuring agreement provides that it will pay sums "that the insured becomes

20

legally obligated to pay as damages," the operation of R.S.A. 264:15 extends Liberty's obligation to include payment of sums that the insured would otherwise recover from an uninsured or underinsured tortfeasor. The operation of R.S.A. 264:15 automatically converts the Liberty policy to one which provides both third party and first party coverage.

Section 2f(1) incorporates the auto coverages in the underlying ACE policy. While purporting to exclude claims for bodily injury and property damage resulting from certain uses of "any auto," the section then excepts from that exclusion bodily injury and property damage "covered by underlying insurance." This language does not just carve out an exception to its exclusion; it expressly states that it "provides coverage" and tells an ordinary insured that the auto coverages afforded by the ACE policy are also provided by the Liberty policy. Because the ACE policy expressly provides liability and UM coverage, and because nothing in section 2 f(1) limits that incorporation third party or liability claims only, a reasonable person of ordinary intelligence would believe that Liberty's policy incorporates the UM coverage provided by the ACE UM coverage endorsement. (See Exhibit 4.) This interpretation of section 2 f(1) is supported by the section's last provision, that "the coverage provided will be no broader than the coverage provided by 'underlying insurance'." A reasonable insured would understand this language to mean that Subsection 2(f)(1) affirmatively provides the same breadth of auto coverages as provided in the ACE policy. Contrary to Liberty's argument, there is no language in section 2 f(1) which limits the incorporation of ACE's underlying coverage to liability coverage only.

Even if statutory UM coverage was deemed to have been validly and effectively rejected within the terms of R.S.A. 264:15, section 2 f(1) provides an independent source of UM coverage to the plaintiff. By defining the "coverage provided" to "follow the terms, definitions, conditions,

21

and exclusions of 'underlying insurance'," Liberty <u>expands</u> the breadth of its coverage obligation to that of the underlying ACE policy, which provides coverage for both auto liability and UM claims. This construction is confirmed by the fact that Liberty goes on to specify that "coverage provided will be no broader than the coverage provided by 'underlying insurance.'"

        **(3)      Section 2(f)(2) contravenes R.S.A. 264:15 and is void.**

Insurers may limit their liability through policy exclusions provided that the exclusion does not violate a statutory provision. *Rivera v. Liberty Mut. Fire Ins. Co.*, 163 N.H. 603, 606, (2012). An exclusion that eliminates UM coverage in violation of R.S.A. 264:15 is void. *Id.*; *Merchants Mut. Ins. Grp. v. Orthopedic Prof'l Ass'n*, 124 N.H. 648, 653 (1984)(overruled on other grounds).

Exclusion 2f(2) in Liberty's policy directly contravenes R.S.A. 264:15. The exclusion seeks to eliminate coverage for "any loss, cost or expense payable under or resulting from ... [an] uninsured or underinsured motorist law." Unfortunately for Liberty, R.S.A. 264:15 does not permit a general exclusion of UM coverage, even in excess or umbrella policies. In addition, contrary to R.S.A. 264:15 Liberty's section 2f(2) would eliminate UM coverage even without an express written rejection of UM coverage. Because this section directly contradicts R.S.A. 264:15, it is void in New Hampshire.

## V.  <u>Conclusion</u>

Liberty is not entitled to summary judgment. A genuine issue of material fact exists as to whether the rejection form on which Liberty relies was entered into by an individual authorized to reject statutory coverage, and authorized to execute such a form on behalf of Plum Creek.

Second, as a matter of law, the operation of R.S.A. 264:15 and Liberty's clear and

unambiguous policy language require that Liberty provide UM coverage to Brendan Kelly. From the vantage point of a reasonable person in Brendan Kelly's position, nothing in the Liberty policy gives notice that the UM coverage mandated by statute has been rejected. Because of Liberty's failure to attach, incorporate, or refer to a rejection of the UM coverage otherwise mandated by R.S.A. 264:15, Liberty's umbrella policy was misleading as to Kelly. Liberty cannot rely on a document outside of the policy to deny UM coverage when the rejection of UM coverage was not included in the policy, was unknown to the plaintiff, and when Liberty's own language precludes consideration of materials outside of the policy.

Third, for the Court to hold otherwise would defeat the purpose of R.S.A. 264:15 and would contradict the long-standing requirement that insurance policies must clearly and unambiguously disclose what coverage is and is not provided. Liberty should not be permitted to avoid statutory coverage by secretly holding a rejection in its closed files, to reveal to an insured only after a claim for UM coverage is made. That unfair and misleading result cannot be the result intended by the New Hampshire legislature and should not be endorsed by this Court.

For all the reasons set forth in this Memorandum of Law, and in his Objection to Liberty's Motion for Summary Judgment, Liberty's Motion for Summary Judgment should be denied.

Respectfully submitted,
Brendan Kelly
By his attorneys,
THE STEIN LAW FIRM, PLLC

June 20, 2016                                      /s/:Robert A. Stein
                                                      NH Bar #2438
                                                      PO Box 2159
                                                      Concord NH 03302-2159
                                                      (603) 228-1109
                                                      rstein@steinlawpllc.com


                                                  /s/:Diane Perin Hock
                                                      NH Bar #1999
                                                      PO Box 2159
                                                      Concord NH 03302-2159
                                                      (603) 228-1109
                                                      dphock@comcast.net