UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE


\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*
                                 \*
BRENDAN KELLY                     \*
                                 \*   15-CV-234-JL
                v.            \*   March 23, 2017
                                 \*   2:00 p.m.
LIBERTY INSURANCE CORPORATION,   \*
D/B/A LIBERTY MUTUAL         \*
                                 \*
\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*


TRANSCRIPT OF MOTIONS HEARING
BEFORE THE HONORABLE JOSEPH N. LAPLANTE


APPEARANCES:


For the Plaintiff:         Robert A. Stein, Esq.
                         The Stein Law Firm, PLLC


For the Defendant:         John B. Schulte, Esq.
                         Schulte Law Office


                         Nancy D. Adams, Esq.
                         Lavinia M. Weizel, Esq.
                         Mintz Levin


Court Reporter:            Susan M. Bateman, LCR, RPR, CRR
                         Official Court Reporter
                         United States District Court
                         55 Pleasant Street
                         Concord, NH 03301
                         (603) 225-1453

1                   P R O C E E D I N G S

2              THE CLERK:  The Court has before it for

3    consideration today motion hearing in civil case

4    number 15-CV-234-JL, Kelly versus Liberty Insurance

5    Corporation.

6              THE COURT:  Okay.  We're here on cross-motions for

7    summary judgment that we've had some pretty extensive

8    briefing on and some extra discovery, and of course I've read

9    your arguments and I'm prepared to hear your -- I've read

10   your submissions, I mean, and I'm prepared to hear your

11   arguments today.

12             Why doesn't everybody identify themselves for the

13   record and we'll proceed.

14             MR. SCHULTE:  John Schulte for Liberty Mutual

15   Insurance Company.

16             MS. WEIZEL:  Lavinia Weizel for Liberty Mutual

17   Insurance Company.

18             MS. ADAMS:  Nancy Adams for Liberty.

19             MR. STEIN:  Bob Stein for the plaintiff, Brendan

20   Kelly.

21             THE COURT:  There are cross-motions.  I'm happy to

22   proceed however you want.

23             MR. STEIN:  It matters not to me, Judge.  Whatever

24   is convenient for the Court.

25             THE COURT:  All right.  I guess I'll hear from

1   Liberty first.

2           MS. ADAMS:  Sure.

3           Your Honor, we moved for summary judgment.  You

4   will recall we had previously filed a motion under Rule

5   12(c).

6           THE COURT:  Yes.

7           MS. ADAMS:  This is a situation in which the

8   plaintiff was involved in a motor vehicle accident.

9   Following the accident the plaintiff obtained an underinsured

10  payment from the primary carrier, ACE, in the amount of

11  $1 million, and then it asserted a claim against Liberty, an

12  umbrella policy for effectively excess UM coverage, and as we

13  set forth in our brief --

14          THE COURT:  So ACE has paid 900 already, right?

15          MS. ADAMS:  Right.  That's right.

16          THE COURT:  And somebody else paid a hundred?

17          MS. ADAMS:  The liability, right.

18          THE COURT:  All right.

19          MS. ADAMS:  So as we've explained in the brief and

20  we've discussed with your Honor before, this is a situation

21  where the umbrella policy does not afford coverage, and we

22  know it does not afford coverage for two reasons.

23          The first is the insuring agreement.  In the

24  insuring agreement itself it provides that Liberty will pay

25  for damages that the insured, which Mr. Kelly would be an

insured, becomes legally obligated to pay because of bodily

injury or property damage.

The whole concept of being legally obligated to pay

is a third-party claim.  The policy does not afford

first-party coverage.  Cases around the country that have

addressed this issue where an individual such as the

plaintiff had sought UM coverage under an umbrella policy

have uniformly held that UM coverage is outside the scope of

an umbrella policy because the whole purpose of it is to

provide third-party or liability coverage.

The second reason is there's a specific exclusion

on the policy.  Again, this is an umbrella policy, which is

slightly different than excess.  The way we kind of look at

it is we think of an umbrella, and so sometimes it can drop

down effectively and provide primary coverage.

Because of that there's an auto exclusion.  Liberty

did not want to insure at first dollar one an auto exposure.

So this policy includes at exclusion F something that

would -- the provision that would exclude the auto risk, and

it has two paragraphs which we talk about in our briefs.

The first applies to third-party claims.  It's

talking about how we won't provide a coverage of bodily

injury, again property damage, unless the underlying

insured's policy provides it, that being ACE.  And if that's

the case, it will provide coverage but only in an excess

1    right on top of the ACE policy.  So explaining that it

2    doesn't provide umbrella coverage.

3              And then, secondly, we have the specific exclusion

4    for UM claims, but that second paragraph deals with all of

5    the different types of first-party exposure, be it

6    comprehensive or collision.  And we know that paragraph 1

7    only applies to third-party claims.  Again, because it

8    references the BIPD concept.  But we also know because the

9    exclusion itself cannot through a carveout or through an

10   exception create coverage that's broader than the policy to

11   begin with.  And because the policy to begin with is a

12   liability policy it is not a first-party policy.  We know

13   that the exclusion at paragraph 1 is only referencing

14   third-party type claims, which is not what the plaintiff is

15   asserting here against Liberty.

16             A case that is very helpful on this and has some

17   very good language explaining this is a Second Circuit case

18   in which they explained that the nature of liability

19   insurance is too well-settled to permit quibbling about the

20   difference between a first-party claim and third-party claim.

21             A third-party claim where the insured is legally

22   obligated to pay, as opposed to a first-party claim where the

23   insured himself or herself is injured, be it a UM claim, be

24   it a house fire, where you're trying to get compensation for

25   your lost house or your goods or your personal items, those

1  are all first-party claims and we know that this policy would

2  not provide coverage for that.

3          The Second Circuit case in <u>Mazzaferro</u> continues

4  that, "Liability insurance is designed to protect an insured

5  from claims for damages owed by a third person."  Again, this

6  liability concept.

7          The distinction between liability insurance and UM

8  coverage is clear and well recognized and then holds that

9  under an umbrella policy, such as one that Liberty Mutual

10  issued to Plum Creek, there is no coverage for UM claims.

11          The policy itself is very clear on that.  The issue

12  really that's before the Court is whether or not because of

13  the UM statute in New Hampshire --

14          THE COURT:  Whether Plum Creek decline UM.

15          MS. ADAMS:  Exactly.

16          THE COURT:  I didn't mean to cut you off.

17          MS. ADAMS:  That's fine.  Yes, they declined

18  coverage.

19          THE COURT:  Okay.

20          MS. ADAMS:  And what we've submitted to you were

21  five different affidavits.

22          The first affidavit we submitted to you was from

23  Lisa Duetsch.  She's the risk manager.  She worked at Plum

24  Creek from 2005 to actually 2015 when she left and moved to

25  Bozeman, Montana.

1          After a conference with the Court additional

2    discovery was done.  We submitted two additional affidavits

3    of Lisa Duetsch, supplemental affidavits, where she said I

4    was delegated the authority to reject UM coverage, I intended

5    to reject UM coverage, and I was delegated that authority

6    by --

7          I'm sorry.  I'll slow down.

8          THE COURT:  Let me ask Mr. Stein something about

9    this.

10         MS. ADAMS:  Yes.

11         THE COURT:  At the end of the day do you dispute

12   actual authority on her part?

13         MR. STEIN:  The answer is, and I hate to be this

14   way, an equivocal yes.  I dispute in the sense our

15   supplemental pleadings, which I don't want to get into, show

16   why Lisa Duetsch and Kent Jones, the affiants, don't

17   satisfy --

18         THE COURT:  I actually accept that argument.  Okay.

19   You stand by it is the bottom line.

20         MR. STEIN:  Correct.

21         THE COURT:  And you also dispute -- you're also not

22   agreeing to apparent authority?

23         MR. STEIN:  Correct.

24         THE COURT:  Okay.

25         Continue then because I want to hear your argument.

1          MS. ADAMS:   Sure.

2          So with respect to Lisa Duetsch -- so she has

3    provided an affidavit saying it was me, I signed the

4    rejection form.  She has then said I had authority to sign it

5    from Kent Jones.  He was my supervisor.  He was the director

6    of accounting and risk manager.  We had a discussion about

7    this and he instructed me to reject UM coverage, and I knew

8    it was in Plum Creek's interest to reject UM coverage because

9    they were already providing Workers' Comp. insurance for the

10   plaintiff.

11          And so as Hermes explains, a well-known treatise in

12   the insurance industry, it is not unusual for a corporation

13   such as Plum Creek to reject the UM coverage.

14          We then had a second set of affidavits that were

15   submitted to your Honor from Kent Jones, who was the director

16   of accounting, who said I got my authority from David Brown.

17   He is an officer of the corporation and I'm in charge of

18   insurance, and so I delegated my authority to Lisa Deutsche.

19          Then after we submitted those Mr. Stein submitted a

20   series of questions to us.  We then answered the questions.

21   Those were provided to your Honor in the form of affidavits

22   enclosing ten delegations of authority from 2005 all the way

23   to the present saying, here's the authority, Lisa, this is

24   what I want you to do.  And if Lisa Deutsche had not rejected

25   UM coverage, then it would have -- she would not have been

1   doing what she had been instructed to do, and it would have

2   been a poor performance.

3        He knew that she was rejecting it because when he

4   was seeing the premium page and the declarations page he

5   wasn't seeing any corresponding premium for UM coverage.  So

6   he knew that she was doing what she was supposed to do.

7        So the question is do these affidavits satisfy the

8   apparent authority, and under the law the answer to that is

9   absolutely unequivocally yes.

10       The burden is to show that there is some sort of

11  agency.  Under the Restatement it can be employer/employee.

12  It can be apparent authority, which we've shown.

13       Your Honor was concerned that someone couldn't say

14  for themselves that they had authority.  I will say that one

15  of your colleagues of the northern district disagrees with

16  that, and with an affidavit of Michael Luck (ph.), and that's

17  in the Stinson case, he said I had authority to do it, I

18  rejected it, and the Court found that that was sufficient on

19  the authority front.

20       Two of the cases cited by Mr. Stein, one of them

21  has an affidavit from the risk manager similar to what we

22  have here, which is Mr. Jones, as well as a second affidavit,

23  saying we wanted to reject it, I had authority to reject it,

24  and I did.

25       In addition, in the Bouffard case, which is the one

1    that started actually down this road, the Court likewise

2    found that there was enough evidence that had been presented

3    to show that there was authority.

4              THE COURT:  I don't have any -- I don't really

5    quibble with the fact that if you present this to a jury the

6    jury is probably going to find apparent authority.  It looks

7    that way to me.

8              The question becomes is it -- you know, is it --

9    are there no disputes to the point that it is -- you're

10   entitled to judgment as a matter of law?  I'm just not even

11   sure, and it's mostly because in 99 percent of the situations

12   like this, let's face it, the plaintiff would say -- yeah,

13   we're not going to argue that question anymore.  Mr. Stein is

14   not in that category.

15             MR. STEIN:  Thanks a lot, Judge.

16             THE COURT:  Well, the same goes for the actual

17   authority.  I mean it looks an awful lot like actual

18   authority, but making that -- I think he correctly points out

19   that when you're talking about corporate authority you've got

20   to go right back to how the board issues authority to which

21   officers and from those officers to the actual agent

22   declining the coverage.  You go a long way.  You just don't

23   get all of the way there.

24             MS. ADAMS:  Your Honor, I would respectfully

25   disagree that that is what is required under the statute and

1    that is what would be required in the insurance industry.

2           So we have two affidavits that have been provided

3    to you.  One which says I had authority to do this and I did

4    it.  A second from the person who gave the authority saying

5    she had the authority.  I got it from an officer of the

6    corporation, and here's the delegation.

7           That is sufficient to satisfy Liberty's burden.

8           THE COURT:  Under the statute?

9           MS. ADAMS:  Under agency law under New Hampshire

10   that is sufficient to satisfy --

11          THE COURT:  What statute are you talking about?

12          MS. ADAMS:  Well, there's the New Hampshire

13   statute.  But when New Hampshire looks at the concept of

14   agency it applies common law principles of agency under the

15   Restatement.

16          THE COURT:  Okay.  Absolutely.

17          MS. ADAMS:  So I would respectfully suggest that we

18   have demonstrated and satisfied our burden that there is

19   apparent authority which is consistent with what you said,

20   that a jury might find that.

21          THE COURT:  You're shifting gears.  I thought you

22   were telling me that under the statute there's actual

23   authority.  You said apparent.  There's a difference, of

24   course.

25          Here's what I'm asking you.  You give me lots of

1    delegations which I don't have any reason to question, but

2    then you get to the officer.  You said officer of the

3    corporation.

4          Now, the way I understand corporation law, that

5    officer may very well have had the authority to delegate

6    this power to decline coverage all the way down the chain,

7    all of the way to Ms. Duetsch, but that has to be set forth

8    somewhere in the bylaws generally.  Maybe it is in this

9    company.  I don't know.  I sense you probably would have

10   given it to me if you could find it, but you haven't.

11         MS. ADAMS:  Your Honor, when you're talking about a

12   company under corporate law, the notion that you would

13   delegate down, you have the authority to buy pens, paper, to

14   buy insurance.  What's fascinating and ironic about this

15   case, which Bouffard talks about, is that Mr. Stein, or the

16   plaintiff, they don't dispute that Ms. Duetsch and Mr. Jones

17   had the authority to buy the insurance in the first place,

18   right?  They would agree that they had the authority to buy

19   it.  They're now saying that they don't have apparently the

20   ability to reject it.

21         So the point is that under an apparent --

22         THE COURT:  I'm not sure if he did have the

23   authority to buy it.  He just doesn't happen to contest the

24   fact that they did.

25         MS. ADAMS:  Well, if they don't have the authority

1   to reject it, they don't have the authority to buy it in the

2   first instance.

3          THE COURT:  You might be right.

4          MS. ADAMS:  And that's what Bouffard talks about.

5   So when you look at apparent authority, I suggest that we

6   have submitted to the Court sufficient evidence to meet that

7   standard consistent with what other courts have done around

8   the country.

9          THE COURT:  Yeah.

10         MS. ADAMS:  And when you get then to implied

11  authority, or even apparent authority, we have Lisa Duetsch

12  dealing with a broker at Aon who they are working with and

13  negotiating the insurance policy.  Aon has been working with

14  Liberty.  From Liberty's view they certainly have apparent

15  authority to be moving forward with the insurance.

16         If you were to create a situation where your Honor

17  would say that for any insurance policy issued in New

18  Hampshire we have to have a board resolution or we have to

19  have some sort of a resolution coming from the board that

20  says that this individual has --

21         THE COURT:  No, no.  But there does have to be --

22  the officer that starts the delegation chain, right,

23  generally has to have authority over the subject matter area

24  for the corporation.

25         MS. ADAMS:  Right.  So the person who did this was

1     the chief of accounting who gave -- the authority was given.

2           THE COURT:  Isn't there a job description of -- I

3     guess -- my guess is -- I only serve on nonprofits.  I've

4     seen some bylaws for nonprofits, but I've seen some bylaws

5     for corporations.  Generally all those top officers have a

6     job description under the bylaws, and it's fairly clear from

7     that where it proceeds, in which directions.  You haven't

8     shown me that in this case.

9           Look, don't get me wrong.  I get that by every

10    indication, every available indication, it looks like there's

11    authority here, actual and apparent it looks like.  That's

12    why I don't have much doubt at all any trier of fact would

13    find in your favor.

14          I just -- and usually in a situation like this

15    you're going to have the other side saying, look, we concede

16    the issue.  You don't have it here.

17          MS. ADAMS:  No, I appreciate that.

18          Your Honor, we have put forward -- it's our

19    position, as I know you've heard me say, that we have

20    satisfied the initial burden on this and all the plaintiff is

21    doing is speculating and there's no evidence that's

22    contradicting --

23          THE COURT:  When you say the initial burden -- what

24    do you mean by that, the initial burden?

25          MS. ADAMS:  Well, what I mean is the Court in State

1    <u>Farm versus Bouffard</u> found that the carrier had the burden to

2    demonstrate the agency, and I would suggest that the five

3    affidavits we've submitted to your Honor satisfy that.

4              THE COURT:  So you're saying you satisfied your

5    burden.  Okay.

6              MS. ADAMS:  And it's consistent with what other

7    courts have done around the country.

8              THE COURT:  Understood.  Okay.  That's on the issue

9    of agency.  I'll talk to Mr. Stein about agency and then

10   we'll get to -- we've got a statutory argument and we've got

11   a contract argument, right?  We've got a policy argument.

12             Okay.  So agency.

13             MR. STEIN:  Well, Judge, frankly I think the papers

14   on both sides lay out everybody's positions.

15             THE COURT:  They do.

16             MR. STEIN:  And I don't want to spend a lot of time

17   on it except to say that I believe the case law and your

18   Honor's suggestions require the moving party to come up with

19   a bylaw, to come up with something that shows that Mr. Jones

20   had the responsibility to do what he did and delegate it to

21   Ms. Duetsch.

22             THE COURT:  Or somebody did that gave it to Mr.

23   Jones.

24             MR. STEIN:  Either way.

25             THE COURT:  Well, let me ask you this.  You've been

1 | in a few courtrooms in your life.

2 |       MR. STEIN:  Right.

3 |       THE COURT:  Can you imagine a trier of fact in this

4 | case who wouldn't find that Ms. Duetsch had the authority

5 | based on delegations that go pretty far up the chain here?  I

6 | mean, it looks like the defendant has crossed all the t's and

7 | dotted all the i's within their power.  And if they presented

8 | that to a jury, even if it's not as a matter of law, can you

9 | imagine a jury not finding authority?

10 |       MR. STEIN:  I'm going to be facetious for a second.

11 | Who knows what juries would find because there's other

12 | evidence involved.

13 |       It's not the strongest piece of what we have.  The

14 | strongest piece of what we have is that the alleged rejection

15 | form doesn't show up anywhere.  That's the strongest piece.

16 |       So if she has authority delegated by Mr. Jones,

17 | it's unclear how that --

18 |       THE COURT:  That she exercised it.

19 |       MR. STEIN:  Exactly.  So that answers the authority

20 | question.  I really think that is the tail, frankly, that

21 | wags the dog.

22 |       But if I can proceed just a tad, I must disagree

23 | with my colleague.  The starting point here is the statute

24 | involved, and if I can have the --

25 |       THE COURT:  You want to talk about the statute?

1          I'll let him go first on the statute and then you

2     can respond.

3          MS. ADAMS:  Okay.

4          MR. STEIN:  I have this wonderful PowerPoint.

5          THE COURT:  He doesn't want to talk about authority

6     very much.  I understand.  It's your burden.

7          MR. STEIN:  It's part of my '60s thing.  I just

8     don't like authority, with all respect to the Court.  No, I'm

9     just kidding.

10         THE COURT:  You have a presentation you want me to

11    look at?

12         MR. STEIN:  The answer is yes.  The statute is what

13    I want to pop up.  I am not going to bore you.  I have a

14    complete PowerPoint which I'm not -- repeat not -- going to

15    walk through or bore you with, but I hope to leave for you as

16    my memoranda of law, if you will.

17         THE COURT:  You refer to it as much as you like.

18    I'm happy to see whatever you want to present.

19         MR. STEIN:  Very good.

20         I want to start with the claim that Ms. Adams made

21    right at the beginning, that there's this distinction, and

22    there is of course a distinction between an umbrella and an

23    excess policy, but the New Hampshire Legislature doesn't

24    appear to care.

25         And so under RSA 264:14, the New Hampshire

1    Legislature, and it's now up on the board, is quite clear in

2    its use of language that for the purpose of the paragraph,

3    264:14, and I'm quoting, "Umbrella or excess policies shall

4    also provide uninsured motorist coverage equal to the limits

5    of liability purchased unless the named insured rejects such

6    coverage in writing."

7            So in terms of the distinction between the two, New

8    Hampshire law doesn't care, it just doesn't care, because the

9    mandatory requirement of 264:14 uses both types of policies.

10           So that's where we start.  But ultimately, Judge,

11   ultimately, the case involves a matter of perspective.

12           We have three choices.  What a reasonable insured

13   would look at.  We have sophisticated lawyers representing

14   Liberty parsing the statute.  But quite frankly I think far

15   more important than anything is the Insurance Commission, and

16   from their perspective Liberty represented to them in

17   applying for the right to do business and their policy, and

18   under 412:5 Liberty was required to file its policy forms,

19   endorsements, and other contract language with the

20   Commission, and the language required is as set out on the

21   PowerPoint before you.  The statute's language requires

22   submission of the forms that will be part of the insurance

23   policy because ultimately we know this form, while accepted

24   by the Commission, the rejection form, was not part of the

25   policy.  It was held in the underwriter's file.  When this

1  case surfaced, it took them five weeks to even find it.

2           Moreover, Liberty's submission to the Commission

3  says that it was part of its entire commercial umbrella

4  policy.  So when the Commission said, yes, Liberty, you may

5  do business, they expected if you were going to opt out and

6  use the exclusion form, which is laid out right there, that

7  in fact forms would be attached.

8           There's the table of contents.  There's the list of

9  forms that were to have been attached.  Here specifically is

10 the exclusion, the New Hampshire excess uninsured motorist

11 coverage selection or rejection form, the New Hampshire

12 excess uninsured motorist coverage selection or rejection

13 form set out in Liberty's application, and this is found at

14 Exhibit L to our motion for summary judgment.

15          THE COURT:  So what factual inference would a trier

16 of fact draw from that?

17          MR. STEIN:  That Liberty, first of all, represented

18 to the Commission that if they were going -- if an insured of

19 Liberty's were going to opt out, that that form would be

20 attached to the policy and that the insured would know about

21 it.  That's what a jury would find.  And here of course it

22 wasn't and they can't.

23          So as a matter of fact, and of law, we suggest that

24 what Liberty did in this case is, A, an admission of what

25 should be done, and B, what they didn't do.  I guess I should

have flipped that around.  What they didn't do and what they should have done.

And consequently, it's an admission by a party that they had applied to the Insurance Commission for coverage and for a form which they ultimately did not use.

And the consequence, of course, is obvious.  It's obvious from the insured's perspective and from the Court's perspective on this particular motion.

Liberty hid the selection form in its underwriting file.  It contradicted the representations which were made to the Insurance Commission, and as a result Liberty's failure to attach the form violates New Hampshire law and policy.

We suggest, therefore, that Liberty's submission can and should be treated as an admission that it should have attached the rejection form to the policy in order for it to be effective so that everybody knew the fair game.

THE COURT:  So it's not because any law or any regulation requires the attachment.  It's because -- your suggestion is that they're representing that they did or would attach it and did not, right?

MR. STEIN:  The last part is absolutely true, but the requirement of the submission made to the Insurance Commission under 412:5 requires every insurer shall file policy forms, endorsements, and other contract language with the New Hampshire Insurance Commission.

1           So if the requirement is there for every insurance

2    company to file the papers with the Commission --

3           THE COURT:  The papers it will use.

4           MR. STEIN:  Yes.

5           Now, I know, I said the same thing.  Okay.  Well,

6    where's the dots between the promise that it made to the New

7    Hampshire Insurance Commission and the papers it will use.

8    There's not something -- I can't find, and I'm not going to

9    suggest to the Court that I can, that there's a statute that

10   says, and once you file it with the Commission you must use

11   it.  Well, I might not be able to find a piece of authority,

12   but what else would it mean?

13          THE COURT:  Well, they did use it.

14          MR. STEIN:  They had her attach it to the policy.

15          THE COURT:  But that's the problem, isn't it?

16          MR. STEIN:  Correct.

17          THE COURT:  That's your problem, though.  I mean

18   they had to attach it to the policy.  You say that, but

19   that's not what the law says.

20          MR. STEIN:  No, I think it does.

21          THE COURT:  Because they shall file policy forms,

22   endorsements -- that's the forms they're going to use in

23   general to do business.

24          MR. STEIN:  Right.

25          THE COURT:  Well, that is the form they used and it

1  was utilized.  You're ignoring the fact that there's no

2  requirement that it be attached.

3          MR. STEIN:  Well, you go back to the principal

4  statute and that rule.  That's why it becomes, okay, if you

5  want to walk down that road.  But when the Insurance

6  Commission approves the contract that Liberty says it's going

7  to use, it also has the law in mind that the statute requires

8  as to excess or umbrella policies.  They will be written in

9  the same amount as liability unless there's a waiver.

10         So the actions of the New Hampshire Insurance

11 Commission have to be read in the context of the statute that

12 already exists.

13         THE COURT:  I agree.

14         MR. STEIN:  And the reason that's important is

15 because, and there are two parts, a reasonable insured needs

16 to be able to read the policy and find out what the coverage

17 is.  And in this case it can't be done because it's not

18 there, because the exclusion is not there.

19         We all agree -- they briefed it, we briefed it, I

20 have it in the PowerPoint for you -- that the policy is an

21 integrated policy.  It says, this is it.  It's all there is.

22 If it's not here, it ain't there.  We're entitled to rely on

23 that.  They relied on that.  And that's why the crux of their

24 argument, and the most important part of their argument, is

25 the exclusions under 2(f)(1) and (2).  They ultimately have

1    to rely on that.  They ultimately have to say, okay, even if

2    for some reason Stein's -- I don't think they would ever say

3    Stein's right -- but even if for some reason the policy had

4    to have the exclusion attached to it by way of an

5    endorsement, a statement, anything, and I don't care how they

6    do it, to notify the insured that in this particular instance

7    there's not $5 million of UM, there's 5 million of liability,

8    but the statute doesn't apply.  The statutory mandate doesn't

9    apply because they opted out.

10            All well and good.  All they had to do as the

11   controller of the policy, the people that write it, the

12   people that are sophisticated and know about the audience and

13   the people who represent to the Insurance Commission what

14   it's going to say, they have to say to the consumer either

15   you're not covered.  Look at the endorsement.  You're not

16   covered.  Look at the attachment or somewhere in the policy.

17   That's why ultimately you get to the (2)(f) arguments.

18            THE COURT:  But to the consumer.  The policyholder.

19            MR. STEIN:  Yeah.

20            THE COURT:  That's not the insured.  The

21   policyholder is the person who buys the insurance policy,

22   that purchases insurance.

23            MR. STEIN:  Well, sure.  But under the definition

24   of the policy the insured is both Plum Creek and its

25   employees, and we lay that out again in our papers and in

1     this PowerPoint, quite frankly.

2           And the reason I -- Judge, with all respect, this

3     is a wonderful tool and I'll leave it with you and the other

4     side because it succinctly puts all of my arguments together,

5     but for me to sit here and just walk through a PowerPoint

6     which you can read I just don't think is a good productive

7     use of time.

8           But I can tell you that the best starting point in

9     the analysis from the three perspectives is the Insurance

10    Commission and what was represented by Liberty to the

11    Commission and what the public, i.e., the Commission, had a

12    right to expect as a result of those representations.

13          THE COURT:  But I guess that's where I lose you.

14          Okay.  That expectation you just added on at the

15    end I guess clarifies it a bit for me.  I don't know how it

16    would constitute some type of admission other than here's our

17    umbrella policy and here's the endorsements that we'll use

18    when we sell this insurance.

19          I don't know why you suggested there's a

20    representation that it's always and forever going to attach

21    every time -- attach to every endorsement that's ever

22    adopted.

23          MR. STEIN:  Look at the converse.  If they had done

24    any of the things we suggest, had Mr. Kelly read the policy,

25    or more important his lawyer read the policy, it would have

1    been right there.

2         Although there's 5 million of liability coverage

3    when you drive a Plum Creek vehicle, which they agree he was

4    doing, on Plum Creek business, which he was doing -- although

5    there's 5 million of liability, you don't have 5 million of

6    UM.  It would say it right there.  We wouldn't be here.

7         And if he -- when I presented this case to Mr.

8    Covert -- and his e-mails are in the attachments.  When I

9    presented this case to Liberty's representative, he couldn't

10   find the exclusion form, either.  They had to dig for it.

11        Now, we don't say this in our papers, but it seems

12   to me -- well, we do actually -- that the fact that Liberty's

13   own people couldn't find at the ready the exclusion they're

14   now relying on is also telling as to the obligation that

15   Liberty has to the public when they present a company

16   employee with a car.

17        THE COURT:  I struggle with that, but okay.

18        MR. STEIN:  Okay.  Now, the other perspective -- do

19   you want me to stop now and sit down, or do you want me to

20   address the (2)(f) problem?

21        THE COURT:  No.  I want to hear from Liberty's

22   counsel on your statutory point.

23        MR. STEIN:  Very good.

24        MS. ADAMS:  I'm virtually speechless.  We argue to

25   this Court in connection with discovery motions that the

1    information from the regulators was not relevant to the

2    policy.  When we did the discovery what we learned was in

3    fact that Liberty had submitted the forms to have them

4    approved, both the primary form, the umbrella form that it

5    uses across the country, as well as the rejection form.

6            There were comments from the regulators with

7    respect to it, but the bottom line was the regulators

8    approved them.  And you can see from the exhibits, you can

9    see comments where at different times they approved them or

10   there were revisions made to the rejection form.

11           At no time did Liberty represent to anyone that it

12   would attach a copy of the rejection form to the policy

13   itself.  There's no evidence to support that whatsoever.

14           With respect to the --

15           THE COURT:  And I guess if there's -- I mean, you

16   think it's sort of an implicit admission, right, that they're

17   representing something that is required by statutory purpose

18   or something.  I mean, what's the authority for that?

19           MR. STEIN:  Are you back to me?

20           THE COURT:  Yeah.

21           MR. STEIN:  I thought about that.  So let's assume

22   an analogy.  Let's assume Liberty states, as it does here,

23   that its terms can be amended only by endorsement issued by

24   Liberty and made a part of the policy.  Everybody agrees that

25   language is in this policy.

1              Imagine if Plum Creek instructed Liberty to

2    eliminate all of its auto liability coverage and amend the

3    policy accordingly, and Plum Creek did and Liberty did, and

4    Liberty writes an endorsement, excludes all of the liability

5    coverage, and then instead of attaching that exclusion to the

6    policy it files the endorsement in its underwriting policy,

7    just like you have here.

8              A Plum Creek driver believing that he had the

9    protection of an auto liability policy would merrily go down

10   the road thinking he's insured to the tune of $5 million only

11   to find out that Liberty and Plum had said no, no, no, and he

12   doesn't have the coverage.  And theoretically, my theoretical

13   driver, had he known that there was no liability coverage on

14   the Plum Creek auto that he was using, could say, hey, whoa,

15   I've got a logging truck here.  I'm not driving this rig down

16   the road unless I've got some liability coverage that's going

17   to protect me and my family.  That's the logical extension of

18   their position.

19             THE COURT:  Thank you.

20             MS. ADAMS:  The statute requires -- the statute

21   provides that the named insured will reject on behalf of

22   every insured.  The named insured is Plum Creek.

23             Setting the authority issue aside, Plum Creek

24   rejected UM coverage on behalf of all of its insureds.  There

25   is nothing in the statute that says that Plum Creek in order

1   to effectuate coverage, or Liberty, has to provide a copy of

2   its policy to every single driver that gets in a car.  That

3   would be illogical, unfair, and unwieldy.

4           We're talking about a company that had nearly 2,000

5   employees across the country.  That is not required by the

6   statute.  Nor is it required by the statute that the

7   rejection form be attached to the policy.  In fact, there are

8   certain states that do have such a requirement.  Mexico is

9   one, for example.  Florida is another one.

10          For this Court to require that the form be attached

11  to the policy would be adding to the language in the statute

12  and effectively amending it by case law.

13          THE COURT:  Yeah.

14          MS. ADAMS:  The second piece -- aside from that,

15  the statute here, again unlike others, is evergreen, which

16  means that once you sign the form you don't have to do it

17  every year.  In this case Plum Creek did, and presumably

18  because they also rejected in West Virginia, Florida, and

19  Louisiana.  And Louisiana, for example, requires that you do

20  it every year.

21          THE COURT:  Slow down a little bit for the

22  reporter.  Just a little bit.

23          MS. ADAMS:  Okay.

24          MR. STEIN:  She'll throw things at you.  I want you

25  to know.

1          MS. ADAMS:  I don't believe that.  Maybe a little

2     bit.

3          So this isn't -- so because -- I lost my train of

4     thought.

5          THE COURT:  That's okay.

6          MS. ADAMS:  This is an evergreen situation, unlike

7     other states.

8          So when Mr. Stein suggests that Mr. Covert who was

9     on the claims side at Liberty Mutual somehow was unable to

10    find a form, the point is that it was in the underwriting

11    file.  They had to go to the underwriting file and get the

12    file.  It wasn't that it was hidden from anyone or Liberty

13    was trying to mislead anyone.

14         Plum Creek, the insured, who has the right to

15    reject on behalf of all insureds, had rejected it.  It was in

16    the underwriting file, which is exactly where it should have

17    been.  Nothing in the statute requires that it be attached.

18    In fact, if you are the insured and you looked at the policy

19    what you would notice is, one, it provides coverage only for

20    third-party claims, i.e., those claims where the insured has

21    a legal objection to pay a third-party.

22         You would also notice that there's no limit for UM

23    coverage, that there's no premium charged for UM coverage and

24    that there's an exclusion for UM coverage, which I think is

25    where we left off with Mr. Stein, and that's exclusion (f) of

1   the policy.

2          So this is not a situation where Mr. Kelly has some

3   reasonable expectation that there is UM coverage.  To the

4   extent, as Mr. Stein argues in his pleadings, that he is

5   presumed and of the law, i.e., he's presumed to know that the

6   statute exists, he's also presumed to know that the company

7   can reject it, which here Plum Creek did.

8          THE COURT:  When you say he's presumed to -- where

9   does that presumption come from?  What's the source of that

10  presumption?

11         MS. ADAMS:  In plaintiff's papers they take the

12  position that an individual is presumed to know the law, and

13  that without any affidavits from the plaintiff that somehow

14  he believed he had UM coverage because he knows that the

15  statute is out there.  Well, if he knows the statute is out

16  there, he knows what the last sentence says as well.

17         MR. STEIN:  Well, with all respect, that puts an

18  impossible burden on any claim.  I mean, I have two irons

19  here.  If you go watch television for an evening, you will

20  find Liberty's ads on TV, but their plain language of their

21  policy -- so everybody is on the same page, there's nothing

22  plain in the language of this policy.

23         First-party and third-party are never defined.

24  Although made a big part of their case, they're never defined

25  in the policy.  So the average citizen has no clue if he were

1    to read the policy.

2            The New Hampshire Supreme Court has not made it

3    that stringent that the average citizen driving a rig with

4    logs behind has to be sophisticated enough to read the

5    policy.  That's why I say the lawyer who --

6            THE COURT:  When you make that argument, I think it

7    undermines your position.  What employee brings counsel in to

8    read the policy?

9            MR. STEIN:  And shouldn't have to.  He should be

10   able to say clearly to his employer, when I drive down the

11   road what's the coverage.

12           THE COURT:  Yeah, he should be able to say that to

13   his employer.

14           MR. STEIN:  Right.  And the history, by the way, of

15   this statute, the UM being grafted on, is not known to many

16   lawyers, except old people like myself.  In the old days when

17   there was an accident and there was minimal insurance and

18   suddenly a plaintiff who is badly injured is looking to find

19   out if he's covered, and the answer is, no, the guy that hit

20   you has 25,000, and then he goes to a lawyer and the lawyer

21   tells him, well, did you purchase UM coverage.  Well, no, I

22   didn't.  I didn't even know what it was.

23           So in the old days before the statute lawyers were

24   suing agents for not providing UM as an agency malpractice,

25   if you will.  And so the legislature came and said we're

1    going to make an end to this.  When you provide liability,

2    you provide UM in the same amount, and that's the statute.

3         So that's really where we are, and that's really

4    some people say my strongest argument.  I don't think it is,

5    but be that as it may.

6         The legislature mandates that when you write

7    liability, you write UM.  $5 million of liability has been

8    written by Liberty.  There should have been 5 million of UM

9    unless or until in writing they waive.

10        Why would the term in writing be there?  Well, the

11   answer is so somebody could see it.  That's why I'm making

12   such a big stink about the fact that --

13        THE COURT:  Isn't it just as likely that the

14   requirement is -- first of all, if it was so someone could

15   see it, it would say written and attached.  And if it doesn't

16   say written and attached, the reason it's required to be in

17   writing -- not that I really question reasons for statutes.

18   I just don't do that generally.  But if I'm going to play

19   that game, the reason something must be in writing is so it's

20   memorialized, not so much memorialized and seen by every

21   single viewer, right?

22        MR. STEIN:  And that's the same coin I'm talking

23   about.  Memorialized is the head.  The tail is so it can be

24   seen by whoever is going to look at it.

25        And here's the thing that I heard which really I

1    find difficult to understand.

2              THE COURT:  What?

3              MR. STEIN:  Ms. Adams, skilled as she is, talks

4    about the nature of this particular company, the number of

5    employers, the number of vehicles doing business across the

6    land.

7              Now, this is not an argument that's going to win

8    for me, but in discovery we now know that for an extra 900

9    bucks Liberty could have insured UM in three states.  That's,

10   again, historically what we know, too, that umbrella policies

11   or excess policies, whichever you call them, are relatively

12   inexpensive.

13             The other thing that the language of this policy

14   talks about when we get to (2)(f) specifically, is it

15   incorporates by reference the underlying policy, the ACE

16   policy, the ACE policy that paid $900,000.

17             And so it's not circular.  It's direct.  If we had

18   been there before Mr. Kelly decided to drive the vehicle, we

19   would have said, okay, let's look at the underlying policy,

20   okay?

21             The (2)(f) part of all of this is I think --

22             THE COURT:  Hold on a minute.

23             You might not have been done with your presentation

24   on -- if you were, that's fine -- on the statutory

25   requirements here.

1              MS. ADAMS:  This is all about the named insured,

2      Plum Creek, having the right to buy or not buy this

3      insurance.

4              THE COURT:  Right.

5              MS. ADAMS:  Plum Creek has the right to contract as

6      it sees fit.  It may have been $900, it may have been less,

7      in order to buy UM coverage.

8              THE COURT:  It's not really for me to get into.

9              MS. ADAMS:  They made the corporate decision not to

10     do it.  As Lisa Duetsch explained, which is consistent with

11     what treatises have done, is that corporations routinely deny

12     at the umbrella level buying this coverage because they have

13     Workers' Comp. coverage for their employees.

14             THE COURT:  Let me ask you something from your

15     presentation that -- maybe I don't need to be distracted by

16     it, but it's this.  I view this case as a case that comes

17     down to whether Plum Creek rejected UM coverage, that's what

18     the case is about, but you keep talking -- I don't want to

19     disparage your argument.  You started talking about

20     third-party versus first-party.  Why does that make any

21     difference to this analysis?

22             MS. ADAMS:  I think -- the point is that the policy

23     itself does not provide coverage for UM unless the statute

24     either broadens the insuring agreement or the statute

25     eliminates the exclusion.  So, yes, it --

1          THE COURT:  And the statute does in this case.  It

2    broadens it unless rejected.

3          MS. ADAMS:  Exactly.

4          THE COURT:  Okay.  You're just sort of orienting me

5    in the bigger policy and bringing me to --

6          MS. ADAMS:  Exactly.

7          THE COURT:  Okay.  Thank you.

8          All right.  You want to talk about the exclusion

9    2(f) in the policy?

10         MR. STEIN:  I do.  I tell you what I thought I was

11   going to hear, and I'm a little surprised I didn't.  I

12   thought Ms. Adams would basically be saying, okay, the

13   exclusion is not part of the policy and Stein is making at

14   least a colorable claim, but even so the language of the

15   policy itself, which they say in their brief at 2(f)(1) and

16   (2) excludes coverage.

17         And here's the problem with that.  And I think

18   that's their strongest argument because we all know that the

19   entire language of this 60-page policy has to be read in its

20   entirety.

21         The problem with that is that the exclusion broken

22   down into two sections, 2(f)(1) and 2(f)(2), they pars out to

23   third and first-party claims.  Fine.  So far so good.

24         But first-party versus third-party claims are, A,

25   never defined; (f)(1) and (f)(2)are ambiguous, confusing, and

1    contradictory, and inherently inconsistent.

2             The auto coverages are found here at Exhibit A for

3    our motion for summary judgment, page 46.  That's where

4    you'll find 2(f)(1) and (2).

5             And I call this ping-pong drafting because the

6    statute starts off with defining bodily injury or property

7    damage which is not covered arising out of the ownership,

8    maintenance, use or entrustment to others of any auto.  But

9    then it says the use includes operation and loading or

10   unloading, and then it says, "This exclusion does not apply,

11   however, if the bodily injury or property damage is covered

12   by underlying insurance."  And in this case, of course, it

13   is.  Coverage provided will follow the terms and conditions

14   of the underlying insurance.

15            So on the one hand Liberty is saying here's no

16   coverage, here's no coverage at all, but on the other hand

17   here is coverage.  So ping-pong.  Back and forth.

18            THE COURT:  Yeah.  That's how insurance policies

19   read sometimes.  They do.

20            MR. STEIN:  I'm sorry?

21            THE COURT:  That's how insurance policies read

22   sometimes.

23            MR. STEIN:  And that's why those policies that read

24   that way are ambiguous, not cognizable by the New Hampshire

25   Supreme Court, and as a matter of statutory common law and

1    common sense should be rejected by courts.

2              THE COURT:  I get it.

3              MR. STEIN:  So 2(f)(1), again we say for the

4    reasons set out on the slides, does not help their case.  You

5    won't see the term first-party or third-party in any of that

6    language.  Only lawyers figure that out or people who draft

7    policies.

8              Whatever 2(f)(1) and 2(f)(2) says, however, has to

9    always be read in the context of 264:15 which provides and

10   goes back to the touchstone of my argument that UM and excess

11   policies have to have liability as well as UM attached to

12   them.

13             By its own definition, 2(f)(1) appears to apply to

14   auto coverages, and it makes clear, however, that the

15   coverage will be narrower.  It's a form following situation.

16             So the reasonable insured having read that language

17   would turn to his ACE policy, the primary policy.  And the

18   ACE policy which you have there is for business auto

19   declarations.  The named insured is Plum Creek.  And as an

20   employee of Plum Creek, Brendan Kelly is entitled to the

21   benefits of the policy.  The liability is in the amount of a

22   million dollars.  Uninsured motorist is covered in that as

23   well, and ultimately is was deemed to be $1 million.

24             By the way, it took convincing to get ACE to pony

25   up the $900,000 because they said, well, we don't see

1   anything here, it's 25,000.  I said it doesn't work that way

2   and I had to show them the coverage, but they did it.

3           And there's again in the ACE policy the New

4   Hampshire insurance coverage, a million dollars.  At least in

5   this particular analysis if the insured goes to the ACE

6   policy he sees there's coverage for UM in the amount of a

7   million dollars.

8           They then turn to 2(f)(2).  But again, 2(f)(2) has

9   to comply with RSA 264:15.  You can't exclude the provisions

10  of 264:15 by just some language.  2(f)(2) provides, and there

11  it is laid out for you in glorious PowerPoint that any loss,

12  cost or expense payable under or resulting from a first-party

13  physical damage coverage, no-fault, personal injury, or auto,

14  or underinsured or uninsured motorist law, except to the

15  extent coverage is specifically provided by endorsement in

16  this policy.  There's the ping-pong again.

17          So what does all that mean?  Well, it purports to

18  exclude coverage for uninsured and underinsured, but it would

19  be void under 264:15 because it's not a written exclusion as

20  mandated by what we talked about earlier, about 40 minutes

21  ago.

22          And so under the case law we cite there, National

23  Fire Companies, and the language itself, we suggest 2(f)(2)

24  is unenforceable if there's no effective rejection of the UM

25  coverage.

1          And for that proposition we not only have that

2     little PowerPoint slide, but we quote on the slide from their

3     brief at page 13, "In the event a court were to find that an

4     insured failed to validly reject UM coverage, then for claims

5     subject to the New Hampshire UM statute the exclusion would

6     be unenforceable."  That's from their memorandum of law.  I

7     think we are actually close on that.

8          So there you have it, and there's our conclusion.

9          THE COURT:  You know, you went back a couple of

10    slides and you showed me something that you drew from their

11    brief and that made me think of something I wanted to ask you

12    about.

13         You said you wanted to leave this with me, this

14    presentation.

15         MR. STEIN:  Yeah.

16         THE COURT:  The presentation is very nice and I

17    appreciate it, but I don't want to create the impression with

18    you that this is a brief because -- for example, your whole

19    argument about admissions made to the Insurance Department.

20    If you briefed that, I overlooked it.

21         MR. STEIN:  Right.

22         THE COURT:  Did you brief it?  I don't think you

23    did.

24         MS. ADAMS:  No.

25         MR. STEIN:  Let me put it this way.  I think we

1   did.

2              THE COURT:   Okay.   Look, I know you're not trying

3   to throw it by me, but here's my point.   I'm hearing oral

4   argument.   I've got to decide this case.   I don't want you to

5   leave this here with me.   This is your presentation.   I don't

6   want the suggestion later that that's an argument that I

7   considered before today.   That's an oral argument you made,

8   and I don't generally embrace arguments made for the first

9   time in oral argument because I haven't considered them.

10             I tried to understand it.   It was very interesting,

11  but it wasn't something I was absorbing too well I think

12  because I had never seen it before.

13             I'm happy to watch this, but the only way -- and

14  I'm not even going to try to make a deal with you about the

15  circumstances under which you can leave it with me because

16  that's been happening lately.   I have people coming in here

17  giving me presentations, and sometimes they have like six,

18  seven case cites in them that aren't briefed.   I have to have

19  some way of managing my time.

20             MR. STEIN:   Sure.   Judge, let me tell you why I did

21  it.   As I'm going -- and it simplifies it because I'm a

22  simple country lawyer.

23             THE COURT:   Right.

24             MR. STEIN:   I try that.   I do the bet I can.

25             THE COURT:   Yeah.

1    MR. STEIN:  My point is it does simplify the

2    argument.  On the other hand, as an advocate for me to just

3    hit the button and walk through the slides, while it's

4    effective, it's boring.  It's going to bore you.  It's going

5    to bore me.

6    THE COURT:  It's really helpful to blow up policy

7    language.  It really is.

8    MR. STEIN:  Yes.

9    THE COURT:  But when you -- look, I'm going to tell

10   you the truth, I don't think there's much statutory -- I

11   don't think your statute-based claim or your contract-based

12   claim -- I think I can decide those on summary judgment.  I

13   happen to disagree with you on what those -- what the statute

14   and the contract require.

15   I think you're right about the agency, by the way.

16   Although anybody in your position would have conceded those

17   issues by now, but you don't and you don't have to.

18   But on the law and on the contract I think you're

19   wrong.  But when you start conflating it with admissions made

20   to the Department of Insurance -- I don't even know what

21   that's about.  I understand now what you're trying to say to

22   me, but those weren't arguments that were briefed and those

23   aren't arguments that I'm going to consider.

24   MR. STEIN:  In fairness to Diane Hock who works

25   with me on these things, these were all briefed, and indeed

1    part of our briefs talk about, as today, representations of

2    the New Hampshire Insurance Commission, and the brief talks

3    about it as an admission.  This is just a summary of the

4    briefs.  If you won't take it, God bless you, fine.

5              THE COURT:  Hold on.  If it only summarizes what's

6    in the briefs --

7              MR. STEIN:  I believe it does.  If it doesn't, then

8    reject it out of hand.

9              THE COURT:  Well, here's what I'm going to do.  I'm

10   going to hear from defense counsel for a minute.  I want you

11   to find in your brief where you make that argument or

12   something remotely connected to it.

13             MR. STEIN:  Okay.

14             THE COURT:  Because I've read the briefs and I

15   didn't see it.

16             Go ahead.

17             MS. ADAMS:  So with respect to the argument that

18   Mr. Stein was just making, and I heard your Honor's comment,

19   but the statute itself does not require that there be an

20   exclusion in the policy.  It just requires that there be UM

21   coverage provided if you don't effectively do the rejection.

22             With respect to the exclusion itself, the (f), the

23   paragraph (1) and the paragraph (2), another creative lawyer

24   similar to Mr. Stein made this argument in New York in the

25   federal court, and on appeal the Second Circuit said, "The

1    Court relied on a warped interpretation of the endorsement to
2    require UM coverage.  In so doing, the Court was indulging in
3    a forced construction and torturing words to import ambiguity
4    where the ordinary meaning leaves no room for ambiguity."
5             THE COURT:  What case did you just cite, by the
6    way?
7             MS. ADAMS:  Mazzaferro, M-A-Z-Z-A-F-E-R-R-O, and it
8    is 50 F.3d 137.
9             THE COURT:  Second Circuit?
10            MS. ADAMS:  Yes.
11            THE COURT:  What year?
12            MS. ADAMS:  '94.
13            THE COURT:  Thanks.  Okay.
14            MS. ADAMS:  The point of (f)(1) and (f)(2), and
15   this gets back to your Honor asking me why in the beginning
16   did I start with a discussion of the policy itself, is that
17   the umbrella policy provides third-party coverage, liability
18   coverage, which the Second Circuit, you know, talks about and
19   other cases have talked about.
20            Paragraph (1) deals exclusively with third-party
21   coverage.  It only deals with situations where there are
22   claims for bodily injury and property damage where an insured
23   is legally obligated to pay.
24            Paragraph (2) excludes first-party claims,
25   including UM coverage.  Yes, it says at the end unless an

1    endorsement were to provide it, because some companies in

2    fact buy excess UM coverage and thus there would be an

3    endorsement attached to the policy providing the UM coverage

4    on an excess basis.

5              That didn't happen here.  I would suggest that the

6    plain -- you can try to cobble together an argument, and Mr.

7    Stein has been very creative in doing that, but the plain

8    language of exclusion (f) demonstrates that UM coverage is

9    excluded.  The only issue is whether or not the statutory

10   rejection form was supplied.

11             THE COURT:  Okay.

12             MS. ADAMS:  Or whether they effectively rejected, I

13   should say, the coverage.

14             THE COURT:  Yes, Mr. Stein.

15             MR. STEIN:  Yeah, I have found what you're looking

16   for, and that is to say in our first opening brief, which was

17   May 20th, at page 14, section C, the New Hampshire Insurance

18   Commission approval of the rejection form in isolation --

19             THE COURT:  That's your objection to Liberty's

20   motion?

21             MR. STEIN:  No, this is in our motion.

22             THE COURT:  Do you know what document it is?

23             MR. STEIN:  Yes, I do.  27.

24             THE COURT:  Okay.

25             MR. STEIN:  So we set it out there, and I think if

1    I get another page into it I can actually find the word

2    admission because they argue in their brief that when the New

3    Hampshire Insurance Commission approved their forms that

4    therefore they've complied with the statute, and that's what

5    triggered off our research to show the opposing situation.

6              In just flipping through my papers, I think it's

7    also important to remember the Supreme Court of New Hampshire

8    has said -- I had it in front of me -- that, "Men in general

9    cannot read and understand insurance documents."  That's the

10   Trombly case.  I think that's a fair statement.  It is what

11   it is.

12             That's why I'm always amused when I'm sitting there

13   watching TV, on the one hour I give myself, when Liberty pops

14   up.  When I'm trying to avoid the work from the office and

15   there's Liberty in its commercial saying we have a clear

16   contract and we cover all of this, I want to call Ms. Adams

17   up and say would you watch the show that I'm watching,

18   please.

19             THE COURT:  Yeah.  Okay.

20             MS. ADAMS:  Your Honor, one final point, if I

21   could, not to beat a dead horse.

22             THE COURT:  No, I don't mind.

23             MS. ADAMS:  But to return kind of back to where we

24   started on the agency.  Mr. Stein attached the bylaws of the

25   company to his papers.  And as you'll see, as with many

1   public companies, they're incredibly broad.  Nonprofit

2   entities have very narrow and very specific bylaws.

3            And in fact one of the cases cited by Mr. Stein out

4   of Louisiana there was a trust and they were very specific

5   about what could and couldn't be done in terms of rejecting

6   UM coverage, and the person who effectively rejected it

7   didn't even know that he was rejecting it and the board had

8   to make that decision.

9            These bylaws are very different.  They are very

10  broad.  We have an individual who was an officer, and it's

11  our position, as you know, that we have not only actual,

12  apparent, and implied authority, but it's also important to

13  recognize that this had been done since at least 2005, and to

14  the extent --

15            THE COURT:  That certainly goes to the apparent

16  authority argument.

17            MS. ADAMS:  It also goes to whether it was ratified

18  by Plum Creek.

19            THE COURT:  Ratified?

20            MS. ADAMS:  Ratified.

21            MR. STEIN:  That's the problem.

22            THE COURT:  What?

23            MR. STEIN:  The ratification.

24            THE COURT:  What do you mean it's a problem?

25            MR. STEIN:  They're obligated in this forum, in

1    this case, before this Judge, to show actual -- or if not, if

2    they can't make actual, apparent authority.

3            Now, they can do it in a variety of ways.  My guess

4    is they looked and found out that some of these actors were

5    no longer around, but how tough is it to actually be specific

6    to say I'm on the board, or I'm the president or the vice

7    president, and acting pursuant to the vague grant of

8    authority of the bylaws I can tell you specifically it was my

9    intent to give Kent Jones and therefore Ms. Duetsch

10   authority.  '

11           They didn't do it, and we didn't want to beat that

12   horse anymore or delay any more than we already have.

13           THE COURT:  I gave everybody extra briefing, extra

14   time to do that.

15           MR. STEIN:  Yes, you did.

16           THE COURT:  It's not that your argument is

17   unreasonable in any way.  It isn't.  It's just that corporate

18   authority is one of those things that is frequently sort of

19   conceded after a time because it looks pretty good.  It looks

20   pretty valid.

21           But I think any corporate treatise tells you that

22   the only way employees and agents can act on behalf of a

23   corporation is with some type of grant of authority.  That

24   can be apparent, but generally in New Hampshire apparent

25   authority questions are jury questions.

1            MS. ADAMS:  I agree it's an issue of fact.  I do

2    agree it's an issue of fact.  It's just our point is that we

3    have provided enough facts for you to make that finding

4    without anything coming to you to dispute in any way that

5    fact other than sheer speculation, and under Rule 56 that's

6    sufficient for summary judgment.

7            THE COURT:  Yeah, I don't think I can consider it,

8    it's your speculation, but I understand your point.

9            Anything else you want to say, Mr. Stein?

10            MR. STEIN:  No, sir, but I would offer these

11    PowerPoints.  I have one for my colleague and one for you.

12    Should you decide not to use it, fine, but I really do think

13    it will help your analysis because of the pop-ups if nothing

14    else.

15            MS. ADAMS:  And I would object to that.

16            THE COURT:  Yeah.  Well, if she objects, I really

17    can't accept it, to be honest.  I have it and I've viewed it.

18    I don't want to make it part of the record if we have counsel

19    objecting to it.

20            MR. STEIN:  Well, then in fairness I would like to

21    mark it for identification.  It's not part of the record, but

22    at least it's, I guess theoretically, what was not allowed.

23            THE COURT:  I mean, do you have some argument that

24    I'm supposed to allow you to supplement the record of oral

25    argument at summary judgment?

1          MR. STEIN:  No.  I want to be clear I'm not trying

2     to supplement the record.

3          THE COURT:  Okay.

4          MR. STEIN:  Again, I'm not trying to sandbag.

5     There's no new authority.  There's the one analogy I already

6     showed you which came to me in the dead of night.

7          THE COURT:  If we have an agreement, I'll tell you

8     right now -- here's the thing.  For whatever reason I've

9     gained a reputation for enjoying oral argument.  It's not

10    that I enjoy holding oral argument.  I hold oral argument on

11    these cases all of the time because I think it helps.  But

12    what happens is people take advantage and they sneak new

13    arguments and evidence in, and I don't appreciate that.  It

14    makes the job harder.

15         So if we have an agreement that it's not part of

16    the record that will be cited on appeal, I'll accept it.

17         MR. STEIN:  I so agree because my whole goal in

18    this was to make your job -- how is this going to come out --

19    make your job easier.

20         MS. ADAMS:  My point on this, and not to be prickly

21    about this, is that this is something that we have not seen.

22    He is submitting to you an entire PowerPoint that has many

23    pages that we haven't even seen up on the screen, and whether

24    it's marked for identification or as an exhibit, it's

25    something that we don't even know what's in it or have the

```
 1   ability to respond to.
 2           THE COURT:  Do you want the ability to respond to
 3   it?
 4           MS. ADAMS:  If your Honor would like a briefing.
 5           THE COURT:  No, I don't want more briefing.  I
 6   don't.
 7           MS. ADAMS:  I just don't see the point of even
 8   giving it to your Honor if it's not going to be used for any
 9   purpose.
10           THE COURT:  Here's what I'm going to do.  Look, I'm
11   not comfortable accepting it over objection, and she's
12   raising an objection.  The same way you're objecting to what
13   looks like pretty clear authority on the part of the agent,
14   you have the right to object.  You both do.  So I'm going to
15   honor both your objections.  I'm not going to allow the
16   PowerPoint, but I'm also not going to grant summary judgment
17   on the authority issue.
18           So let's go off the record here for a minute and
19   talk logistics, and then we'll come back on the record.
20           MR. STEIN:  Sure.
21           (OFF THE RECORD)
22           THE COURT:  Let me take a little five minute
23   recess.  I'll talk to my law clerk for a minute.
24           (RECESS)
25           THE COURT:  A couple of points.
```

1              I'm sensitive to the right to try one's case, and I

2    might be overindulging here a little bit for the plaintiffs

3    so I want to test a few ideas.

4              First of all, I've been talking about a jury trial.

5    This is not a jury trial.  You didn't ask for a jury trial.

6    You asked for a DJ decision.  You didn't check jury trial.

7    If there's going to be a trial, it's going to be before the

8    Court unless somebody tells me there's some right to a jury

9    trial that's been granted here that I'm not aware of.  But

10   all the documents, we just looked through the whole case, you

11   didn't ask for a jury, and there's not one available under

12   the statute you sued under, which is 491:22, as far as I

13   know.  So there's that.  It still could be a trial, though.

14             I guess before we are going to have a trial like

15   that I need to know -- here's the thing.  I focused when we

16   first started on agency because although I don't think as a

17   matter of summary judgment that actual authority has been

18   proven such that there's no issues of material fact, it's

19   very close, but I don't think that's the case.  It doesn't

20   matter if there's no actual authority if there is apparent

21   authority to decline coverage here, and the defendant has

22   made a very strong showing for apparent authority.

23             As a matter of fact, I'm going to ask counsel,

24   since we're sitting here, to summarize your case for me under

25   apparent authority to decline UM coverage.  Ms. Duetsch.

1          MS. ADAMS:  She had the delegation from Mr. Jones.

2     She worked with the broker.  They submitted -- Liberty Mutual

3     asked if they wanted UM coverage.  Lisa Duetsch signed the

4     form, gave it to the broker, and gave it to Liberty Mutual.

5          THE COURT:  What's her title?

6          MS. ADAMS:  Her title is risk manager.

7          THE COURT:  Don't get impatient with me.

8          MS. ADAMS:  No, I'm not.  I'm not.  It's risk

9     manager.

10         THE COURT:  I'm just trying to make a record here.

11         Now, is there any evidence in the record from

12    anyone who would suggest she lacked authority to do this, any

13    witness?

14         MS. ADAMS:  No.

15         THE COURT:  Internally or externally?

16         MS. ADAMS:  No.

17         THE COURT:  I have to ask you, Mr. Stein, all

18    right, in a trial -- now, I think I've only -- in a

19    declaratory judgment case on coverage, which is what this is,

20    who carries the burden?

21         MR. STEIN:  We both do.

22         THE COURT:  Okay.  Explain.

23         MR. STEIN:  I think anybody who wants summary

24    judgment has the burden.

25         THE COURT:  I'm talking about at the trial we're

1    talking about having, which will be a bench trial.

2          You're asking for coverage under the policy which I

3    don't think the law provides for.  In other words, I

4    don't think -- the question for the bench trial will be did

5    Ms. Duetsch effectively deny coverage, or did Plum Creek

6    effectively decline UM coverage through Ms. Duetsch's

7    exercise of her authority.

8          I assume there will be evidence put on of her

9    actual authority and her apparent authority.

10         MS. ADAMS:  Correct.

11         THE COURT:  I don't think it matters though if she

12   lacked actual if she had apparent authority, and you don't

13   dispute that.  Do you dispute that?

14         MR. STEIN:  Judge, I was actually thinking about

15   something else when you were --

16         THE COURT:  Let me ask it again then.

17         Even if she lacked actual authority, if she had

18   apparent authority her rejection of UM coverage was effective

19   in this case.

20         MR. STEIN:  The answer to both questions is I would

21   put to her on the stand -- and I think they have the burden,

22   by the way.  I'll tell you why in a minute.  I would put to

23   her on the stand her job description, which is in the papers,

24   and there's nothing in her job description that says you will

25   accept or reject UM coverage.

1           THE COURT:  That's for actual authority.  I'm

2   talking about apparent authority.  The people who -- in other

3   words, that involves I think a function of two things under

4   agency law; people who dealt with her within her own company

5   and people who dealt with her at arm's length and whether

6   anybody in that position would regard her as having

7   authority.

8           And she has exercised it.  One thing that defense

9   counsel had mentioned, she's exercised it for many years.

10          MR. STEIN:  She's exercised it since 2005, and this

11  accident --

12          THE COURT:  That's over ten years.

13          MR. STEIN:  But the law changed, too.  She's going

14  to be on the stand by way of deposition or trial testimony

15  and will be grilled by me about who told her what about what

16  in terms of the actual.

17          Now, in terms of apparent then you get the

18  question, how far did she range from what would be apparent

19  authority.  How much did she know or study this issue.  I

20  haven't thought the rest through, quite frankly.

21          THE COURT:  Well, for apparent authority it isn't

22  about how much she studied the issue.  It's about how she

23  behaved when she acted on behalf of Plum Creek in dealing

24  with insurance brokers, you know, any number of people, her

25  own superiors.

1              What evidence would you present?  I mean, you've

2    had time to do discovery now.  What evidence would you

3    present to me to suggest she lacked apparent authority to

4    decline UM coverage?

5              MR. STEIN:  I don't have an answer for you.

6              THE COURT:  All right.  Do you agree with me -- I

7    think I just asked you this.  Sorry if I'm asking again.

8              If she had apparent authority, it doesn't matter if

9    she lacked actual authority?

10             MR. STEIN:  And that would be what you would charge

11   the jury or charge yourself.

12             THE COURT:  So it has to be what I know as a matter

13   of law, and you agree.

14             MR. STEIN:  Yeah.

15             THE COURT:  I think then before -- if I asked you

16   to present whatever evidence you could, you said you didn't

17   have an answer for me now, and that's an honest answer.  If I

18   said I would give you an opportunity to do that, present to

19   me something, you would probably -- I mean, would you want to

20   go get it?  Would you want to do anymore discovery or would

21   you want to just make an offer of proof and attach that?

22   What would you do to say to me she lacked apparent authority?

23   Because all the evidence I'm aware of looks like she had

24   apparent authority.

25             MR. STEIN:  We would have to put her under oath

1    either here or there.

2              THE COURT:  Has she been deposed?

3              MR. STEIN:  No.

4              THE COURT:  Okay.  That's an honest answer.  That

5    might be -- what made me think of that is your point about

6    having to track down the chain of command and all that.

7              What do you think about the idea of Mr. Stein takes

8    her deposition and he presents it.  And you could do it too,

9    by the way.  You could do a trial depo of Ms. Duetsch.

10             MS. ADAMS:  Just to correct the record, I think I

11   said she was the risk manager.  Her actual title is manager

12   of risk and insurance for Plum Creek just to correct that.

13             THE COURT:  I thought you were going to tell me it

14   was UM decliner in chief.  No.

15             What's her title?

16             MS. ADAMS:  Yeah, that too.

17             With respect to the burden question, it's Liberty's

18   position that it would be Mr. Stein's burden of proof because

19   the insured has the burden of proof coverage and therefore it

20   would be his burden on that front.

21             With respect to the depositions, Mr. Stein was

22   afforded the opportunity to take Lisa Duetsch's deposition

23   and Kent Jones' deposition.  They were aware of it and they

24   had agreed to it.  We were trying to figure out a means to do

25   that.  If we need to do that, that's fine.

1          MR. STEIN:  And that is true.  What Ms. Adams said

2     is true.  They gave me the opportunity to take her

3     depositions with regard to the issues in the papers.

4          But now we're talking about a trial, and now I need

5     to actually go out there and take a discovery deposition

6     followed by a trial deposition, or however it's going to

7     work.  And particularly since Rule 50 sanctions are always a

8     possibility, therefore I need to make a trail because it's

9     not apparent from the papers.  And I believe that once we

10     establish there's a contract, the party with all the tools to

11     dispute that contract, Plum Creek, Liberty has the burden.

12          THE COURT:  I'll figure that out.

13          MR. STEIN:  Sure.  And it may be --

14          THE COURT:  Here's why we're having the

15     conversation.  You wrote a terrific brief, Mr. Stein, on

16     actual authority.  I mean, you've squeezed that lemon for

17     every drop, and in a case that looks like there's actual

18     authority -- I conclude you're correct, it hasn't been proven

19     for summary judgment purposes, but compliment time is over.

20     You didn't develop any argument to speak of on apparent

21     authority.

22          Now, that could be a number of things.  It might

23     have just been you thought it wasn't that important or

24     something, but the teeth aren't there like they're there with

25     actual authority.

1          So I guess I'm a little reluctant to do it, but it

2     seems to me that with one deposition -- and you could do a

3     depo, a trial depo.  Frankly, without a jury, Mr. Stein, I

4     don't know why you would need to do that.  One depo would do

5     it and that could lead to -- you know, and you could present

6     it to me.  You could submit it with a brief, both sides

7     could, and I could decide the case, rather than the trial

8     that -- the trial that I was talking about before when I

9     thought you had a right to a jury trial, because that would

10    be a different kettle of fish, I agree.

11          But when you're talking about the Court, you know,

12    I've seen all the evidence now, and there's only one thing I

13    need to see and that's Ms. Duetsch on the issue of apparent

14    authority.

15          So let me ask while we're sitting here -- go ahead.

16          MR. STEIN:  Well, I think I hear what you're

17    saying, and you're really saying that the trial in front of

18    you is identical as the last part of the motion for summary

19    judgment.

20          THE COURT:  Sort of.  Although I'm ready to decline

21    summary judgment on the issue of agency is what I'm saying,

22    and at a trial.  But when I asked you what would you do to

23    prove a lack of apparent authority, you said Duetsch.  And if

24    it's Duetsch, if that's your trial, I don't think you need me

25    to be there when you question her.  You can have me there.

1   You can bring her here and do it or you can take the depo and
2   submit it and I'll decide.
3           MR. STEIN:  Yeah.  And again, Judge, it could be
4   Duetsch and Jones for that matter.  I don't have Mr. Smith
5   out there who is suddenly a disgruntled employee of Plum.  I
6   don't have that kind of smoking gun.
7           THE COURT:  Okay.  Look, let's face it, your real
8   issues that you probably want from the Court of Appeals are
9   on the legal issues, right?
10           MR. STEIN:  That's true.
11           THE COURT:  I assume that once I decide those
12   you'll do what you have to do.
13           MR. STEIN:  Well, and that's why I thought actually
14   what you were saying was let's leave this record open on one
15   narrow issue, apparent authority, make the decision then on
16   all, and then we can go up or down or sideways.
17           THE COURT:  That's about the equivalent.
18           MR. STEIN:  Yes.  Absolutely.
19           MS. ADAMS:  I'm thinking about this as you're --
20   just some thoughts that come to mind.  It's Liberty's
21   position that we can demonstrate both apparent and actual.  I
22   understand your view on apparent.
23           And so on the apparent -- we could take and develop
24   the evidence and the record.  On the apparent, yes, Lisa
25   Duetsch is important in that, but as would the broker at Aon

1   be important on that.

2          So if your Honor is suggesting that we do Lisa

3   Duetsch's deposition and then give it to you kind of as a

4   step in between -- I guess I want to understand is, that what

5   you're suggesting, because if you're suggesting a trial, it

6   really shouldn't just be limited to Lisa Duetsch.  It should

7   permit us to develop both apparent and actual.

8          THE COURT:  It should.  The reason I was suggesting

9   it is because I really thought -- it doesn't matter if

10  there's actual if there's apparent.

11         MS. ADAMS:  Agreed.

12         THE COURT:  I actually think the evidence looks so

13  strong for apparent that you've presented already.  Mr.

14  Stein, what would you present to overcome that?  He told me

15  Duetsch, and now he's saying Duetsch and maybe somebody else.

16         What I'm trying to do is -- I was moved by your

17  comments about what it was going to take now on this very

18  narrow issue to get this to trial, and I thought that's a lot

19  of resources.  So I'm trying to work with you to find a way

20  to present this for decision with the least possible

21  expenditure of resources.

22         MS. ADAMS:  And I appreciate that.  What I don't

23  want to do in the process is limit our ability to prove up

24  full apparent authority and full actual.

25         THE COURT:  Okay.  So here's the deal.  Take your

1    pick.  I mean, how do you want to do it?  Do you want me to

2    just clear a day, have a trial, or would you rather go out

3    and do trial depos and submit them to me?  If you have

4    another idea, tell me.

5              MR. STEIN:  I'm usually pretty fast on my feet, but

6    I really would like the opportunity to think about that.

7              THE COURT:  You can even talk to each other and

8    agree on something.

9              MS. ADAMS:  And I need to speak to my client about

10   that, too.

11             THE COURT:  All right.  Here's what we'll do.

12             MS. ADAMS:  I mean, if we could do some -- I mean,

13   I don't know if we can do an -- we don't really do different

14   phases at trials but --

15             THE COURT:  You can do whatever you want if you

16   agree to it.  I will take your record.  I think I have a good

17   record now, frankly, but I want to give Mr. Stein a chance to

18   carry his burden on authority, on agency, right.

19             The reason I'm there, I'll just be clear about it,

20   is that I think the defendant's evidence falls a tiny bit

21   short on actual and it's very strong on apparent, and Mr.

22   Stein hasn't seemed to brief it much.  If there's more to say

23   about it, I want to hear about it.

24             So come up with any plan you want, submit the plan

25   to me, and I'll -- and if you can't agree, I'll give you one,

1    which will probably be a one-day trial, maybe two, on a date

2    you can agree to.

3              We can go off the record now.

4              (OFF THE RECORD)

5              THE COURT:  All right.  First of all, I appreciate

6    counsel's presentations and their patience, as well as their

7    excellent written and oral presentations today and leading up

8    to today.

9              The motion for summary judgment is granted on the

10   defendant's motion that the statute does not require that a

11   rejection of UM coverage be attached to the policy as well as

12   in writing.  So the fact that it was not attached to the

13   policy in this case is not a bar.

14             The Court concurs with the defendant's arguments

15   regarding the applicable statute and the fact, that's RSA

16   264:15, and the fact that it does not require attachment of a

17   rejection of UM coverage.

18             The Court also grants summary judgment on the

19   insurance policy based arguments advanced by the defendant.

20   The policy provides -- I'm just looking for that provision.

21   The policy provides under the section called changes that the

22   policy contains all the agreements between you and Liberty

23   concerning the insurance afforded.  The policy's terms can be

24   amended or waived only by endorsement issued by Liberty and

25   made part of the policy.

1          And the question is whether this is a change, this

2     declaration of UM coverage.

3          The Court does not view it as a change to the

4     policy and cites as authority the Stopher case out of the

5     Seventh Circuit, 1998, 155 F.3d 892, for the proposition that

6     an endorsement is not necessary to effect the rejection

7     despite the policy provision that terms can be amended or

8     waived only by endorsement.  It's a very analogous case.  But

9     the Court doesn't view this as a change to the policy.  The

10    Court views it as a declaration of statutorily required

11    coverage in the way prescribed by the statute.

12         Now, summary judgment is denied as to the issue of

13    whether Ms. Duetsch had authority to decline UM coverage.

14    That order is without prejudice to the parties' ability to

15    either conduct another round of summary judgment practice on

16    that issue or go to trial.  It will be a bench trial because

17    no jury trial is available under the law in this case or has

18    been demanded by the plaintiff.

19         We also will move ahead -- I assume I'll hear from

20    you with your answer -- or your plan in how many days?  What

21    do you want?  Take your pick.

22              MS. ADAMS:  I'm leaving the 19th.

23              THE COURT:  When do you get back?

24              MS. ADAMS:  I get back the 8th.

25              THE COURT:  By the 22nd of April.  Two weeks from

```
1   when you get back.
2               MS. ADAMS:  It's April.  I leave April 19th.
3               THE COURT:  Oh, you can tell me before you go.
4               MS. ADAMS:  I'll try to tell you before we go.
5               THE COURT:  So April 19 is when you leave?
6               MS. ADAMS:  Yes.
7               THE COURT:  You'll tell me by April 18th.
8               All right.  Thank you, counsel.
9               MR. STEIN:  Thank you.
10              MS. ADAMS:  Thank you.
11              (Conclusion of hearing at 3:45 p.m.)
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1                        C E R T I F I C A T E

2

3          I, Susan M. Bateman, do hereby certify that the

4     foregoing transcript is a true and accurate

5     transcription of the within proceedings, to the best of

6     my knowledge, skill, ability and belief.

7

8     Submitted: 7-27-17

9                                    **SUSAN M. BATEMAN, LCR, RPR, CRR**
                                     LICENSED COURT REPORTER, NO. 34
10                                   STATE OF NEW HAMPSHIRE

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25