# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW HAMPSHIRE

---

**BRENDAN KELLY,**

   **Plaintiff,**

**v.**

**LIBERTY INSURANCE CORPORATION,**

   **Defendant.**

---

**CIVIL ACTION NO. 15-CV-00234-JL**

## JOINT STATEMENT OF AGREED-UPON FACTS
## SUBMITTED BY PLAINTIFF BRENDAN KELLY AND
## DEFENDANT LIBERTY INSURANCE CORPORATION

Pursuant to the Court's Procedural Order dated December 29, 2017, Plaintiff Brendan Kelly and Defendant Liberty Insurance Corporation ("Liberty") hereby submit the following Joint Statement of Agreed-Upon Facts.

## JOINT STATEMENT OF AGREED-UPON FACTS

### Underlying Auto Collision

1.      Mr. Kelly submitted a claim to Liberty for insurance coverage arising out of an automobile collision which took place on December 10, 2013 in Columbia, New Hampshire. Mr. Kelly based his claim on the following:

   a.   At the time of the collision, Mr. Kelly was employed by Plum Creek Timber Company ("Plum Creek" or the "Company").

   b.   When the collision took place, Mr. Kelly was en route to a Plum Creek job site driving a truck that was owned by Plum Creek. Plum Creek registered and garaged the truck in New Hampshire.

1

    c.  As Mr. Kelly was en route to the job site, a vehicle driven by George Motard crossed over the double line into M Kelly's lane of travel and struck Kelly's truck head-on.

    d.  The New Hampshire State Police determined that Motard was 100% at fault for the collision.

    e.  As part of his claim to Liberty, Mr. Kelly submitted medical records showing the serious and permanent injuries that resulted from the collision. Mr. Kelly also submitted medical bills for treatment from those injuries, which exceed $440,000.

    f.  Mr. Kelly is an "insured" under the Liberty policy because Mr. Kelly was acting within the scope of his employment for the named insured, Plum Creek, and because he was using a "covered auto" with Plum Creek's permission.

**Underlying Insurance**

2.    At the time of the collision, Motard was insured by Progressive Casualty Insurance under a policy which provided auto liability limits of $100,000. Progressive tendered its policy limits to Kelly.

3.    Plum Creek carried its primary auto liability insurance through ACE American Insurance Company ("ACE"), with auto liability limits of $1,000,000.

4.    The ACE policy provided uinsured/underinsured motorists ("UM") coverage with limits of $1,000,000.  The policy contained a "New Hampshire Uninsured Motorist Coverage" endorsement.

5.    ACE tendered its policy's UM coverage limits, minus credit for the payment from Progressive, to Kelly.

**Liberty Insurance Policy**

6.      At the time of the collision, Plum Creek was insured under a Commercial

Liability Umbrella policy issued by Liberty, with effective dates of June 1, 2013 to June 1, 2014

("Liberty Policy").

7.      The Liberty Policy provides auto liability umbrella coverage with limits of

$5,000,000 each occurrence and $5,000,000 general aggregate.

8.       A "New Hampshire Excess Uninsured Motorists Coverage Selection or Rejection

Form" was not attached to the Liberty Policy.

9.      Liberty, through its claims representative Joseph Covert, denied Mr. Kelly's claim

for coverage under the Liberty Policy.

**Liberty's UM Selection/Rejection Form**

10.     Liberty submitted the forms for its commercial umbrella product to the New

Hampshire Insurance Department for approval in June 2010. Liberty included the form titled

"New Hampshire Excess Uninsured Motorists Coverage Selection or Rejection Form" in its list

of "Form Attachments." The Department subsequently approved Liberty's commercial umbrella

product.

11.     On August 26, 2014, Mr. Covert, an employee of Liberty in the Complex Claims-

Specialty Claims Unit, sent plaintiff's counsel a copy of the Liberty Policy.  A "New Hampshire

Excess Uninsured Motorists Coverage Selection or Rejection Form" was not attached to the

Policy.

12.     On September 15, 2014, Mr. Covert sent an email to Paul Stuart of ACE and Lisa

Duetsch of Plum Creek stating "[o]ur policy is not a 'follow form' policy and it contains an

exclusion for UM/UIM benefits. I am working with our underwriter to confirm we obtained the appropriate rejection forms and will be issuing a coverage position shortly." ECF 33-6.

13.     On September 15, 2014, Mr. Covert supplied a copy of the NH UM Selection/Rejection Form to counsel for the Plaintiff by email. In so doing, Mr. Covert stated, "the attached form confirms that the coverage was rejected by the insured." L001080.[1]

14.     The New Hampshire UM Selection/Rejection form provided by Mr. Covert identified the "Applicant/Named Insured" as "Plum Creek Timber Company, Inc."

15.     The form was signed by Ms. Duetsch on May 30, 2013. On the form, Ms. Duetsch's initials are written on a line next to the sentence "I reject Uninsured Motorists Coverage." The signature line does not state Ms. Duetsch's title.

16.     Liberty received the signed NH UM Selection/Rejection Form on June 3, 2013.

**Authority for Execution of NH UM Selection/Rejection Form**

17.     Kent Jones began working at Plum Creek in May of 1999 in the role of Resource Accounting Manager.

18.     On August 15, 2001, Mr. Jones assumed the role of Director of Accounting – Shared Services, Manufacturing and Risk Management.

19.     Mr. Jones understood that in his role as Director of Accounting – Shared Services, Manufacturing and Risk Management, he was responsible for deciding whether to accept or reject UM coverage on behalf of Plum Creek.

20.     As Director of Accounting – Shared Services, Manufacturing and Risk Management, Mr. Jones reported directly to David Brown, Vice President and Chief Accounting Officer for Plum Creek.

---

[1]     Citations in the form L_____ are references to the Bates numbers of documents produced by Liberty.

21.     Mr. Jones was authorized by Mr. Brown to decide whether to accept or reject UM coverage on behalf of Plum Creek.

22.     Beginning in 2002, and based on Mr. Jones' understanding of Plum Creek's past practice and his own professional judgment, Mr. Jones rejected UM coverage on behalf of Plum Creek on an annual basis in each state in which such rejection was permitted.

23.     Thereafter, Mr. Jones delegated the responsibility of executing UM selection/rejection forms to an employee whom he supervised, Ms. Duetsch.

24.     In authorizing Ms. Duetsch to execute these forms, Mr. Jones furnished Ms. Deutsch with a written delegation of authority memorandum.

25.     Mr. Jones maintained similar delegation of authority memoranda in his files for the years 2004, 2005, 2007, 2010, 2011, 2012, 2013, 2014 and 2015.  These memoranda were updated as needed.

26.     The delegation of authority memorandum in effect in May 2013 stated in paragraph 5 that the Risk Manager was authorized to sign "contracts, agreements, statements" including "Auto UI/UnderI forms."  Although the date on this memorandum is September 20, 2016, Mr. Jones confirmed that, based on the document's electronic title, this is the document furnished to Ms. Duetsch prior to May 2013.

27.     When Mr. Jones assigned Ms. Duetsch the responsibility of executing UM coverage selection/rejection forms on behalf of Plum Creek, he verbally instructed Ms. Duetsch to execute the UM forms so as to reject such coverage where permitted by law.

28.     Mr. Jones was aware that Ms. Duetsch executed UM coverage forms on behalf of Plum Creek in each of the years in which she was authorized to do so, including in the year 2013, and he was aware that she executed these forms so as to reject coverage.

29.     Mr. Jones was aware of Ms. Duetsch's execution of the UM coverage forms because the "Liberty TRIA and UI & UIM Election Form Signatures" PDF file was placed in a shared access folder, and because the invoice or premium cost for the Liberty Policy reflected the binder cost, which did not include TRIA or UI & UIM coverage for any of the four states included in the Liberty binder.

30.     In Mr. Jones' view, the failure to execute the UM selection/rejections forms so as to reject coverage would have been a direct deviation from Mr. Jones' instructions and would have reflected poorly on Ms. Duetsch's performance.

31.     Ms. Duetsch served as the Manager, Risk & Insurance at Plum Creek.

32.     Ms. Duetsch began working at Plum Creek in January of 2005.  In 2008, she assumed the title of Manager, Risk & Insurance.

33.     Plum Creek provided Ms. Duetsch with a company email address which she used to communicate with insurers and insurance brokers.

34.     Part of Ms. Duetsch's company email address listed her title as "Manager, Risk & Insurance."

35.     Plum Creek provided Ms. Duetsch with an office within Plum Creek's corporate offices in the Kalispell area of Montana where Ms. Duetsch met with Plum Creek's insurers and insurance brokers.

36.     Plum Creek supplied Ms. Duetsch with business cards which identified her title as "Manager, Risk & Insurance."

37.     On May 30, 2013, Ms. Duetsch completed and signed the NH UM Selection/Rejection Form so as to reflect a rejection of UM coverage.  The signature appearing on the NH UM Selection/Rejection Form is the signature of Ms. Duetsch.  At that time, Ms.

Duetsch likewise completed and signed UM forms for Florida, Louisiana and West Virginia. The signatures appearing on these documents are the signatures of Ms. Duetsch.   On June 15, 2012, Ms. Duetsch likewise completed and signed UM coverage forms for Florida, Louisiana, New Hampshire and West Virginia.  The signatures appearing on these documents are the signatures of Ms. Duetsch.

38.     Ms. Duetsch executed UM coverage selection/rejection forms on behalf of Plum Creek so as to reject coverage annually from 2005 to 2015.

39.     Mr. Jones was the direct supervisor to Ms. Duetsch.

40.     Mr. Jones delegated to Ms. Duetsch the responsibility of executing UM coverage forms on behalf of Plum Creek.  In authorizing Ms. Duetsch to execute these forms, Mr. Jones furnished Ms. Deutsch with a written delegation of authority memorandum.

41.     Throughout her employment, Ms. Duetsch regularly referred to the delegation of authority memoranda that she had received to ensure she was acting within the scope of her authority.  The delegation of authority memorandum was in effect in May 2013 and stated in paragraph 5 that the Risk Manager was authorized to sign "contracts, agreements, statements" including "Auto UI/UnderI forms."

42.      On or about June 1, 2005, Mr. Jones verbally instructed Ms. Duetsch to complete the UM forms associated with Plum Creek's June 1st renewal of its casualty policies.  Mr. Jones reviewed the forms before Ms. Duetsch mailed them to Plum Creek's insurer(s).  Mr. Jones provided these instructions in Ms. Duetsch's office, when she informed him that she had received the forms. On or about June 1, 2006, Mr. Jones verbally instructed Ms. Duetsch to complete the UM forms and indicated that he was comfortable not reviewing the forms given Ms. Duetsch's demonstrated comprehension of Plum Creek's intent to reject such coverage, as

well as the accuracy of the prior years' forms Ms. Duetsch had completed.  Mr. Jones provided

these instructions in his office during a scheduled Weekly Meeting with Ms. Duetsch. Until the

delegation of authority memorandum was updated to explicitly grant Ms. Duetsch authority to

complete the UM forms, she always notified Mr. Jones of her intent to complete the UM forms

and received his verbal authority to do so.  After the delegation of authority memorandum was

updated to explicitly grant Ms. Duetsch authority to complete the UM forms, Ms. Duetsch

informed Mr. Jones of the status of her completion of these forms during their scheduled Weekly

Meeting.

43.     Based on conversations with Mr. Jones, Ms. Duetsch understood that Plum Creek

wished to reject UM coverage in states in which it was permitted to do so because Plum Creek

had already secured insurance coverage for its employees in the form of workers' compensation

insurance.

44.     Ms. Duetsch understood the delegation of authority memorandum she received,

together with Mr. Jones' verbal instructions, to authorize her to execute UM coverage forms on

behalf of Plum Creek so as to reject UM coverage where permitted by law.

45.     Ms. Duetsch understood that Mr. Jones was aware of her execution of UM forms

because it was one of her job responsibilities for over 10 years.

46.     In addition, Ms. Duetsch and Mr. Jones met annually with the underwriter for

Plum Creek's primary casualty insurer.  During these meetings Ms. Duetsch and the underwriter

discussed the execution of the forms in the presence of Mr. Jones.

47.     Ms. Duetsch understood that if she failed to reject UM coverage of behalf of Plum

Creek, such failure would have been inconsistent with the position of Plum Creek and with the

instructions she was given by Mr. Jones.

48.     In 2012 and 2013 (the "Relevant Time Period"),[2/] Mr. Brown was the Vice President and Chief Accounting Officer at Plum Creek.

49.     Mr. Brown began working for Plum Creek in 1994.

50.     Prior to working at Plum Creek, Mr. Brown received a Bachelor's Degree in accounting from the University of Washington, a Master's Degree in Accounting, a Master's Degree in Business, and a Master's Degree in Taxation.

51.     Between 1994 and 2016, Mr. Brown held multiple titles with Plum Creek, including Controller; Vice President, Controller; Vice President, Controller (Chief Accounting Officer); and Vice President and Chief Accounting Officer.  While Mr. Brown's title changed during his 21 years at Plum Creek, in his view he had the same job for 21 years, which was to be responsible for the accounting for the Company.  Mr. Brown retired following the acquisition of Plum Creek by Weyerhaeuser in 2016.

52.     During the Relevant Time Period, Mr. Brown was elected to the position of Vice President and Chief Accounting Officer annually by the Plum Creek Board of Directors (the "Board").

53.     In its Form 10-K filing with the U.S. Securities and Exchange Commission ("SEC") for the year ending December 31, 2013, Mr. Brown was not listed as an executive officer of Plum Creek. Mr. Brown signed the Form 10-K in his capacity as "Vice President and Chief Accounting Officer (Principal Accounting Officer)."

54.     Mr. Brown was never on the Plum Creek Board of Directors.

---

[2/]     Unless otherwise specified, the facts set forth herein apply to the Relevant Time Period of 2012 and 2013.

55.     Plum Creek was the largest private landowner in the United States.  It derived revenue from selling trees, manufacturing wood products, selling and/or developing its land, and mineral rights.

56.     Plum Creek earned approximately $1.5 billion in revenue annually.

57.     Plum Creek was a publicly-traded company and a member of the S&P 500.

58.     Mr. Brown understood that as a publicly-traded company, Plum Creek was subject to oversight by the SEC.

59.     As Plum Creek's Vice President and Chief Accounting Officer, Mr. Brown's primary job responsibility was to oversee the Company's annual disclosure of financial information in order to meet various SEC requirements.

60.     Mr. Brown's view was that he was primarily responsible for the Company's Form 10-K filing with the SEC.  He worked with various accountants, attorneys, and Board members to make sure "we got it right."  Brown Dep. at 8, 13.[3/]  As the Company's principal accounting officer, Mr. Brown signed Plum Creek's Form 10-K Annual Report for the years 2012 and 2013.

61.     Mr. Brown was primarily responsible for "internal controls" at Plum Creek, meaning appropriate protocols and practices to prevent material misstatements in the reported earnings and to ensure that all material transactions were properly approved in accordance with the requirements of the Board.  This responsibility was given to Mr. Brown by the Board, the Chief Financial Officer (the "CFO"), and the President of the Company.  It was Mr. Brown's job to take primary responsibility for the Company's internal controls.

62.     After the Sarbanes-Oxley Act of 2002 ("SOX") came into effect, the SEC issued guidance to public companies regarding internal controls.  The SEC directed management of

---

[3/]     Citations in the form "Brown Dep. at ___" are to the Deposition of David Brown taken in Seattle, Washington on August 3, 2017.

public companies to focus on making sure that all accounting transactions were properly recorded and that these transactions were properly executed in accordance with delegations of authority.  Delegations of authority were specifically included in the SEC's definition of proper internal controls.

63.     After SOX was implemented, Mr. Brown spent approximately twenty-five percent of his time ensuring that the Company had proper internal controls in place and approximately seventy-five percent of his time ensuring that "the numbers were correct." Brown Dep. at 17.

64.     Based on his knowledge of federal regulations governing public companies, including the SEC's guidance, along with his educational and professional experience, Mr. Brown understood that adequate internal controls over financial reporting, specifically those intended to ensure all material transactions are properly authorized, required that Plum Creek have adequate delegations of authority in place.

65.     As an area within his work on internal controls, Mr. Brown spent much of his time on the area of delegations of authority.  Mr. Brown and a counterpart in the legal group worked together regularly to make sure the Company "had a good delegation in place." Brown Dep. at 22.

66.     Delegations of authority are part of the requirements for proper internal controls, and internal controls in turn are a component of financial reporting.  This is so because an audit always addresses two questions: 1) "are the numbers right"? and 2) "do we have controls in place to make sure the numbers [are] right"?  Brown Dep. at 41.

67.     Beginning in approximately 2004 and continuing through the Relevant Time Period, the Audit Committee met nine times per year, and Mr. Brown attended each meeting.

68.     At each Audit Committee meeting, Mr. Brown gave the Audit Committee an update on his responsibilities related to financial reporting, including internal controls and delegations of authority.

69.     The Plum Creek By-Laws provide that the "Board of Directors . . . may exercise all such powers of the Corporation and do all such lawful acts and things as are not by statute or by the Certificate of Incorporation or by these By-Laws required to be exercised or done by the stockholders." Amended and Restated By-Laws of Plum Creek Timber Company, Inc., ECF #40-1.

70.     In 2003 or 2004, in connection with SOX, the Plum Creek Board of Directors issued a written delegation of authority ("BOD Delegation of Authority").  Under the BOD Delegation of Authority, Mr. Brown reported up to the CFO, who in turn reported to the Chief Executive Officer ("CEO"), who in turn reported to the Board of Directors.

71.     From time to time thereafter, the Board changed the BOD Delegation of Authority to adjust responsibilities.

72.     The BOD Delegation of Authority addressed the power of individual corporate officers to approve payments to third parties on behalf of the Company.

73.     According to the BOD Delegation of Authority, payments of certain amounts required Board approval. Below that, certain authority was delegated to the President of the Company.  From there, the delegations would "cascade down throughout the [C]ompany." Brown Dep. at 36.

74.     The BOD Delegation of Authority did not contain a separate line for insurance. Insurance fell under approval for payments. Mr. Brown "guessed" that there were-approximately

fifteen categories of payments, and insurance would have been one of the normal recurring expenditures.  Brown Dep. at 36.

75.     Mr. Brown received a copy of the BOD Delegation of Authority in the first year the Board approved it.

76.     The BOD Delegation of Authority was reviewed quarterly by internal and external auditors. If the auditors raised any issues, they would first bring them to Mr. Brown's attention, then Mr. Brown and the auditors would bring the issues to the attention of the Audit Committee.

77.     Plum Creek's external auditor, Ernst & Young, reported on its audit of Plum Creek in the Company's 2013 10-K.  Ernst & Young's audits included a review of the Company's internal controls, including its BOD Delegation of Authority.  Ernst & Young reported no material weaknesses in the Company's internal controls, including its BOD Delegation of Authority.

78.     Mr. Brown received feedback from both internal and external auditors that they "weren't really aware of any company that did [internal controls] better than Plum Creek." Brown Dep. at 35.

79.     At all relevant times, Mr. Brown understood that his authority came from his boss, the CFO, and Mr. Brown reported up to the CFO.

80.     The CFO received his authority from the CEO, and the CFO reported up to the CEO.

81.     The CEO received his authority from the Board and reported up to the Board.

82.     The CFO delegated to Mr. Brown the primary responsibility of ensuring that "all of the accounting was correct" for the Company. Brown Dep. at 23.  Mr. Brown also understood

that, based on the BOD Delegation of Authority, he had a "specific level of authority for certain transactions that he was allowed to approve." Brown Dep. at 23.

83.     Mr. Brown had different authorities depending on what category a payment fell into, and he maintained a file to review whenever he was asked to approve a payment in order to ensure the payment was within his authority.

84.     Mr. Brown met weekly with his direct supervisor, Plum Creek's CFO, David Lambert.  During these meetings, Mr. Brown discussed "basically anything and everything that [Mr. Brown] thought was important to [Mr. Lambert] relating to financial reporting," which included accounting for transactions, the annual audit, internal controls, and personnel-related matters.  Brown Dep. at 44.

85.     Mr. Brown was the direct supervisor to Mr. Jones.

86.     Insurance was within the job description of Mr. Jones and people who reported to him.

87.     Mr.  Brown knew that as Plum Creek grew, Mr. Jones hired Ms. Duetsch so that Mr. Jones would have someone to whom he "could delegate some of his insurance responsibilities." Brown Dep. at 44.

88.     As the direct supervisor to Mr. Jones, Mr. Brown knew that insurance was within Mr. Jones' job description as well as within Mr. Brown's own authority.

89.     Generally, the people responsible for insurance at Plum Creek were Mr. Jones, Ms. Duetsch, Mr. Brown and Mr. Lambert.

90.     Mr. Brown viewed Mr. Jones as the "top person in the [C]ompany to make sure that all of [Plum Creek's] insurance decisions were done correctly." Brown Dep. at 24.

91.     Anything having to do with insurance, except for authorizing payments, was within the full authority of Mr. Jones.  Mr. Jones was responsible for ensuring that Plum Creek was buying the correct amount of insurance, subject to whether the payments were within his delegation.  For any payments above the level of his delegation of authority, Mr. Jones was required to seek approval from someone senior to him with the requisite authority, such as Mr. Brown or the CFO.

92.     A delegation of authority in effect in 2013 gave Mr. Jones authority to approve insurance payments under $1 million, and stated that any payments greater than $1 million needed to be approved by Mr. Brown.

93.     The delegation of authority memorandum, issued by Mr. Jones and attached to the Supplementary Affidavit of Mr. Jones, is consistent with information Mr. Brown had regarding the CFO's level of authority, Mr. Brown's own level of authority, and the authority of Mr. Brown's direct reports.

94.     Mr. Brown worked for Plum Creek in Seattle, and Mr. Jones worked in a different office in Montana. During the period in which Mr. Jones reported to Mr. Brown, including during the Relevant Time Period, Mr. Brown and Mr. Jones had a standard call each week for one hour.  For each meeting, Mr. Brown would prepare an agenda and Mr. Jones would prepare an agenda.  They spent an hour a week "discussing issues." Brown Dep. at 20. Mr. Brown conducted an annual evaluation of Mr. Jones each year beginning in 2001 and continuing through the Relevant Time Period.

95.     Mr. Brown received external feedback that, with respect to insurance, risk management, manufacturing and accounting, and shared services, Mr. Jones was "about as good as any employee in the industry."  Brown Dep. at 27-28.

96.     Mr. Brown reported to the CFO with respect to insurance.  He would ask the CFO how he wanted to manage that area.  Mr. Brown believed that Mr. Jones was an expert in the area of insurance, so he did not want to micromanage Mr. Jones.  Mr. Brown's boss, Plum Creek's CFO, Mr. Lambert, provided the authorization in 2012 and 2013 for the binding of Plum Creek's insurance program.

97.     Because the annual policy premiums for Plum Creek's insurance program generally were greater than Mr. Brown's authority to approve the payment, Mr. Jones asked Mr. Lambert to approve the premium payments to insurers.  Brown Dep. at 26.

98.     With respect to Plum Creek's binding or purchase of insurance, several meetings were held each year at Plum Creek's Seattle office.  Mr. Lambert and Mr. Brown attended, as did Plum Creek's insurance brokers.  Mr. Jones travelled to Seattle to attend and Ms. Duetsch sometimes attended as well.

99.     Prior to each broker meeting, the participants received written materials.

100.     During each broker meeting, Mr. Jones and the insurance brokers walked through Plum Creek's insurance renewals and discussed the "prudent thing to do."  Brown Dep. at 24. The group reviewed the premiums, coverages, and deductibles.

101.     Meeting participants had an opportunity to ask Mr. Jones and other experts within the Company, along with outside advisors, "Are we doing the right thing?"  Brown Dep. at 37.

102.     After these meetings, once Plum Creek received the final premium quotes from its insurers, Mr. Jones emailed Mr. Lambert to ask for approval of various coverages and various payments.  Mr. Jones copied Mr. Brown on the email.  Mr. Lambert emailed his approval back to Mr. Jones with a copy to Mr. Brown.

103.     Mr. Brown did not recall seeing any instance in which Mr. Lambert did not provide such approval to Mr. Jones.  Also prior to the renewal of Plum Creek's insurance policies, Mr. Jones sent Mr. Brown a spreadsheet with a summary of the different coverages, premiums, and deductibles, and Mr. Brown reviewed the spreadsheet.

104.     During the Relevant Time Period, Mr. Brown and Mr. Jones discussed Plum Creek's automobile insurance coverage, which was primarily a Powerpoint presentation summarizing the level of coverage, the deductible and generally why it was the "prudent thing to do."  Brown Dep. at 28.

105.     Mr. Brown never discussed UM coverage with Mr. Jones.  Mr. Brown never directed Mr. Jones to accept or reject UM coverage in the umbrella policy.  While he and Mr. Jones met weekly, the topic of UM coverage never came up.

106.     Mr. Brown did not know whether or not Plum Creek purchased UM coverage in 2012 or 2013. He did not know of any reason why that would be something he would have needed to know.

107.     According to Mr. Brown, Mr. Jones had full authority to decide whether to accept or reject UM coverage for Plum Creek. He made that decision based on his training and experience.

108.     Mr. Brown was not surprised to learn that Plum Creek did not purchase UM coverage.  In Mr. Brown's view, Mr. Jones purchased the correct amount of insurance.  Brown Dep. at 39.  That amount of insurance purchased was within Mr. Jones' delegation of authority.

109.     Mr. Brown did not know how many vehicles Plum Creek owned during the 2012-2013 period, or how many vehicles Plum Creek had in New Hampshire.

110.     Anything having to do with insurance, except for authorizing payments over a certain amount, was within the fully authority of Mr. Jones, and to the extent Mr. Jones delegated that authority to Ms. Duetsch, Mr. Brown was "totally comfortable" with either Mr. Jones or Ms. Duetsch "signing on behalf of the [C]ompany." Brown Dep. at 37.

111.     Generally insurance was not covered at the Board level.

112.     Mr. Brown was always aware of the agenda for Board Meetings because he wanted to know if there was anything the Board was discussing that had any internal control or financial reporting significance.  Mr. Brown also always received copies of the materials provided to the Board during their meetings and copies of the minutes of the meetings after the fact so that he could determine whether anything had come up that had financial reporting significance.

113.     Insurance was not a standard item on the Board meeting agenda. Periodically, Mr. Jones sent Mr. Brown Powerpoint presentations that would then be included in the materials sent to the Board. The Board was always more interested in the directors and officers insurance coverage.

114.     In the Relevant Time Period, Mr. Jones never appeared in front of the Board of Directors. None of Mr. Jones' memos were ever presented to the Board or the Board's Audit Committee.

115.     The Board generally met four times per year for two or three hours.  According to Mr. Brown, insurance generally was not covered at the Board level.

116.     Michael Day works as an Account Executive, Senior Vice President at AON Risk Services ("AON") in Seattle, Washington.

117.     AON was Plum Creek's insurance broker.  AON is an insurance brokerage and risk advisor specialty firm.  It serves as an intermediary between its clients and various insurance carriers.

118.     Mr. Day has served as a Senior Vice President at AON since 1999.

119.     Mr. Day has worked in the insurance industry for over thirty years, both at AON and elsewhere.

120.     During the Relevant Time Period, in his role as an Account Executive and Senior Vice President, Mr. Day had two primary responsibilities.  First, as an account executive, he was the direct client service contact, with day-to-day interaction with his clients at AON.  Second, as a casualty broker, he placed casualty risk within the marketplace on behalf of his own clients and clients of other account executives at AON.

121.     Mr. Day's work spanned all different types of industries but typically involved the same lines of coverage in the casualty arena – which includes liability insurance and workers' compensation – for larger commercial accounts.

122.     Mr. Day began working with Plum Creek in June of 2009 when AON's previous casualty broker retired.

123.     AON had an internal client service team that worked with Plum Creek.  The members of that team were Mr. Day, Donna Keane (Account Executive), and Jacquie Brissey (Account Specialist).

124.     In 2012, Plum Creek became a new customer of Liberty for purposes of umbrella coverage.

125.     In 2012 and 2013, Paulo Aguiar was an employee of Liberty with the title "Senior Underwriter."

126.    In 2012 and 2013, Evelyn Surban was an employee of Liberty with the title Senior Underwriting Assistant. Ms. Surban was the assistant to Mr. Aguiar.

127.    On May 14, 2012, Mr. Aguiar sent an email to Mr. Day with the subject line "Plum Creek Timber Company – Lead Umbrella quote." Mr. Aguiar stated, "[h]ere's your lead umbrella quote for Plum Creek." L000424 (Day Ex. 1-A).[4/] Mr. Aguiar further stated, among other things, that the quote letter contained offers for UM coverage for Florida, Louisiana, New Hampshire and West Virginia. Neither Mr. Jones nor Ms. Duetsch was copied on this email.

128.    On May 23, 2012, Mr. Day sent an email to Mr. Aguiar stating, "Quick Question on your [UM] options." L000424 (Day Ex. 1-A). Mr. Day then asked Mr. Aguiar to confirm that if Plum Creek rejected UM coverage where permitted and/or is only subject to minimums where required, no additional premiums would be incurred under the policy. Mr. Day added that he "[j]ust wanted to make sure there are no minimum charges since the insured does not buy this coverage in their primary." L000424 (Day Ex. 1-A). Mr. Day closed the email by stating, "Thanks and we may have some additional questions as we discuss with the client." Neither Mr. Jones nor Ms. Duetsch was copied on this email.

129.    On May 24, 2012, Mr. Day provided binding instructions to Liberty for Plum Creek with respect to Plum Creek's umbrella coverage for the policy effective June 1, 2012 to June 1, 2013. These instructions were provided by telephone from Mr. Day to Mr. Aguiar and were documented in a follow-up email that Mr. Day sent to Mr. Aguiar. Among other things, this email stated, "The insured is declining Terrorism and UM. If you need the rejection forms signed, please let me know." L000421-22 (Day Ex. 1-B). Neither Mr. Jones nor Ms. Duetsch was copied on this email. This email was stored in Liberty's underwriting file for Plum Creek.

---

[4/]        Citations in the form "Day Ex.___" are to Exhibits to the Deposition of Michael Day.

130.    On May 25, 2012, Mr. Aguiar sent an email to Mr. Day of AON, with a copy to Ms. Surban, with the subject line "Plum Creek Timber Company – Lead Umbrella Binding Order."  In the email, Mr. Aguiar stated "Here's your official lead umbrella binder for Plum Creek."  L000421 (Day Ex. 1-B).  Attached to the email was a document entitled "PLUMCREEKTIMBERCOMPANY-v1binderletter.pdf."  In his email, Mr. Aquiar also requested that Mr. Day send, among other documents, "[s]igned copies of the UM/UIM offer letters for FL, LA, NH, and WV."  L000421 (Day Ex. 1-B).  This email was stored in Liberty's underwriting file for Plum Creek.   Neither Mr. Jones nor Ms. Duetsch was copied on this email.

131.    Liberty issued a Commercial Umbrella Policy to Plum Creek with an effective date of June 1, 2012 to June 1, 2013.

132.    On June 15, 2012, Mr. Day sent an email to Ms. Surban that stated, "Per my earlier email, here are the signed forms." L000382-88 (Day Ex. 1-D).  Attached to the email were signed UM rejection forms for the states of Florida, Louisiana, New Hampshire and West Virginia for the year 2012.  Neither Mr. Jones nor Ms. Duetsch was copied on this email. This email and its attachments were stored in Liberty's underwriting file for Plum Creek.

133.    Liberty's underwriting file for the 2012 underwriting of Plum Creek's umbrella coverage reflects that Liberty personnel did not communicate directly with Plum Creek personnel.  Rather, all communications relating to the negotiation and issuance of the policy were relayed through AON personnel, including Mr. Day.

134.    In 2013, Connie Cameron was an employee of Liberty with the title "Executive Underwriter."

135.    In 2013, Martha Kuykendall was an employee of Liberty with the title "Insurance Assistant – Umbrella Support."

136.     On March 15, 2013, Ms. Kuykendall sent an email to Mr. Day, with a copy to Ms.

Cameron, with the subject line "Umbrella Renewal Information Request – Plum Creek Timber

Company, Inc."  In her email, Ms. Kuykendall stated, "[o]ur records indicate that the above

mentioned policy is up for renewal.  Please forward the umbrella/excess renewal specifications

and/or an application along with [certain specific] documentation."  L000144 (Day Ex. 1-E).

Neither Mr. Jones nor Ms. Duetsch were copied on this email.

137.     On May 3, 2013, Mr. Day sent an email to Ms. Cameron with the subject line,

"Plum Creek – Umbrella Renewal Eff: 06/01/2013."  In his email, Mr. Day stated, "Attached is

the updated umbrella renewal submission."  L000142 (Day Ex. 1-F).  Neither Mr. Jones nor Ms.

Duetsch were copied on this email.

138.     On May 21, 2013, Mr. Day sent an email to Ms. Cameron and a subsequent email

to Mr. Aguiar and Ms. Surban requesting that Liberty provide a quote to renew its umbrella

coverage.  L000135-36 (Day Ex. 1-G).  Neither Mr. Jones nor Ms. Duetsch were copied on this

email.

139.     On May 23, 2013, Mr. Aguiar sent an email to Mr. Day with a copy to Ms.

Cameron providing the "lead umbrella renewal quote" for Plum Creek.  Mr. Aguiar further stated

that "just like last year I am offering [UM] coverage for vehicles garaged in the states of FL, LA,

NH, and WV. . . . If there are any changes that need to be made to the [UM] offer we can amend

it later if the insured's interested in the coverage this year (they rejected it last year . . .)."

L000090 (Day Ex. 1-H).   Neither Mr. Jones nor Ms. Duetsch were copied on this email.

140.     On May 30, 2013, Ms. Brissey provided the binding order to Liberty for Plum

Creek with respect to the renewal of its umbrella policy, stating "[p]lease bind per your renewal

quote attached."  L000089 (Day Ex. 1-H).  This order was sent by email to Ms. Cameron and

Mr. Aguiar.  Neither Mr. Jones nor Ms. Duetsch were copied on this email.  This email was stored in Liberty's underwriting file for Plum Creek.

141.    Liberty issued a Commercial Umbrella Policy to Plum Creek with an effective date of June 1, 2013 to June 1, 2014.

142.    On June 3, 2013, Ms. Brissey sent an email to Ms. Cameron, with a copy to Mr. Day, with the subject line "Plum Creek Timber Company – signed TRIA and UM/UIM forms." Attached to this email were signed UM rejection forms for Florida, Louisiana, New Hampshire and West Virginia for the year 2013.  Neither Mr. Jones nor Ms. Duetsch was copied on this email. This email and its attachments were stored in Liberty's underwriting file for Plum Creek.

143.    Liberty's underwriting file for the 2013 underwriting of Plum Creek's umbrella coverage reflects that Liberty personnel did not communicate directly with Plum Creek personnel.  Rather, all communications relating to the negotiation and issuance of the policy were relayed through AON personnel, including Mr. Day.

144.    During the Relevant Time Period, Mr. Day did not recall any specific conversations with Plum Creek regarding UM coverage. He worked off of his renewal files and from those files understood that UM coverage had been rejected in the past.

145.    Mr. Day understood the rejection of UM coverage to be consistent with Plum Creek's strategy with respect to insurance.

146.    Mr. Day believed that Plum Creek did not buy UM coverage in their primary coverage. Mr. Day stated that UM coverage would typically not follow up into the umbrella policy if it was not on the primary policy.  When Mr. Day receives signed forms from a client, he expects that those documents have been signed with the authority of the client, according to the client's own internal protocols.

23

147.    In Mr. Day's experience, he has never seen a written document or delegation of authority giving a risk manager the authority to purchase coverage.

148.    There is a protocol within AON that the people with whom AON works are established in their role.  AON does not "have someone coming in and declaring themselves authorized without the proper relationship already having been established." Day Dep. at 93.[5]

149.    Mr. Day understood Mr. Jones's role at Plum Creek to be that of "director in risk management."  Day Dep. at 18.

150.    Mr. Day understood Ms. Duetsch's role at Plum Creek to be that of "risk manager."  Day Dep. at 18, 56.

151.    In Mr. Day's experience risk managers are typically in charge of the insurance matters for the organization that they represent.  If there is a risk manager in an organization, that is the person Mr. Day typically interacts with on insurance matters and questions that may come up regarding contracts.

152.    The "New Hampshire Excess Uninsured Motorists Coverage Selection or Rejection Form" signed by Ms. Duetsch on May 30, 2013, was at all relevant times stored in the Liberty underwriting file in the ordinary course of Liberty's business.

---

[5]    Citations in the form "Day Dep. at ___" are to the Deposition of Michael Day, taken in Seattle, Washington on August 2, 2017.

**BRENDAN KELLY**
By his attorneys,
THE STEIN LAW FIRM, PLLC

*/s/ Robert Stein*
Robert A. Stein, Esq. (NH Bar #2438)
PO Box 2159
Concord, NH 03302
603 228-1109
rstein@steinlawpllc.com


Diane Perin Hock (NH Bar #1999)
PO Box 2159
Concord, NH 03302-2159
603 288-1109
dphock@comcast.net

**LIBERTY INSURANCE CORPORATION**
By its attorneys,

*/s/ Lavinia Weizel*
Nancy D. Adams, Esq. (admitted *pro hac vice*)
Lavinia M. Weizel, Esq. (NH Bar #265351)
Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, PC
One Financial Center
Boston, MA 02111
Telephone:  (617) 542-6000
Fax: (617) 542-2241
nadams@mintz.com

John B. Schulte, Esquire (NH Bar #9376)
Law Offices of John B. Schulte
Two Bedford Farms Drive, Suite 202
Bedford, NH 03110
Telephone:  (603) 623-8413
Fax:  (603) 623-8517
Johnb.schulte@libertymutual.com


Dated:  January 22, 2018


## CERTIFICATE OF SERVICE

I hereby certify that on January 22, 2018, I electronically filed the foregoing document with the Clerk of the District Court using the CM/ECF system, which sent notification of such filing to counsel of record for the parties.

*/s/ Lavinia M. Weizel*
Lavinia M. Weizel