### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| BRENDAN KELLY,<br><br>　　　Plaintiff,<br><br>v.<br><br>LIBERTY INSURANCE<br>CORPORATION<br><br>　　　Defendant. | CIVIL ACTION NO. 15-CV-00234-JL |

### PRETRIAL MEMORANDUM OF LAW
### OF LIBERTY INSURANCE CORPORATION

LIBERTY INSURANCE CORPORATION
By its attorneys,

*/s/ Lavinia M. Weizel*
Nancy D. Adams, Esq. (admitted *pro hac vice*)
Lavinia M. Weizel, Esq. (NH Bar #265351)
Mintz, Levin, Cohn, Ferris, Glovsky and
Popeo, PC
One Financial Center
Boston, MA 02111
Telephone:  (617) 542-6000
Fax: (617) 542-2241
nadams@mintz.com

John B. Schulte, Esquire (NH Bar #9376)
Law Offices of John B. Schulte
Two Bedford Farms Drive, Suite 202
Bedford, NH 03110
Telephone:  (603) 623-8413
Fax:  (603) 623-8517
Johnb.schulte@libertymutual.com

**Dated:** January 26, 2018

## Table of Contents

PRELIMINARY STATEMENT ............................................................... 1

BACKGROUND ............................................................................ 2

   I.    Factual Background Regarding Plum Creek Timber Company...................... 2

     A.   Plum Creek's Business and Organizational Structure ................... 2

     B.   Plum Creek Risk Management Department & Insurance Program........... 4

     C.   Plum Creek's Insurance Broker............................................... 6

     D.   Plum Creek's Rejection of UM Coverage ................................. 8

     E.   Binding of the 2012 and 2013 Umbrella Policies.................... 10

   I.    New Hampshire Agency Law Principles .................................... 12

   II.   Lisa Duetsch Possessed Actual Authority, Traceable to the Plum Creek Board of Directors, to Reject UM Coverage........................................... 14

     A.   Kent Jones Expressly Delegated Authority to Lisa Duetsch to Reject UM Coverage. 15

     B.   The Plum Creek CFO and CAO Both Expressly and Impliedly Delegated Authority over Insurance Matters to Kent Jones.................................. 16

     C.   The Plum Creek Chief Financial Officer and Chief Accounting Officer Each Possessed Express and Implied Authority to Approve Insurance-Related Transactions and Decisions on Behalf of Plum Creek.................................... 19

     D.   The Authority of the Plum Creek Board of Directors Was Expressly Delegated by the Company's Bylaws. ................................................ 21

   III.  In the Alternative, Lisa Duetsch Was Cloaked with Apparent Authority to Reject UM Coverage on Behalf of Plum Creek. .................................... 21

CONCLUSION.......................................................................... 25

## PRELIMINARY STATEMENT

On May 13, 2013, Lisa Duetsch, the Manager of Risk and Insurance for Plum Creek Timber Company ("Plum Creek" or "the Company"), executed an Excess Uninsured Motorists Coverage Selection or Rejection Form (the "NH UM Rejection Form").  The NH UM Rejection Form reflects the rejection of optional underinsured/uninsured motorist ("UM") coverage on behalf of Plum Creek in connection with a Commercial Umbrella Policy issued to Plum Creek by Liberty Insurance Corporation ("Liberty") with an effective date of June 1, 2013 through June 1, 2014 (the "2013 Umbrella Policy").[1/]  After the Plaintiff was allegedly injured in a motor vehicle accident in December of 2013, he sought UM coverage under the 2013 Umbrella Policy.  Based on the NH UM Rejection Form, Liberty denied the claim.

The Plaintiff then filed a petition for declaratory judgment, seeking a declaration that the 2013 Umbrella Policy provides coverage for his UM claim.  In ruling on the parties' cross-motions for summary judgment, this Court denied summary judgment to the Plaintiff and granted summary judgment to Liberty, in part, with respect to the legal questions related to the interpretation of the 2013 Umbrella Policy and the New Hampshire Uninsured or Hit-and-Run Motor Vehicle Coverage statute (N.H. Rev. Stat. § 264:15).  This Court further determined that a genuine issue of material fact remained as to whether Ms. Duetsch was duly authorized to execute the NH UM Rejection Form on behalf of Plum Creek.

Accordingly, the sole factual issue remaining for trial is whether the preponderance of the evidence shows that Ms. Duetsch was authorized, under principles of New Hampshire agency law, to execute the NH UM Rejection Form on behalf of Plum Creek.  As set forth more fully

---

[1/]    Liberty had previously issued a Commercial Liability Umbrella Policy to Plum Creek for the policy period June 1, 2012 through June 1, 2013 (the "2012 Umbrella Policy").  The 2012 Umbrella Policy and the 2013 Umbrella Policy are collectively referred to as the "Umbrella Policies."

below, the evidence in the trial record overwhelmingly demonstrates that Ms. Duetsch possessed

actual authority, traceable to the Company's Board of Directors (the "Board"), to execute the NH

UM Rejection Form.  The trial record further demonstrates that, even if she lacked actual

authority, Ms. Duetsch was cloaked with apparent authority upon which Liberty could

reasonably rely – both in the negotiation and issuance of the 2013 Umbrella Policy and thereafter

in the enforcement of policy's terms – to conclude that Plum Creek had rejected UM coverage.

## BACKGROUND

### I.   FACTUAL BACKGROUND REGARDING PLUM CREEK TIMBER COMPANY

#### A.   Plum Creek's Business and Organizational Structure

In 2012 and 2013 (the "Relevant Time Period"),[2] Plum Creek was the largest private

landowner in the United States.  It derived revenue from its land through channels including the

sale of timber, manufacturing of wood products, real estate development and mineral rights.

Plum Creek was a publicly-traded company and a member of the S&P 500, earning

approximately $1.5 billion in revenue annually.[3]

Plum Creek was organized as a Delaware corporation and its bylaws permitted the Plum

Creek Board to act on the Company's behalf, including by executing contracts. Tr. Ex. 41 (ECF

No. 40-1), Art. III, § 4 ("Board of Directors . . . may exercise all such powers of the Corporation

and do all such lawful acts and things as are not required by statute or by the Certificate of

Incorporation or by these By-Laws required to be exercised or done by the stockholders.")[4] As a

publicly-traded company, Plum Creek was subject to regulation by, among other entities, the

---

[2]        Unless otherwise specified herein, each of the facts referenced herein was true during the Relevant Time Period.

[3]        SOF ¶¶ 55-57 (Citations in the form "SOF ¶__" refer to the paragraphs in the parties' Joint Statement of Agreed-Upon Facts (ECF No. 54)).

[4]        SOF ¶ 69.  In 2016 Plum Creek was acquired by Weyerhaueser Corporation.  SOF ¶ 51.

U.S. Securities and Exchange Commission (the "SEC").[5]  In 2003 or 2004, following the

passage of the Sarbanes-Oxley Act of 2002 ("SOX"), the Board issued a written Delegation of

Authority (the "BOD Delegation of Authority"), which provided that the Chief Executive Officer

("CEO"), Chief Financial Officer ("CFO"), the Chief Accounting Officer ("CAO") and other

corporate officers could approve certain types of transactions and expenditures up to specific

dollar amounts.[6]  Although modified slightly over time, the BOD Delegation of Authority

remained in effect during the Relevant Time Period.[7]  According to the BOD Delegation of

Authority, the CEO's authority was delegated by the Board, and the CEO reported directly to the

Board.  The CFO's authority was delegated by the CEO, and the CFO reported directly to the

CEO.  The CAO's authority was delegated by the CFO, and the CAO reported directly to the

CFO.[8]  From there, the delegations of authority "cascaded down throughout the Company."[9]

Because delegations of authority were a component of the Company's internal controls

over financial reporting, the delegations were reviewed quarterly by both internal and external

auditors to ensure compliance both with SEC requirements and with the terms of the delegations

themselves.  These internal and external audits were intended to ensure both that the Company's

accounting was accurate, and that the Company maintained adequate internal controls, in the

form of delegations of authority, to ensure that the Company's financial reports were based on

duly-authorized transactions and expenditures.  Plum Creek's external auditor, Ernst & Young,

reported on its audit of Plum Creek in the Company's 2012 and 2013 Form 10-K Annual

Reports.  Ernst & Young's audits included a review of the Company's internal controls,

---

[5]        SOF ¶ 58.
[6]        SOF ¶¶ 62, 70, 72-73.
[7]        SOF ¶¶ 71; PFF ¶ 1.
[8]        SOF ¶¶ 70, 79-81.
[9]        SOF ¶ 73.

including its delegations of authority.[10/]  Ernst & Young reported no material weaknesses in the Company's internal controls, including its delegations of authority, and according to the Plum Creek CAO, Plum Creek always received an "A+" on its internal controls, including its delegations of authority.[11/]  Subject to the delegations of authority and reports at regular Board meetings, and as a result of the size and scope of Plum Creek's operations, the Board trusted the Company's officers to manage their areas of responsibility, including by hiring and delegating responsibilities to personnel who were expert in their fields.[12/]

**B.  Plum Creek Risk Management Department & Insurance Program**

During the Relevant Time Period, David Brown was the Vice President and CAO of Plum Creek.[13/] Mr. Brown's primary responsibility was to ensure that Plum Creek's financial reporting was accurate in all material respects and compliant with applicable federal regulations.[14/]  In this role, he also supervised Kent Jones, who held the title of Director of Accounting – Shared Services, Manufacturing and Risk Management.[15/]  Mr. Jones' responsibilities included managing Plum Creek's insurance program, subject to oversight from Mr. Brown and the CFO, David Lambert.[16/]  Mr. Brown was responsible for insurance because he supervised Mr. Jones and because he was authorized to approve expenditures for insurance premiums in certain amounts.[17/]

Additionally, under the BOD Delegation of Authority, the CFO was responsible for insurance because he supervised Mr. Brown and because he was authorized to approve

---

[10/]      SOF ¶¶76-78; PFF ¶ 5.
[11/]      SOF ¶ 77; PFF ¶ 2.
[12/]      SOF ¶¶ 112-13, 115; PFF ¶ 8.
[13/]      SOF ¶¶ 51, 52.
[14/]      SOF ¶¶ 51, 60, 61, 63, 65.
[15/]      SOF ¶ 20.
[16/]      SOF ¶¶ 84-86, 91, 94.
[17/]      SOF ¶ 88.

expenditures for insurance premiums that exceeded Mr. Brown's authority.[18/]   On occasion, the

Board requested reports from the officers regarding the company's insurance program.  These

were provided in the form of presentations for which Mr. Jones prepared the relevant

materials.[19/]

Mr. Lambert and Mr. Brown held weekly meetings to discuss Mr. Brown's execution of

his responsibilities and Mr. Brown in turn held weekly meetings with Mr. Jones to discuss Mr.

Jones' execution of his responsibilities, including with respect to insurance.[20/]  Mr. Brown also

met routinely with the Audit Committee of the Plum Creek Board to report on his execution of

his responsibilities.[21/]  Mr. Lambert, Mr. Brown and Mr. Jones participated in regular meetings

with personnel from Plum Creek's insurance broker, AON Risk Services (AON).[22/]  During these

meetings, the group discussed the Company's insurance program and the applicable deductibles

and premiums, and Mr. Jones and AON made recommendations to Mr. Brown and Mr. Lambert

as to the appropriate coverages for Plum Creek to renew or obtain.[23/]

Mr. Brown viewed Mr. Jones as an expert on insurance who did not need to be

"micromanaged."[24/]  Accordingly, Mr. Brown viewed the regular meetings with Mr. Jones, Mr.

Lambert and the Company's insurance brokers, together with annual performance reviews and

Mr. Brown's weekly meetings with Mr. Jones, to be sufficient to enable Mr. Brown and Mr.

Lambert to be apprised of Mr. Jones' insurance-related activities on behalf of Plum Creek.[25/]

Subject to Mr. Jones' duty under the relevant delegations of authority to obtain authorization for

---

[18/]      SOF ¶¶ 89, 96, 97, 110.
[19/]      SOF ¶¶ 112-13, 115; PFF ¶ 7.
[20/]      SOF ¶¶ 84, 94.
[21/]      SOF ¶¶ 67-68.
[22/]      SOF ¶¶ 98-100; 117; PFF ¶ 17.
[23/]      SOF ¶¶ 100-01.
[24/]      SOF ¶ 96.
[25/]      SOF ¶ 96.

insurance premium payments over a certain amount, Mr. Brown expected Mr. Jones to make decisions with respect to insurance on behalf of Plum Creek based upon Mr. Jones' professional training, experience and judgment.[26/]

During each policy renewal cycle, following a Renewal Strategy Meeting, Mr. Jones supplied a spreadsheet to Mr. Lambert and Mr. Brown, providing a summary of each of Plum Creek's insurance coverages, premiums and deductibles.[27/]  Because the cost of the annual premium for Plum Creek's insurance program exceeded the limit of Mr. Jones' and Mr. Brown's delegations of authority, Mr. Jones sought formal, written approval from Mr. Lambert to bind the policies, which Mr. Lambert provided.[28/]  This process was followed for the binding of the Umbrella Policies.[29/]

### C.   Plum Creek's Insurance Broker

AON Risk Services ("AON") was Plum Creek's insurance broker.[30/]  AON is an insurance brokerage and risk advisor specialty firm that serves as an intermediary between its clients and various insurance carriers.[31/]  AON maintained an internal client service team that interacted with Plum Creek personnel.[32/]  The AON team included Donna Keane, who was the primary contact with Plum Creek, Jacquie Brissey, and Account Specialist, and Michael Day, an Account Executive and Senior Vice President at AON in Seattle, Washington.[33/]  Mr. Day is also a casualty broker with eighteen years of experience in the insurance industry.[34/]  In the years leading up to and including the Relevant Time Period, Mr. Day's work as a broker focused on

---

[26/]     SOF ¶¶ 91-92, 96-97; PFF ¶ 6.
[27/]     SOF ¶ 103.
[28/]     SOF ¶¶ 102-03.
[29/]     SOF ¶¶ 102-03.
[30/]     SOF ¶ 117.
[31/]     SOF ¶117.
[32/]     SOF ¶ 123.
[33/]     SOF ¶ 123.
[34/]     SOF ¶¶ 118, 120.

placing liability insurance and workers' compensation, for large, commercial accounts.[35]   In 2009, Mr. Day began working with Plum Creek.[36]   When Mr. Day first began working on the Plum Creek account, he familiarized himself with AON's file for Plum Creek.  Based upon his review of this file, Mr. Day understood that Plum Creek had rejected UM coverage in the years prior to 2009.[37]

Based upon his 18 years of experience as an insurance broker, Mr. Day interacts with certain designated representatives within a corporate client.[38]   Mr. Day does not interact with personnel from a client regarding insurance unless that person had been introduced to him and the proper relationship had already been established using appropriate internal protocols.[39]   Accordingly, in 2009, Ms. Keane and Ms. Brissey brought Mr. Day to the Plum Creek corporate office in Montana for the purpose of introducing him to Mr. Jones and Ms. Duetsch.[40]   Upon meeting Mr. Jones and Ms. Duetsch, Mr. Day exchanged business cards with them and the group met for approximately two hours.[41]   During this meeting, Mr. Day discussed with Mr. Jones and Ms. Duetsch Plum Creek's then-current insurance policies and coverages as well as required renewal materials.[42]   From 2009 through the Relevant Time Period, Mr. Day understood that Mr. Jones was the director of risk management for Plum Creek and that Ms. Duetsch was the risk manager for Plum Creek.[43]   In Mr. Day's experience, he typically interacts with individuals with the title of risk manager regarding insurance matters and questions relating to insurance

---

[35]     SOF ¶¶ 120-21.
[36]     SOF ¶ 122.  The prior AON broker had retired.  SOF ¶ 122.
[37]     PFF ¶ 9.
[38]     PFF ¶ 10, 19; SOF ¶¶ 148, 151.
[39]     PFF ¶ 10; SOF ¶ 148.
[40]     PFF ¶ 11.
[41]     PFF ¶ 13.
[42]     PFF ¶ 14.
[43]     SOF ¶¶ 149-50; PFF ¶ 15.

coverage.[44]  According to Mr. Day, risk managers are typically the individuals "in charge of the insurance matters for the organization that they are representing."[45]

From 2009 through 2014, Mr. Day served as an intermediary between Plum Creek and various insurance carriers to effectuate Plum Creek's "primary casualty placement," which included auto liability, general liability and workers' compensation insurance, together with umbrella liability coverage.[46]  Mr. Day met with Mr. Jones and Ms. Duetsch on other occasions in Plum Creek's corporate offices in Montana as well as in its corporate headquarters in Seattle.[47]  Mr. Day also regularly attended, either by phone or in person, meetings with Plum Creek personnel, including Mr. Lambert, Mr. Brown and Mr. Jones, regarding Plum Creek's insurance program.[48]

### D.  Plum Creek's Rejection of UM Coverage

Beginning in 2002, on the basis of Plum Creek's past practice and his own professional judgment, Mr. Jones rejected UM coverage in each state in which rejection was permitted by law.[49]  Subsequently, Mr. Jones assigned this responsibility to his direct report, Ms. Duetsch.[50]  Ms. Duetsch held the title of Manager, Risk and Insurance, which was reflected on her company-issued business cards and email account, and she maintained an office in the Plum Creek corporate offices in Montana where she and Mr. Jones met with AON personnel, including Mr. Day.[51]

---

[44]      SOF ¶ 151.
[45]      SOF ¶ 151.
[46]      PFF ¶ 16.
[47]      PFF ¶ 17.
[48]      PFF ¶ 18.
[49]      SOF ¶ 22.
[50]      SOF ¶ 23.
[51]      SOF ¶¶ 31-36; PFF ¶¶ 11, 17.

In 2005, Mr. Jones assigned Ms. Duetsch the responsibility of executing UM forms for the states that required the execution of such forms.[52]  Mr. Jones verbally instructed Ms. Duetsch to complete the UM forms associated with Plum Creek's renewal of its liability policies, and he supplied Ms. Duetsch with a written delegation of authority memorandum, stating, in relevant part, that the Risk Manager was authorized to sign "contracts, agreements, statements" including "Auto UI/UnderI forms."[53]  Although the delegation of authority memorandum was updated periodically, the language regarding UM rejection forms remained in effect during the Relevant Time Period.[54]

In the first year that Mr. Jones delegated this responsibility to Ms. Duetsch, Mr. Jones reviewed the UM forms before Ms. Duetsch delivered them to AON.  In the following year, Mr. Jones verbally instructed Ms. Duetsch to complete the UM forms and indicated that he was comfortable not reviewing the forms given Ms. Duetsch's demonstrated comprehension of Plum Creek's intent to reject such coverage, as well as the accuracy of the prior years' forms Ms. Duetsch had completed.  Mr. Jones provided these instructions in his office during a scheduled weekly meeting with Ms. Duetsch. Until the delegation of authority memorandum was updated to explicitly grant Ms. Duetsch authority to complete the UM forms, she always notified Mr. Jones of her intent to complete the UM forms and received his verbal authority to do so.  After the delegation of authority memorandum was updated to explicitly grant Ms. Duetsch authority to complete the UM forms, Ms. Duetsch informed Mr. Jones of the status of her completion of

---

[52]     SOF ¶ 23.
[53]     SOF ¶¶ 26, 41, 42; Tr. Ex.6 at 39 of 48.
[54]     SOF ¶¶ 25-26.

these forms during their scheduled weekly meeting.[55/]  Ms. Duetsch was aware that her failure to execute the UM forms correctly would have reflected poorly on her job performance.[56/]

Ms. Duetsch executed UM rejection forms annually from 2005 until she left the Company in 2015.[57/]  These forms were stored in a shared access folder at Plum Creek where Mr. Jones could view them.[58/]  As these forms were delivered to AON to transmit to Plum Creek's insurers, copies of these forms were likewise stored in AON's underwriting file for Plum Creek.[59/]  Once Liberty acquired Plum Creek's business in 2012, copies of the UM RejectioN Forms for 2012 and 2013 were delivered to Liberty by AON and stored in Liberty's underwriting files for the 2012 Umbrella Policy and 2013 Umbrella Policy, respectively.[60/]

### E.  Binding of the 2012 and 2013 Umbrella Policies

In May of 2012, Liberty underwriter Paulo Aguiar provided Mr. Day of AON with a new business quote for umbrella coverage for Plum Creek.  This quote contained an offer for Plum Creek to purchase UM coverage in New Hampshire, Florida, Louisiana and West Virginia.[61/]  Mr. Aguiar subsequently confirmed for Mr. Day that, if Plum Creek rejected UM coverage where permitted, no additional premium would be required above that set forth in the quote.[62/]  Thereafter, Mr. Day provided binding instructions to Liberty on behalf of Plum Creek.  Mr. Day also confirmed by email to Liberty that Plum Creek was rejecting UM coverage.[63/]  The following day, Mr. Aguiar sent Mr. Day the binder for the 2012 Umbrella Policy and requested

---

[55/]    SOF ¶ 42.
[56/]    SOF ¶¶ 30, 47.
[57/]    SOF ¶ 38.  In 2012 and 2013 Ms. Duetsch executed forms for New Hampshire, Florida, Louisiana and West Virginia (collectively, the "UM Rejection Forms").  SOF ¶ 37.
[58/]    SOF ¶ 29.
[59/]    SOF ¶¶ 132, 142; PFF ¶ 9.
[60/]    SOF ¶¶ 132, 142.
[61/]    SOF ¶ 127.  These were the four states where Plum Creek operated that required the insured to select or reject UM coverage.
[62/]    SOF ¶ 128.
[63/]    SOF ¶¶ 129.

that signed copies of the UM selection/rejection forms be returned to Liberty.[64/]  Thereafter, Ms.

Duetsch executed the forms so as to reject coverage in each state, and Mr. Day delivered these

forms to Liberty.[65/]  Liberty issued the 2012 Umbrella Policy for the premium initially quoted –

without the additional premium for UM umbrella coverage.[66/]

   In May of 2013, a similar process was followed.  Liberty notified AON that the 2012

Umbrella Policy was coming up for renewal, and Mr. Day supplied an "updated umbrella

renewal submission" to Liberty on behalf of Plum Creek.  Mr. Aguiar thereafter delivered a

quote to Mr. Day with a premium of $168,813.[67/]  Mr. Aguiar stated, "just like last year I am

offering [UM] coverage for vehicles garaged in the states of FL, LA, NH, and WV. . . . If there

are any changes that need to be made to the [UM] offer we can amend it later if the insured's

interested in the coverage this year (they rejected it last year . . .)."[68/]  Subsequently, another

member of the AON client service team, Ms. Brissey, instructed Liberty to bind the renewal

policy per the quote that had been provided.[69/]  Ms. Duetsch thereafter executed the UM

Rejection Forms to reflect a rejection of UM coverage and AON personnel delivered these forms

to Liberty.[70/]  Liberty issued the 2013 Umbrella Policy for a premium in the amount of $168,813

that corresponded to the quote supplied without an additional premium for UM coverage.[71/]

---

[64/]     SOF ¶ 130.
[65/]     SOF ¶¶ 37, 132.
[66/]     Tr. Ex. 2 at L000057 (2012 Umbrella Policy showing total premium of $183,809); L000398 (2012
Umbrella Excess Liability Proposal showing Total Estimated Premium of $183,809).
[67/]     SOF ¶¶ 136-38; Tr. Ex. 2 at L000117 (Umbrella Excess Liability Proposal reflecting Premium Subtotal of
of $168,813, exclusive of optional Terrorism Coverage Flat Charge).
[68/]     SOF ¶¶ 139.
[69/]     SOF ¶¶139-40.
[70/]     SOF ¶¶ 37, 142.  Although these forms were delivered on June 3, 2013, the 2012 rejection remained in
effect in the interim.  Under the New Hampshire UM statute, "Rejection of [UM] coverage . . . shall remain effective
upon policy amendment or renewal, unless the named insured requests such coverage in writing."  N.H. RSA §
264:15.
[71/]     Tr. Ex. 10 (2013 Umbrella Policy showing a Premium of $168,813); Tr. Ex. 2 at L000117 (Umbrella
Excess Liability Proposal reflecting Premium Subtotalof $168,813, exclusive of optional Terrorism Coverage Flat
Charge).

Liberty stored the UM forms in its underwriting file for Plum Creek in the ordinary course,[72/] and the NH UM Form served as the basis for Liberty's denial of Mr. Kelly's claim for UM coverage.[73/]

## ARGUMENT

### I.   NEW HAMPSHIRE AGENCY LAW PRINCIPLES

In evaluating the existence of a principal-agent relationship, New Hampshire courts "commonly rel[y] on the Restatement for agency principles." *Coyle v. New Times Moving, Inc.*, No. 12-cv-332-JD, 2013 U.S. Dist. LEXIS 193739, at *3 n.2 (D.N.H. Sep. 25, 2013) (collecting cases).  According to the Restatement (Third) of Agency law, "[a]gency encompasses a wide and diverse range of relationships and circumstances. The elements of common-law agency are present in the relationships between employer and employee, corporation and officer, client and lawyer, and partnership and general partner." Restatement (Third) of Agency Law § 1.01, cmt. c (Am. Law Inst. 2006) (hereinafter "Restatement").

Under the Restatement and New Hampshire common law, a valid agency relationship can be established by proof of either actual or apparent authority.  Actual authority "results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by others to so act." *In re Contoocook Valley Paper Co.*, 529 A.2d 1388, 1390 (N.H. 1987).  New Hampshire common law recognizes three elements of a valid agency relationship:  1) the grant of authority from principal to agent; 2) consent of the agent; and 3) some degree of control of the agent by the principal.  *Bouffard v. State Farm Fire & Cas. Co.*, 27 A.3d 682, 687 (N.H. 2011); *see also Boynton v. Figueroa*, 913 A.2d 697, 707 (N.H. 2006).  As to the first two elements, the grant of authority and acceptance of it may be

---

[72/]     SOF ¶ 142, 152.
[73/]     SOF ¶ 13.

either express or implied.  Authority may be implied by the words, actions or prior course of conduct between the principal and the agent; by the acquiescence of the principal to the actions of the agent; or by necessity in carrying out an express grant of authority.  *See Carrier v. McLlarky*, 693 A.2d 76, 78 (1997); *Mannone v. Whaland*, 382 A.2d 918, 920 (1978); Restatement § 2.01, cmt b; *see also Bouffard*, 27 A.3d at 687 ("Implied authority . . . follows as a reasonable incident or construction of the terms of express authority[.]").  Whether express or implied, both are forms of "actual authority."  *See Bouffard*, 27 A.3d at 687.

In the context of an organization or corporation, actual authority usually begins with the organization's governing documents.  An organization's charter or bylaws typically identify "certain key positions within the organization" with authority to act on behalf of the organization.  *See* Restatement § 1.03, cmt. c. Most commonly, the key personnel are members of a board of directors that "by statute, must take specified types of actions and that also, by statute, is assigned ultimate supervisory responsibility for the corporation's business and affairs." *Id.*  Directors in turn appoint officers whose duties "may be defined by statute, by the corporation's constitutional documents, by specific resolutions adopted by the directors, and by custom associating specific functions with a particular position." *Id.* Further, the Restatement acknowledges that agents may appoint sub-agents "to perform functions that the agent has consented to perform on behalf of the agent's principal and for whose conduct the appointing agent is responsible to the principal."  Restatement § 3.15(1).  "The relationships between a subagent and the appointing agent and between the subagent and the appointing agent's principal are relationships of agency."  *Id.*

By contrast, even in cases where the elements of actual authority have not been established, an agency relationship can be found on the basis of apparent authority. Apparent

authority is "that authority which a reasonably prudent man, induced by the principal's acts or conduct, and in the exercise of reasonable diligence and sound discretion, under similar circumstances with the party dealing with the agent, and with like knowledge, would naturally suppose the agent to have." *Atto v. Saunders*, 93 A. 1037, 1039 (N.H. 1915) (internal quotation marks omitted). Conduct of the principal that induces a third party to believe in the existence of an agency relationship can be affirmative conduct, or it can be based on acquiescence. *See State v. Zeta Chi Fraternity*, 696 A.2d 530, 536 (N.H. 1997) (quoting 3 Am. Jur. 2d Agency § 79, at 586 (1986)). The manifestations giving rise to the apparent authority of a corporate principal include the organization's routine for communicating with those external to the organization, such as by designating specific officers or employees to negotiate with respect to specific topics or channeling communications through certain individuals on certain topics may give rise to the reasonable belief on the part of a third party that the person speaks for or may bind the organization. Restatement § 1.03, cmt. c. Apparent authority can also arise from custom and practice in an industry. "A principal's conduct does not occur in a vacuum. A third party's reasonable understanding of the principal's conduct will reflect general business custom as well as usage that is particular to the principal's industry and prior dealings between the parties." *Id.* § 2.03, cmt c.

## II.   LISA DUETSCH POSSESSED ACTUAL AUTHORITY, TRACEABLE TO THE PLUM CREEK BOARD OF DIRECTORS, TO REJECT UM COVERAGE.

The evidence contained in the trial record demonstrates that Ms. Duetsch possessed actual, express authority to reject UM coverage. This authority was granted to Ms. Duetsch from her supervisor, Mr. Jones, who in turn received actual express authority to bind the 2013 Umbrella Policy and actual express and implied authority to reject UM coverage from the Plum Creek CFO and CAO. The CFO and the CAO, in turn, received actual express and implied

14

authority from the Plum Creek Board to enter into financial transactions of certain amounts and to secure insurance for the Company.  The Board in turn received its authority expressly from the Company's bylaws.  Thus at each link in the chain from Ms. Duetsch to Plum Creek's Board, a valid agency relationship existed supporting the delegation of authority to reject UM coverage on the Company's behalf.

### A.   Kent Jones Expressly Delegated Authority to Lisa Duetsch to Reject UM Coverage.

All three elements of a valid agency relationship existed between Ms. Duetsch and Mr. Jones with respect to the rejection of UM coverage.  *See Bouffard*, 27 A.3d at 687 (requiring express or implied authorization, consent and some degree of control).  First, Ms. Duetsch was expressly authorized by Mr. Jones, both verbally and in writing, to reject UM coverage on behalf of Plum Creek.[74]  Mr. Jones verbally instructed her to execute the UM forms so as to reject coverage where permitted by law.[75]  Mr. Jones also issued her a written delegation of authority memorandum, which provided, in relevant part, that the Risk Manager was authorized to sign "contracts, agreements, statements" including "Auto UI/UnderI forms."[76] *See, e.g.*, *In re Contoocook*, 529 A.2d at 1391 (concluding that agency relationship existed based on evidence of verbal agreement with a real estate broker and written letter memorializing same).  Second, Ms. Duetsch accepted this responsibility by rejecting UM coverage and executing the UM Rejection Forms.[77]  Third, Mr. Jones monitored and controlled Ms. Duetsch's performance of her job responsibilities, including the rejection of UM coverage.  In the first year that he delegated this authority to Ms. Duetsch, he verified that she had completed the forms correctly.[78]  Thereafter,

---

[74]      SOF ¶¶ 23, 27.
[75]      SOF ¶ 27.
[76]      SOF ¶¶ 26.
[77]      SOF ¶¶ 37, 38.
[78]      SOF ¶ 42.

Mr. Jones met with Ms. Duetsch weekly.  During these meetings, Ms. Duetsch informed Mr. Jones of the status of her completion of the UM forms.[79]  In addition, Mr. Jones required that Ms. Duetsch save the completed forms in a shared network folder where he could view and access them.[80]  Further, Mr. Jones regularly updated the delegation of authority memorandum in order to make clear the limits of Ms. Duetsch's authority.[81]  Finally, Ms. Duetsch was aware that if she had failed to execute the UM Forms so as to reject coverage where permitted by law, such conduct would have reflected poorly on her job performance.[82] *See, e.g.*, *Herman v. Monadnock Pr-24 Training Council*, 802 A.2d 1187, 1190-91 (N.H. 2002) (finding sufficient evidence of agency relationship in part based on written authorization of instructors to provide courses on behalf of principal and risk of suspension or decertification of instructors who failed to adhere to parameters of authorization).  Accordingly, an actual express agency relationship existed between Mr. Jones and Ms. Duetsch with respect to the rejection of UM coverage.[83]

### B.  The Plum Creek CFO and CAO Both Expressly and Impliedly Delegated Authority over Insurance Matters to Kent Jones.

The evidence further demonstrates that all three elements of a valid agency relationship exist between Mr. Jones and the Plum Creek CFO and CAO.   As to the first element, Mr. Jones was granted actual express authority to bind the 2013 Umbrella Policy from the Plum Creek CFO.  Following the meeting with Plum Creek's brokers and delivery of the spreadsheet from Mr. Jones to the CFO and CAO summarizing Plum Creek's policies, premiums and deductibles,

---

[79]        SOF ¶ 42.
[80]        SOF ¶ 29.
[81]        SOF ¶¶ 24-25.
[82]        SOF ¶¶ 30, 42.
[83]        Even if this Court were to find that Mr. Jones did not expressly delegate authority to reject UM coverage to Ms. Duetsch, Ms. Duetsch likewise possessed implied authority by virtue of Mr. Jones knowing acquiescence to her rejection of UM coverage for ten years.  SOF ¶ 25; *see Lewis v. Washington Metro. Area Transit Auth.*, 463 A.2d 666, 670 n.7 (D.C. App. 1983) ("The doctrine of implied actual authority focuses upon the agent's understanding of his authority: whether the agent reasonably believed, because of conduct of the principal (including acquiescence) communicated directly or indirectly to him, that the principal desired him so to act.").

Mr. Jones submitted a written request to the CFO, Mr. Lambert, by email, with a copy to the

CAO, Mr. Brown, seeking permission to bind the 2013 Umbrella Policy Policy.  The CFO

supplied written approval, also by email, for the binding of the 2013 Umbrella Policy.[84/] *See*

*Herman*, 802 A.2d at 1191 (written agreement authorizing instructors to act in certain manner on

behalf of training council was evidence of actual authority); *see also In re Contoocook*, 529 A.2d

at 1391; *see also* Restatement (Third) of Agency Law, § 1.03.

     Mr. Jones' further authority to reject the optional UM coverage available under the 2013

Umbrella Policy was implied (and ratified) in at least three ways.  First, the decision to reject

UM coverage in certain states was a decision subsidiary to binding the 2013 Umbrella Policy

itself.  Accordingly, the decision to accept or reject subsidiary, optional coverages to the main

policy "follow[ed] as a reasonable incident or construction of the terms of express authority[.]"

*See Bouffard*, 27 A.3d at 687.  Second, Mr. Jones rejected UM coverage in each year from 2002

to 2005 and then his direct report rejected it each year from 2005 through 2015.  At no point did

the CFO or the CAO direct him to do otherwise.  Accordingly, Mr. Jones' authority was implied

by the acquiescence of his superiors.  *See Mannone*, 382 A.2d at 920 ("authorization for the

actions of an agent may be found by acquiescence of the principal in a series of acts performed

by the agent in the past" (citing Restatement (Second) of Agency § 43(2)).[85/]  Third, Mr. Brown

viewed Mr. Jones as an expert on insurance and trusted him to make decisions with respect to

insurance on behalf of Plum Creek.  Accordingly, Mr. Jones reasonably understood, based on his

prior relations with Mr. Brown and Mr. Lambert, that the decision to reject UM coverage fell

within the scope of his implied authority to manage Plum Creek's insurance program.  *See*

---

[84/]     SOF ¶¶ 102-03.
[85/]     Relatedly, the acquiescence of Mr. Brown and Mr. Lambert to Mr. Jones' actions also resulted in their ratification of his conduct.  *See* Restatement § 4.01 ("A principal may ratify an act by failing to object to it or to repudiate it.").

Restatement § 2.01, cmt. c. (The "focal point for point for determining whether an agent acted with actual authority is the agent's reasonable understanding at the time the agent takes action.").

As to the final two elements of an actual-agency relationship, Mr. Jones accepted the authorization he received by rejecting UM coverage in the years 2002 to 2005 and thereafter by directing and monitoring his direct report in doing the same.[86]  *See Bouffard*, 27 A.3d at 688 (securing insurance policy with the intent to do so on behalf of the principal was sufficient evidence of the agent's assent to act on behalf of the principal).   Finally, the Plum Creek CFO and CAO monitored and controlled Mr. Jones' performance of his job duties by ensuring Mr. Jones' compliance with the monetary limits of his delegation of authority and requiring that he seek authorized for expenditures over certain dollar amounts; by participating in and asking questions at regular meetings with Mr. Jones and Plum Creek's brokers; through weekly meetings between Mr. Brown and Mr. Jones during which Mr. Jones' performance of his responsibilities was discussed; and through formal reviews of Mr. Jones' performance conducted by Mr. Brown.[87] *See, e.g.*, *Bouffard*, 27 A.3d at 688 (finding sufficient evidence of control where principal and agent discussed the coverage to be purchased in advance and principal had opportunity to review the policy documents should she so choose); *Herman*, 802 A.2d at 1190-91 (finding sufficient evidence of control to support agency relationship where instructors were subject to written parameters for who they could train and were subject to recertification every four years).  Accordingly, where each of the three elements of an agency relationship was satisfied, Mr. Jones' possessed express actual authority to bind the 2013 Umbrella Policy and implied actual authority to reject UM coverage on behalf of Plum Creek.

---

[86]      SOF ¶¶ 22-23, 27-30.
[87]      SOF ¶¶ 76-77, 84, 91, 94, 98-101.

**C.** **The Plum Creek Chief Financial Officer and Chief Accounting Officer Each Possessed Express and Implied Authority to Approve Insurance-Related Transactions and Decisions on Behalf of Plum Creek.**

The two corporate officers from whom Mr. Jones' received his authority each possessed actual authority, delegated to them by the Plum Creek Board, to engage in financial transactions on behalf of the Company. First, according to the BOD Delegation of Authority, both the CFO and the CAO possessed express authority to approve transactions on behalf of the Company up to distinct dollar amounts.[88] *See Herman*, 802 A.2d at 1190-91. Implicit in the express BOD Delegation of Authority was the authority to approve insurance-related expenditures. *See* Restatement § 2.01, cmt b (implied authority encompasses that which is "necessary, usual, and proper to accomplish or perform an agent's express responsibilities" and that which the "agent believes the principal wishes the agent to [do] based on the agent's reasonable interpretation of the principal's manifestation in light of the principal's objectives and other facts known to the agent"). Although the BOD Delegation of Authority listed only approximately fifteen specific types of expenditures, they each also allowed for the approval of "normal recurring" expenditures.[89] Where insurance fell within the broad scope of the respective responsibilities of the CFO and CAO's authority, the CFO and CAO each possessed implied authority to approve insurance-related expenditures. This implied authority was bolstered by the acquiescence of the Board and CEO. Indeed, the Company's delegations of authority and its finances were audited on a quarterly basis by external auditors and neither the Board nor the CEO ever countermanded the CFO or CAO's insurance approvals. *See Mannone*, 382 A.2d at 920 (finding sufficient evidence of actual authority based is part on the principal's acquiescence to the agent's prior practices on behalf of the principal); *see also* Restatement § 4.01 ("A principal may ratify an act

---

[88] SOF ¶¶ 70-74.
[89] SOF ¶ 74.

by failing to object to it or to repudiate it.").  Further implicit in their authority was the authority

of the CFO and CAO to delegate more specific insurance decisions to Mr. Jones.  Restatement

§ 1.03, cmt. c ("An officer granted broad managerial authority to manage a corporation's affairs

impliedly has authority to delegate to subordinate agents acting under the officer's supervisory

control. In a large corporation, where matters are complex, the implied authority to delegate

extends to matters that are discretionary and not wholly or even substantially ministerial.").

     As to the second element, both the CFO and CAO accepted their responsibilities with

respect to insurance by attending regular meetings with Mr. Jones and Plum Creek's brokers,

supervising Mr. Jones, reviewing the materials he provided, and (in the case of the CFO)

affirmatively authorizing the binding of insurance policies.[90]   With respect to the third element,

both the CFO and the CAO were monitored and controlled in their performance of their

responsibilities.  Internal and external audits served to ensure that the CFO and the CAO

operated within the confines of their respective Delegations of Authority.[91] The CAO met

weekly with his supervisor, the CFO to discuss the CAO's duties and activities with respect to

the Company.[92]  The CAO also met routinely with the Audit Committee of the Board and

reported to them with respect to his responsibilities.[93]  The CFO, in turn, was supervised by the

CEO, and when requested by the Board, the CEO or the CFO provided presentations to the

Board with respect to insurance.[94]  *See, e.g.*, *Herman*, 802 A.2d at 1190-91; *see also*

Restatement § 1.03, cmt c.  Accordingly, both the CFO and the CAO possessed actual authority

to act on behalf of Plum Creek with respect to its insurance program.

---

[90]    SOF ¶¶ 77, 94, 98-101, 102-03.
[91]    SOF ¶¶ 66, 76-78; PFF ¶ 2.
[92]    SOF ¶ 84.
[93]    SOF ¶¶ 67-68.
[94]    SOF ¶¶ 70-80; PFF ¶ 7.

**D.  The Authority of the Plum Creek Board of Directors Was Expressly Delegated by the Company's Bylaws.**

At the final link in the chain, the Plum Creek Board possessed actual authority to act on behalf of the Company.  Plum Creek was a Delaware corporation with the statutory power to "[a]dopt, amend and repeal bylaws." Del. Code Ann. tit. 8, § 122(6).  The Company's bylaws expressly provide that the Board may act on the Company's behalf, including by executing contracts. Tr. Ex. 41 (ECF No. 40-1), Art. III, § 4 ("Board of Directors . . . may exercise all such powers of the Corporation and do all such lawful acts and things as are not required by statute or by the Certificate of Incorporation or by these By-Laws required to be exercised or done by the stockholders.").[95] The Board accepted the express grant of authority contained in the bylaws by, among other activities, issuing the BOD Delegation of Authority, which provided for the flow of authority among the corporate officers, and the Board's authority was cabined by the bylaws themselves.[96]

Accordingly, at each link in the chain of authority from Ms. Duetsch to the Plum Creek Board, each actor possessed actual authority – express, implied or both – flowing from a superior agent to engage in the financial or insurance-related decision-making that resulted in the rejection of UM coverage under the 2013 Umbrella Policy.

**III.   IN THE ALTERNATIVE, LISA DUETSCH WAS CLOAKED WITH APPARENT AUTHORITY TO REJECT UM COVERAGE ON BEHALF OF PLUM CREEK.**

Even if Ms. Duetsch did not possess actual authority, traceable to the Plum Creek Board, to reject UM coverage, she was cloaked with apparent authority on which both AON and Liberty as third-parties to the agency relationship could reasonably rely – both at the time the Umbrella Policies were issued and later when Mr. Kelly made a claim for UM coverage.  *See Horseshoe*

---

[95] SOF ¶ 69, Tr. Ex. 41.
[96] SOF ¶¶ 67-68, 70-77.

*Fish & Game Club v. Merrimack Vill. Dist.*, 291 A.2d 251, 253 (N.H. 1972) ("Apparent authority exists where the principal so conducts himself as to cause a third party to reasonably believe that the agent is authorized to act.")

First, Plum Creek cloaked Ms. Duetsch with apparent authority by its affirmative conduct. Plum Creek vested Ms. Duetsch with the title "Manager, Risk & Insurance."[97/]  The Company likewise provided her with business cards that reflected her title, a company email account that she used to communicate with insurers, and an office in Plum Creek's corporate offices in Montana where Ms. Duetsch met with Plum Creek's insurance brokers.[98/]  *See, e.g.*, *Boynton*, 913 A.2d at 707-08 (concluding that program permitting authorized builders to use company logo, among other factors, gave rise to apparent authority of builder).  Mr. Day, having exchanged business cards with Ms. Duetsch, having learned of her title, and having met with her at Plum Creek's offices, relied on these indicia of authority in concluding that Ms. Duetsch was authorized to execute the UM forms on behalf of Plum Creek.[99/]  Similarly, during the underwriting process, Liberty relied on the fact that Plum Creek had retained AON as its broker, and that AON both informed Liberty that Plum Creek was rejecting UM coverage and supplied Liberty with the UM Rejection Forms.[100/]  Further, during the claims process, Liberty communicated directly with Ms. Duetsch using her Company email address reasonably relied on these indicia of authority in concluding that Ms. Duetsch was authorized to execute the UM forms on behalf of Plum Creek.[101/]

---

[97/]    SOF ¶ 34.  Mr. Day testified that in his eighteen years of experience in the industry, this title signals that this is the person who is typically in charge of insurance matters for an organization she represents.  SOF ¶ 151.

[98/]    SOF ¶¶ 33-36.

[99/]    PPF ¶¶ 13-15.

[100/]   SOF ¶¶ 133, 143.

[101/]   Tr. Ex. 14 at Page 10 of 12, 28.

Second, by its acquiescence to Ms. Duetsch and Mr. Jones' conduct, Plum Creek likewise cloaked Ms. Duetsch with apparent authority vis-à-vis third parties such as AON and Liberty. Indeed, Plum Creek personnel executed UM Rejection Forms in each year since at least 2002.[102/] Record of that rejection existed in the underwriting files of AON as well as Liberty, and Plum Creek never provided any documentation to either AON or Liberty to countermand those rejections.[103/] *See, e.g., Horseshoe Fish & Game*, 291 A.2d at 253-54 (finding existence of apparent authority where two purported agents were allowed to operate as officers for a year without objection and organization did nothing to correct outdated documents in circulation giving authority to those purported officers). Indeed, Mr. Day knew from his review of AON's files that rejection of UM coverage was consistent with Plum Creek's insurance strategy, and Mr. Aguiar similarly relied on Plum Creek's rejection of UM coverage both in 2012 when it issued the 2012 Umbrella Policy and again when it quoted the 2013 renewal. Moreover, the selection (and not rejection) of UM coverage would have resulted in an additional premium and, in 2013, additional underwriting activity, which did not occur.[104/]

Accordingly, both Plum Creek's acquiescence to Mr. Jones' and Ms. Duetsch's conduct, as well as the record of Plum Creek's prior course of dealing, gave rise to a reasonable belief on the part of third parties that Plum Creek intended to reject UM coverage where permitted by law. *See Zeta Chi Fraternity*, 696 A.2d at 536 ("Apparent authority can result when the principal 'fails to disapprove of the agent's act or course of action so as to lead the public to believe that his agent possesses authority to act . . . in the name of the principal.'" (quoting 3 Am. Jur. 2d

---

[102/]     SOF ¶¶ 22, 38.
[103/]     SOF ¶¶ 132, 142, 152; PFF ¶ 9.
[104/]     When Mr. Aguiar sent the renewal quote to Mr. Day, he stated that Liberty did not "have an actual fleet list in the renewal submission (just a summary)." Mr. Aguiar asked that, if Plum Creek wanted to purchase UM coverage, Mr. Day would need to supply a detailed fleet list for the 2013 policy year. Tr. Ex. 2H. If Plum Creek had selected UM coverage, additional underwriting and actuarial activity would have taken place regarding the detailed fleet list to determine the actual additional premium.

Agency § 79, at 586 (1986)); *see also* Restatement § 2.03, cmt c (recognizing that apparent

authority can arise from prior dealings between the parties).

Third, Plum Creek's affirmative conduct and prior course of dealing with respect to the

binding of its insurance policies and the rejection of UM coverage, particularly in light of custom

and practice in the insurance industry,[105] further served to cloak Ms. Duetsch with apparent

authority to reject UM coverage on its behalf.  There is typically a specific person or persons at

the client with whom an insurance broker interacts.[106] For Plum Creek, those individuals were

Mr. Jones and Ms. Duetsch.  In the underwriting process, Plum Creek channeled its

communications with its broker through Ms. Duetsch and Mr. Jones, and Mr. Day handled all

communications with Plum Creek's insurers.[107]   As evidenced by Liberty's communication

solely with AON throughout the underwriting process in 2012 and 2013, and Liberty's binding

of the Umbrella Policies based on binding instructions from AON, Liberty reasonably relied on

this chain of communication as valid because AON was acting in its capacity as a broker on

behalf of Plum Creek.[108]   *See* Restatement § 1.03, cmt c ("An organization may create a routine

to communicate with those external to the organization, designating people with authority to

speak as to particular types of matters. When the designated person speaks as to a matter that is

---

[105]      Indeed, because it will have purchased workers' compensation coverage, it is not unusual for a company not to purchase UM coverage. *See* Tr. Ex. 29 at page 9 of 10, "UM/UIM Coverage Under Commercial Umbrella & Excess Policies," https://www.irmi.com/online/cli/ch011/1l11w601.aspx (International Risk Management Institute 2016) ("For commercial insureds, worker's compensation insurance is already available to employees who are injured in work-related accidents (in or out of an automobile). If the corporate insured is already paying a premium to the worker's compensation insurer to cover the risk of employment-related automobile accidents, most corporate insureds would naturally reject additional coverage for employees in the form of excess [UM] coverage payable above and beyond base worker's comp benefits (and the employee's own personal [UM] coverage)").
[106]      SOF ¶¶ 148-51; PFF ¶ 19.
[107]      SOF ¶¶ 133, 143.
[108]      Under Washington state law (where the 2012 and 2013 Umbrella Policies were bound), "insurance brokers represent insureds." *See* 1-58 Washington Ins. Law § 58.04 (2017).  The same is true in New Hampshire. *See Commercial Cas. Ins. Co. v. Mansfield*, 96 A.2d 558, 566-67 (N.H. 1953) (It is "well settled that brokers do not customarily represent the insurer in negotiating insurance.").

one of the types specified, and in a manner that conforms to the established routine, a third party is justified in believing that the person speaks for the organization.").

For all of these reasons, should the Court conclude that Ms. Duetsch lacked actual authority to reject UM coverage on behalf of Plum Creek, it may nevertheless find that Plum Creek cloaked Ms. Duetsch with apparent authority upon which Liberty reasonably relied both in the issuance of the 2013 Umbrella Policy and in the denial of the Plaintiff's UM claim.

## **CONCLUSION**

Where the trial record demonstrates, without contravention, that Ms. Duetsch possessed actual and apparent authority to reject UM coverage on behalf of Plum Creek, Liberty respectfully requests that this Court return a verdict in favor of Liberty on this sole remaining factual dispute.[109]

---

[109] To the extent Plaintiff continues to contest the validity of either Mr. Jones' or Ms. Duetsch's actual or apparent authority to engage in insurance-related conduct on behalf of Plum Creek, including the negotiation and binding of the 2013 Umbrella Policy, Plaintiff's reasoning would likewise mean that the 2013 Umbrella Policy is itself null and void for lack of authority to bind.  Absent a valid policy, Plaintiff's claims for UM coverage would also fail. *See Bouffard*, 27 A.3d at 686-87 ("[W]e decline to allow a principal to accept the benefits of an insurance policy as negotiated by an agent on the one hand, but at the same time claim that one unbeneficial aspect of the policy should not apply.").

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 26, 2018, I electronically filed the foregoing document with the Clerk of the District Court using the CM/ECF system, which sent notification of such filing to counsel of record for the parties.

*/s/  Lavinia M. Weizel*

75278201v.1