# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| BRENDAN KELLY,<br><br>     Plaintiff,<br><br>v.<br><br>LIBERTY INSURANCE<br>CORPORATION<br><br>     Defendant. | CIVIL ACTION NO. 15-CV-00234-JL |

## LIBERTY INSURANCE CORPORATION'S
## PROPOSED FINDINGS OF FACT AND RULINGS OF LAW

**LIBERTY INSURANCE CORPORATION**
By its attorneys,

*/s/ Lavinia M. Weizel*
Nancy D. Adams, Esq. (admitted *pro hac vice*)
Lavinia M. Weizel, Esq. (NH Bar #265351)
Mintz, Levin, Cohn, Ferris, Glovsky and
Popeo, PC
One Financial Center
Boston, MA 02111
Telephone:  (617) 542-6000
Fax: (617) 542-2241
nadams@mintz.com

John B. Schulte, Esquire (NH Bar #9376)
Law Offices of John B. Schulte
Two Bedford Farms Drive, Suite 202
Bedford, NH 03110
Telephone:  (603) 623-8413
Fax:  (603) 623-8517
Johnb.schulte@libertymutual.com

Dated:  January 26, 2018

## <u>TABLE OF CONTENTS</u>

I.    PROPOSED FINDINGS OF FACT ........................................................................... 1

    A.    Plum Creek's Delegations of Authority ........................................................... 1

    B.    Plum Creek's Relationship with Its Insurance Broker, AON Risk Services ................... 4

    C.    Lisa Deutsch Had Actual Authority – Both Express and Implied – to Reject UM Coverage on Behalf of Plum Creek. ........................................................................... 6

    D.    Lisa Duetsch Had Apparent Authority to Reject UM Coverage on Behalf of Plum Creek……. ........................................................................................................... 9

II.    PROPOSED RULINGS OF LAW ........................................................................ 12

    A.    New Hampshire Agency Law Principles ....................................................... 12

        i.    Principles of Actual Authority .............................................................. 13

        ii.    Principles of Apparent Authority .......................................................... 15

        iii.    Agency Law in the Context of a Corporate Principal ................................. 16

    B.    Lisa Duetsch Possessed Actual Authority, Traceable to the Plum Creek Board of Directors, to Reject UM Coverage. ............................................................................ 18

        i.    Kent Jones Expressly Delegated Authority to Lisa Duetsch to Reject UM Coverage. . 19

        ii.    The Plum Creek Chief Financial Officer and Chief Accounting Officer Both Expressly and Impliedly Delegated Authority over Insurance Matters to Kent Jones. ........ 21

        iii.    The Plum Creek Chief Financial Officer and Chief Accounting Officer Each Possessed Express and Implied Authority to Approve Insurance-Related Transactions and Decisions on Behalf of Plum Creek. .................................................................... 23

        iv.    The Authority of the Plum Creek Board of Directors Was Expressly Delegated by the Company's Bylaws. ............................................................................................ 26

    C.    In the Alternative, Lisa Duetsch Was Cloaked with Apparent Authority to Reject UM Coverage on Behalf of Plum Creek. ......................................................................... 28

    D.    Where Ms. Duetsch Possessed Both Actual and Apparent Authority, Traceable to the Board of Directors, to Reject UM Coverage, the NH UM Form Was Duly Executed by an Authorized Agent of Plum Creek. ........................................................................... 32

Pursuant to this Court's Procedural Order dated December 29, 2017 and Local Rule 16.2, Defendant Liberty Insurance Corporation ("Liberty") hereby submits the following Proposed Findings of Fact and Rulings of Law directed to the sole remaining factual issue in this case: whether Plum Creek Timber Company ("Plum Creek" or "the Company") employee Lisa Duetsch, the Plum Creek Manager, Risk and Insurance, was authorized to sign the New Hampshire Uninsured/Underinsured Motorist Selection Rejection Form (the "NH UM Form") on behalf of Plum Creek so as to reject uninsured/underinsured ("UM") coverage in connection with a Commercial Liability Umbrella Policy issued by Liberty to Plum Creek with a policy period of June 1, 2013 to June 1, 2014 (the "2013 Umbrella Policy").[1/]  Where Local Rule 16.2(b)(1) provides that "[r]equests for findings of fact shall concern only facts that are genuinely disputed and material to the outcome of the case," the facts to which the parties stipulated in the Joint Statement of Agreed-Upon Fact (ECF No. 54) are not contained herein.

## I.    PROPOSED FINDINGS OF FACT

### A.  Plum Creek's Delegations of Authority

1.     Although modified slightly over time, the BOD Delegation of Authority, issued by the Board of Directors of Plum Creek (the "Board") referenced in paragraphs 70-77 and 82 of the parties Joint Agreed-Upon Statement of Facts (ECF No. 54)[2/] remained in effect during 2012 and 2013 ("the Relevant Time Period").[3/]  The purpose of the BOD Delegation of Authority was

---

[1/]     *See* Order dated March 28, 2017  ("Plaintiff's Motion for Summary Judgment is denied (doc. no. 27). Defendant's Motion for Summary Judgment (doc. no. 28) is granted in part and denied in part. Partial summary judgment is granted in favor of the defendant insofar as plaintiff's claims are based on RSA 264:15 and/or the language of the relevant insurance policy. The defendant's motion is denied in so far as it is based on the actual or apparent authority of Ms. Duetsch to reject coverage.").

[2/]     Citations in the form "SOF ¶___" refer to paragraphs in the Joint Statement of Agreed-Upon Facts Submitted by Plaintiff Brendan Kelly and Defendant Liberty Insurance Corporation (ECF No. 54).

[3/]     Brown Dep. at 35-36 (Citations in the form "Brown Dep. at __" refer to the Transcript of the Deposition of David Brown, held in Seattle, Washington on August 3, 2017).

to ensure that all material transactions were approved in accordance with what was required by the Board.[4]

2.      The BOD Delegation of Authority was a component of the Company's internal controls with respect to financial reporting and, as such, they were reviewed quarterly by both internal and external auditors to ensure compliance with SEC requirements.[5]  These internal and external audits were intended to ensure both that the Company's accounting transactions were properly recorded and executed in accordance with the BOD Delegation of Authority.[6]

3.      David Brown's[7] responsibility for financial reporting was vested in him by the Audit Committee of the Plum Creek Board of Directors ("Audit Committee") along with the CEO and the President of the Board of Directors.[8]

4.      Mr. Brown ensured internal compliance with the Company's delegations of authority, as well as their compliance with external regulations, over time.[9]  In that capacity, Mr. Brown had personal knowledge of the terms of the BOD Delegation of Authority and whether financial transactions, including the purchase of insurance, were done in accordance with those delegations of authority.[10]  Mr. Brown had personal knowledge of the delegations of authority from the Board of Directors throughout the Company with respect to any payments.[11]

---

[4]      Brown Dep. at 16-17.
[5]      Brown Dep. at 22-23, 34-35.  Mr. Brown testified, "We always got, in my opinion, an A+ grade.  I always got feedback from both internal audit and external audit that they weren't really aware of any company that did it better than Plum Creek."  Brown Dep. at 35.
[6]      Brown Dep. at 41.
[7]      During the Relevant Time Period, Mr. Brown served as the Vice President and Chief Accounting Officer of Plum Creek.  SOF ¶ 52.
[8]      Brown Dep. at 18, 34.
[9]      Brown Dep. at 34.
[10]     Brown Dep. at 22-23; 36-37.
[11]     Brown Dep. at 36-37.

Indeed, Mr. Brown signed, under the pains and penalties of perjury, the Company's 10-K Annual Report which addressed these very issues.[12/]

5.      Based on Mr. Brown's weekly meetings with his supervisor, the Company Chief Financial Officer ("CFO") Mr. Lambert, Mr. Brown understood that Mr. Lambert shared his view that Kent Jones[13/] was an expert on insurance who did not need to be "micromanaged." Accordingly, Mr. Brown viewed regular meetings with Mr. Lambert, Mr. Jones and the Company's insurance brokers to be sufficient to enable Mr. Lambert and Mr. Brown to be apprised of Mr. Jones' insurance-related activities on behalf of Plum Creek.[14/]

6.      Subject to Mr. Jones' duty under the BOD Delegation of Authority to obtain approval for insurance transactions over a certain amount, both Mr. Brown and Mr. Lambert expected Mr. Jones to make decisions with respect to insurance based upon his professional training, experience and judgment.[15/]

7.      Based upon his review of Board meeting agendas, written materials and minutes, Mr. Brown understood that periodically, the Board was provided with a report regarding the Company's insurance program and its cost.[16/]  The insurance-related materials that were provided to the Board were prepared by Mr. Jones.[17/]

8.      Mr. Brown understood that due to the size and scope of Plum Creek's operations, the Board expected the Company's officers to hire people who were expert in various areas and to handle those matters correctly, including matters related to insurance. Mr. Brown understood

---

[12/]      SOF ¶ 53.
[13/]      During the Relevant Time Period, Mr. Jones served as the Director of Accounting – Shared Services, Manufacturing and Risk Management for Plum Creek.  SOF ¶ 18.
[14/]      Brown Dep. at 45.
[15/]      Brown Dep. at 62.
[16/]      Brown Dep. at 41-42.
[17/]      Brown Dep. at 42.

that the Board viewed insurance as one of the many areas where the Board did not feel it needed to be directly involved. [18]

**B.  Plum Creek's Relationship with Its Insurance Broker, AON Risk Services**

9.       In 2009, when Michael Day[19] began working with Plum Creek, he first familiarized himself with AON's file regarding Plum Creek.[20] Based upon his review of this file, Mr. Day understood that Plum Creek had rejected UM coverage in the years prior to 2009.[21]

10.       Based upon his 18 years of experience as an insurance broker at AON, Mr. Day would not interact with personnel from a client regarding insurance unless that person had been introduced to him and the proper relationship had already been established using appropriate internal protocols.[22]

11.       Accordingly, in 2009, when Mr. Day first began working with Plum Creek,  the other members of the AON client service team for Plum Creek (Donna Keane and Jacquie Brissey) brought Mr. Day to the Plum Creek office in Montana for the purpose of introducing him to Mr. Jones and Ms. Duetsch.[23]

12.       The Plum Creek office in the Kalispell area of Montana was located adjacent to a lumber yard and manufacturing facility.[24]

13.        Upon meeting Mr. Jones and Ms. Duetsch, Mr. Day exchanged business cards with them.[25] The meeting lasted approximately two hours.[26]

---

[18]       Brown Dep. at 64 ("[G]enerally insurance was not covered at the Board level, like a thousand other things, because the Board entrusted that we hired people that were expert in that area and did it correctly.").
[19]       Mr. Day works as an Account Executive, Senior Vice President at AON Risk Services in Seattle, Washington ("AON").  AON was Plum Creek's insurance broker.  SOF ¶¶ 116-17.
[20]       Day Dep. at 13.
[21]       Day Dep. at 31-32.
[22]       Day Dep. at 91-93.
[23]       Day Dep. at 14-15, 16-17, 58-60.
[24]       Day Dep. at 15.
[25]       Day Dep. at 59-60.
[26]       Day Dep. at 18.

14.     During this meeting, Mr. Day discussed with Mr. Jones and Ms. Duetsch Plum Creek's then-current insurance policies and coverages as well as required renewal materials.[27]

15.     Mr. Day maintained this understanding of Mr. Jones' and Ms. Duetsch's respective roles[28] from 2009 through 2014.[29]

16.     From 2009 through 2014, Mr. Day served as Plum Creek's broker, an intermediary between Plum Creek and various insurance carriers, to effectuate Plum Creek's "primary casualty placement," which included auto liability, general liability and workers' compensation insurance, together with umbrella liability coverage.[30]

17.     Mr. Day met with Mr. Jones and Ms. Duetsch at Plum Creek's office in the Kalispell area of Montana on at least one other occasion.[31]  Mr. Day also met with Mr. Jones and Ms. Duetsch in Seattle, Washington on one or more occasions.[32]

18.     During the Relevant Time Period, Mr. Day typically participated in meetings with Plum Creek personnel, including Mr. Jones, Mr. Brown and Mr. Lambert, regarding Plum Creek's insurance coverage and renewals.[33]  Mr. Day sometimes participated in the meeting by phone and sometimes in person.[34]

19.     Based upon his 18 years of experience as an insurance broker at AON, there is typically a specific person or persons at the client with whom the broker interacts.  For Plum Creek, those individuals were Mr. Jones and Ms. Duetsch.[35]

---

[27]     Day Dep. at 15.
[28]     SOF ¶ 149 ("Mr. Day understood Mr. Jones' role at Plum Creek to be that of 'director in risk management.'"); SOF ¶ 150 ("Mr. Day understood Ms. Duetsch's role at Plum Creek to be that of 'risk manager.'").
[29]     Day Dep. at 18-19.
[30]     Day Dep. at 17-18.
[31]     Day Dep. at 21.
[32]     Day Dep. at 60.
[33]     Day Dep. at 22-23.
[34]     Day Dep. at 24-25.
[35]     Day Dep. at 14-15, 90.

### C. Lisa Deutsch Had Actual Authority – Both Express and Implied – to Reject UM Coverage on Behalf of Plum Creek.

20.     At each link in the chain from Ms. Duetsch to Plum Creek's Board of Directors, Ms. Duetsch had actual authority – both express and implied – to reject UM coverage on the Company's behalf.[36/]

21.     Ms. Duetsch further possessed implied authority by virtue of Mr. Jones' knowing acquiescence to her rejection of UM coverage for ten years.[37/]

22.      Mr. Jones monitored and controlled Ms. Duetsch's performance of her job responsibilities, including the rejection of UM coverage.[38/]

23.     Mr. Jones possessed actual, express authority to bind the 2013 Umbrella Policy, delegated from the Plum Creek CFO, Mr. Lambert.[39/] Mr. Jones also possessed actual implied authority to reject UM coverage, delegated from the CFO, Mr. Lambert, and the Chief Accounting Officer ("CAO"), Mr. Brown.

24.     Mr. Jones' authority to reject the optional UM coverage available under the 2013 Umbrella Policy was implied in three ways.  First, the decision to reject UM coverage in certain states was a decision subsidiary to binding the 2013 Umbrella Policy itself.  Second, Mr. Jones rejected UM coverage in each year from 2002 to 2005 and then his direct report rejected it each year from 2005 through 2015.  At no point did the CFO or the CAO direct him to do otherwise.[40/]  Third, the CAO viewed Mr. Jones as an expert on insurance and trusted him to make decisions with respect to insurance on behalf of Plum Creek.[41/]  Thus, Mr. Jones

---

[36/]     SOF ¶¶ 23, 26, 27, 37-38.
[37/]     SOF ¶¶ 29.
[38/]     SOF ¶ 42, 24-25, 29, 30, 30, 47.
[39/]     SOF ¶¶ 102-03.
[40/]     SOF ¶¶ 22, 38, 110.
[41/]     SOF ¶ 96; Proposed Findings of Fact, *supra* (hereinafter "PFF") ¶¶ 5-6.

reasonably understood, based on his prior relations with the CFO and CEO, that the decision to reject UM coverage fell within the scope of his implied authority to manage Plum Creek's insurance program.

25.      The acquiescence of the CFO and CAO to Mr. Jones' actions regarding the placement of insurance, including the decision to reject UM coverage, resulted in their ratification of his conduct.[42]

26.      The CFO and CAO monitored and controlled Mr. Jones' performance of his job duties by ensuring Mr. Jones' compliance with the monetary limits of his delegation of authority and requiring that he seek authorization for expenditures over certain dollar amounts; by participating in and asking questions at regular broker meetings with Mr. Jones and AON personnel; through weekly meetings between the CAO and Mr. Jones during which Mr. Jones' performance of his responsibilities was discussed; and through formal reviews of Mr. Jones' performance conducted by the CAO.[43]

27.      The CFO and the CAO each possessed actual authority, delegated to them by the Board of Directors, to approve transactions up to certain amounts, including those related to insurance, on behalf of Plum Creek.

28.      The written BOD Delegation of Authority granted both the CFO and the CAO express authority to approve transactions on behalf of the Company up to distinct dollar amounts.[44]

29.      The CFO and CAO also possessed implied authority, arising out of the BOD Delegation of Authority, to approve insurance-related expenditures.  Although the BOD

---

[42]      SOF ¶ 96.
[43]      SOF ¶¶ 76-77, 84, 91, 94, 98-101.
[44]      SOF ¶¶ 70-74.

Delegation of Authority listed only approximately fifteen specific types of expenditures, it also allowed for the approval of "normal recurring" expenditures.[45/]  Where insurance fell within the broad scope of the respective responsibilities of the CFO and CAO's authority,[46/] the CFO and CAO each possessed implied authority to approve insurance-related expenditures.  Also implicit in their authority was the authority of the CFO and CAO to delegate specific insurance decisions to Mr. Jones.

30.     The implied authority of the CFO and CAO was bolstered by the acquiescence of the Board of Directors and CEO.[47/]

31.     The CFO and CAO accepted their responsibilities with respect to insurance by attending regular broker meetings, supervising Mr. Jones, reviewing the materials he provided and (in the case of the CFO) affirmatively authorizing the binding of insurance policies.[48/]

32.     The CFO and the CAO were monitored and controlled in their performance of their responsibilities.[49/]

33.     The Board of Directors possessed actual authority to act on behalf of the Company.  Plum Creek was a Delaware corporation.  The Company's bylaws expressly provide that the Board may act on the Company's behalf, including by executing contracts.[50/]  The Board accepted the express grant of authority contained in the bylaws by, among other activities, issuing the BOD Delegation of Authority, which provided for the flow of authority among the

---

[45/]     SOF ¶¶ 74.
[46/]     SOF ¶¶ 88, 89, 96, 97, 102.
[47/]     SOF ¶ 76-77.
[48/]     SOF ¶¶ 94, 97-103.
[49/]     SOF ¶ 84; 67-68; 70-80; PFF ¶¶ 3, 7.
[50/]     SOF ¶ 69, Tr. Ex __ (ECF No. 40-1), Art. III, § 4 ("Board of Directors . . . may exercise all such powers of the Corporation and do all such lawful acts and things as are not required by statute or by the Certificate of Incorporation or by these By-Laws required to be exercised or done by the stockholders.").  Citations in the form "Tr. Ex. __" refer to exhibits listed on the parties Joint Agreed-Upon Exhibit List (ECF No. 56).

corporate officers.[51/]  The Board's activities were monitored and controlled by its stockholders, who elect the Board and may enforce the Board's fiduciary duties to the Company.[52/]

34.    The evidence contained in the trial record demonstrates that at each link in the chain of authority from Ms. Duetsch to the Plum Creek Board, each actor possessed actual authority to engage in the financial or insurance-related decision-making that resulted in the rejection of UM coverage in connection with the 2013 Umbrella Policy.

### D.  Lisa Duetsch Had Apparent Authority to Reject UM Coverage on Behalf of Plum Creek.

35.    Plum Creek cloaked Ms. Duetsch with apparent authority upon which AON and Liberty reasonably relied with respect to the rejection of UM coverage under the 2012 Umbrella Policy and the 2013 Umbrella Policies.[53/]

36.    By its affirmative conduct, Plum Creek vested Ms. Duetsch with the title "Manager, Risk & Insurance."[54/]  The Company likewise provided her with business cards that reflected her title, a company email account that she used to communicate with insurers, and an office in Plum Creek's corporate offices in Montana where Ms. Duetsch met with Plum Creek's insurance brokers.[55/]  Mr. Day, having exchanged business cards with Ms. Duetsch, having learned of her title, and having met with her at Plum Creek's offices, reasonably relied on these indicia of authority in concluding that Ms. Duetsch was authorized to execute the UM forms on behalf of Plum Creek.[56/]

---

[51/]     SOF ¶¶ 67-68, 70-77.

[52/]     *See* Tr. Ex. 41 (ECF No. 40-1), Art. III, § 1 (election of directors by stockholders).

[53/]     In 2012, Plum Creek was new business for Liberty.  Liberty issued a Commercial Liability Umbrella Policy to Plum Creek with a policy period of June 1, 2012 to June 1, 2013 (the "2012 Umbrella Policy").  The 2012 Umbrella Policy and the 2013 Umbrella Policy are referred to collectively as the "Umbrella Policies."

[54/]     SOF ¶ 34.  Mr. Day testified that in his eighteen years of experience in the industry, this title signals that this is the person who is typically in charge of insurance matters for an organization she represents.  SOF ¶ 151.

[55/]     SOF ¶¶ 33-36.

[56/]     PPF ¶¶ 13-15.

37.     By its acquiescence to Ms. Duetsch's and Mr. Jones' conduct, Plum Creek cloaked Ms. Duetsch with apparent authority vis-à-vis third parties such as AON and Liberty. Plum Creek personnel executed UM rejection forms in each year since at least 2002.[57/]  Record of that rejection existed in both AON's and Liberty's underwriting files, and Plum Creek never provided any documentation to either AON or Liberty to countermand those rejections.[58/]

38.     Mr. Day understood from his review of AON's files that Plum Creek did not purchase UM coverage under its primary and umbrella policies unless statutorily required.[59/]  Mr. Day further understood that Plum Creek's rejection of UM coverage was consistent with Plum Creek's insurance strategy.[60/]  Mr. Aguiar similarly relied on Plum Creek's rejection of UM coverage in connection with the issuance of the 2012 Umbrella Policy and when he provided the Umbrella Excess Liability Proposal in May of 2013.[61/]

39.     Liberty reasonably relied on receipt of the UM Rejection Forms to bind and issue the 2012 Umbrella Policy and the 2013 Umbrella Policy, which excluded UM coverage.  If Plum Creek had purchased UM coverage for either policy, an additional premium would have been required.[62/]

40.     Plum Creek's affirmative conduct and prior course of dealing with respect to the binding of its insurance policies and the rejection of UM coverage, particularly in light of custom and practice in the insurance industry, also served to cloak Ms. Duetsch with apparent authority to reject UM coverage on its behalf.  Mr. Day testified that based on his eighteen years of

---

[57/]     SOF ¶¶ 22, 38.
[58/]     SOF ¶¶ 132, 142, 152; PFF ¶ 9.
[59/]     Day Dep. at 13; Tr. Ex. 13.
[60/]     SOF ¶ 145.
[61/]     SOF ¶ 139.
[62/]     Tr. Ex. 2 at L000057 (2012 Umbrella Policy showing total premium of $183,809); Tr. Ex. 2 at L000398 (2012 Umbrella Excess Liability Proposal showing Total Estimated Premium of $183,809); Tr. Ex. 10 (2013 Umbrella Policy showing a Premium of $168,813); Tr. Ex. 2 at L000117 (Umbrella Excess Liability Proposal reflecting Premium Subtotalof $168,813, exclusive of optional Terrorism Coverage Flat Charge).

experience in the industry, he would not interact with personnel from a client regarding

insurance unless that person had been introduced to him and the proper relationship had already

been established using appropriate internal protocols.[63]  For Plum Creek, Mr. Day interacted

with Mr. Jones and Ms. Duetsch, and Mr. Day, or one of his AON colleagues, handled all

communications with Plum Creek's insurers.[64]  As evidenced by Liberty's communication

solely with AON throughout the underwriting process in 2012 and 2013, and Liberty's binding

of the 2012 Umbrella Policy and the 2013 Umbrella Policy based on binding instructions from

AON, Liberty relied on this chain of communication as valid because AON was acting in its

capacity as a broker on behalf of Plum Creek.[65]  In light of Plum Creek's practice of channeling

communications with its brokers through Mr. Jones and Ms. Duetsch who in turn channeled their

communications with underwriters through Plum Creek's broker, which is consistent with

custom and practice in the insurance industry, Liberty's reasonably believed that AON supplied

Liberty with forms signed by an individual who was duly authorized on behalf of Plum Creek.

41.    AON reasonably relied upon Ms. Duetsch's apparent authority in concluding that

Ms. Duetsch was authorized to reject UM coverage on behalf of Plum Creek.   Liberty, in turn,

reasonably relied upon the custom and practice in the industry that the broker represents the

insured and that the rejection forms were signed by an authorized representative of Plum Creek.

---

[63]    PFF ¶ 10.

[64]    SOF ¶¶ 133, 143.

[65]    Under Washington state law (where the 2012 and 2013 Umbrella Policies were bound), "insurance brokers represent insureds." *See* 1-58 Washington Ins. Law § 58.04 (2017).  The same is true in New Hampshire. *See Commercial Cas. Ins. Co. v. Mansfield*, 96 A.2d 558, 566-67 (N.H. 1953) (It is "well settled that brokers do not customarily represent the insurer in negotiating insurance.").

42.     In addition to the indicia of authority relied upon during the underwriting of the 2012 Umbrella Policy and the 2013 Umbrella Policy, Liberty also reasonably relied upon Plum Creek's cloaking of Ms. Deutsch with apparent authority during the claims handling process.

(a)     On September 15, 2014, Joseph Covert, the claims handler for Plaintiff's UM claim, sent Attorney Robert Stein a copy of "the New Hampshire Uninsured Motorist rejection completed by the insured."  At that time, Mr. Covert informed Attorney Stein that "…the Liberty Mutual policy contains an exclusion for UM/UIM coverage and the attached form confirmed that the coverage was rejected by the insured."  Ms. Duetsch was copied on the email. [66/]  Also on September 15, 2014, Mr. Covert informed a claims adjuster at ACE, the primary insurer for Plum Creek, that the 2013 Umbrella Policy contains an exclusion for UM coverage and that he was "working with our underwriter to confirm we obtained the appropriate rejection forms …"   Ms. Duetsch was copied on that specific email as well as on the series of emails making up this email chain. [67/]   In that email chain, Ms. Duetsch provided Mr. Covert with a copy of the ACE policy and Ms. Duetsch's electronic signature includes her title, Manager – Risk & Insurance. [68/]

(b)     On December 10, 2014, Mr. Covert denied coverage for Mr. Kelly's UM claim on the grounds that Ms. Duetsch rejected UM coverage. [69/]

## II.     PROPOSED RULINGS OF LAW

### A.  New Hampshire Agency Law Principles

1.     In evaluating the existence of a principal-agent relationship, New Hampshire courts "commonly rel[y] on the Restatement for agency principles." *Coyle v. New Times Moving,*

---

[66/]     Tr. Ex. 15.
[67/]     Tr. Ex. 28.
[68/]     Tr. Ex. 28.
[69/]     Tr. Ex. 14.

12

*Inc.*, No. 12-cv-332-JD, 2013 U.S. Dist. LEXIS 193739, at *3 n.2 (D.N.H. Sep. 25, 2013) (collecting cases). According to the Restatement (Third) of Agency law, "[a]gency encompasses a wide and diverse range of relationships and circumstances. The elements of common-law agency are present in the relationships between employer and employee, corporation and officer, client and lawyer, and partnership and general partner." Restatement (Third) of Agency Law § 1.01, cmt. c (Am. Law Inst. 2006) (hereinafter "Restatement").

2.      Under New Hampshire law, a valid agency relationship can be established by proof of either actual or apparent authority. *See Boynton v. Figueroa*, 913 A.2d 697, 707 (N.H. 2006); *see also Bouffard*, 27 A.3d at 687; *Horseshoe Fish & Game Club v. Merrimack Vill. Dist.*, 291 A.2d 251, 253 (N.H. 1972).

3.      Actual authority "results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by others to so act." *In re Contoocook Valley Paper Co.*, 529 A.2d 1388, 1390-91 (N.H. 1987).

4.      Apparent authority "exists where the principal so conducts himself as to cause a third party to reasonably believe that the agent is authorized to act." *Horseshoe Fish & Game*, 291 A.2d at 253. Effectively, "[a]pparent authority holds a principal accountable for the results of third-party beliefs about an actor's authority to act as an agent when the belief is reasonable and is traceable to a manifestation of the principal." Restatement § 2.03, cmt c.

### i.      Principles of Actual Authority

5.      With respect to actual authority, New Hampshire common law recognizes three elements of a valid agency relationship: 1) the grant of authority from principal to agent; 2) consent of the agent; and 3) some degree of control of the agent by the principal. *Bouffard*, 27 A.3d at 687; *see also Boynton*, 913 A.2d at 707. As to the first two elements, the grant of

13

authority and acceptance of it may be either express or implied.  Whether express or implied, both are forms of "actual authority."  *See Bouffard*, 27 A.3d at 687 ("The granting of actual authority and consent to act with such authority may be either express or implied from the parties' conduct or other evidence of intent.").

6.      Express actual authority requires an "explicit manifestation" of authorization by the principal to the agent.  *Bouffard*, 27 A.2d at 687 ("Express authority arises when the principal … explicitly manifests its authorization of the actions of its agent.").  Such manifestation may be oral or in writing.  *See In re Contoocook Valley Paper*, 529 A.2d at 1390-91; Restatement § 1.03 ("A person manifests assent or intention through written or spoken words or other conduct.")

7.      By contrast, implied actual authority can arise in at least three ways.  First, implied authority may arise from the words, actions or prior course of conduct between the principal and the agent.  *See Bouffard*, 27 A.3d at 687 (Implied authority may "arise from words used, from customs, or from the relations of the parties."); *Carrier v. McLlarky*, 693 A.2d 76, 78 (1997) ("The granting of authority and consent to act need not be written, but may be implied from the parties' conduct or other evidence of intent.").  Second, implied authority may arise from the acquiescence of the principal to the actions of the agent.  *See Mannone v. Whaland*, 382 A.2d 918, 920 (1978) ("authorization for the actions of an agent may be found by acquiescence of the principal in a series of acts performed by the agent in the past" (citing Restatement (Second) of Agency § 43(2)).  Third, implied authority may also arise where such authority is necessary to carry out the express grant of authority.  *Bouffard*, 27 A.3d at 687 ("Implied authority . . . follows as a reasonable incident or construction of the terms of express authority[.]"); *see also* Restatement § 2.01, cmt b ("[I]mplied authority encompasses that which is "necessary, usual, and proper to accomplish or perform an agent's express responsibilities"

14

and that which the "agent believes the principal wishes the agent to [do] based on the agent's reasonable interpretation of the principal's manifestation in light of the principal's objectives and other facts known to the agent").

8.      The "focal point for determining whether an agent acted with actual authority is the agent's reasonable understanding at the time the agent takes action."  Restatement § 2.01, cmt. c.

9.      Whether authorization is express or implied, control is a necessary third element to establish an actual agency relationship.  *Herman v. Monadnock Pr-24 Training Council*, 802 A.2d 1187, 1191 (N.H. 2002) ("As for the element of control, if no evidence of it is presented, the relationship of principal and agent cannot exist." (internal quotations omitted)).  Control by the principal does not mean actual or physical control at every moment; rather, it turns upon the principal manifesting some continuous prescription of what the agent shall or shall not do.  *Id.* (citing Restatement (Second) of Agency §§ 1 comment b at 9, 14 comment a, at 60 (1958)).

### ii.      Principles of Apparent Authority

10.      Even in cases where the elements of actual authority have not been established, an agency relationship can be found on the basis of apparent authority.  Apparent authority is "that authority which a reasonably prudent man, induced by the principal's acts or conduct, and in the exercise of reasonable diligence and sound discretion, under similar circumstances with the party dealing with the agent, and with like knowledge, would naturally suppose the agent to have."  *Atto v. Saunders*, 93 A. 1037, 1039 (N.H. 1915) (internal quotation marks omitted); *see also Horseshoe Fish & Game Club*, 291 A.2d at 253 ("Apparent authority exists where the principal so conducts himself as to cause a third party to reasonably believe that the agent is authorized to act.").

11.     Conduct of the principal that induces a third party to believe in the existence of an agency relationship can be affirmative conduct, or it can be based on acquiescence. *See Boynton*, 913 A.2d at 707-08; *State v. Zeta Chi Fraternity*, 696 A.2d 530, 536 (N.H. 1997) ("Apparent authority can result when the principal 'fails to disapprove of the agent's act or course of action so as to lead the public to believe that his agent possesses authority to act . . . in the name of the principal.'" (quoting 3 Am. Jur. 2d Agency § 79, at 586 (1986))).

12.     Apparent authority can also arise from the parties' prior course of dealing or custom and practice in an industry.  *See* Restatement § 2.03, cmt c ("A principal's conduct does not occur in a vacuum. A third party's reasonable understanding of the principal's conduct will reflect general business custom as well as usage that is particular to the principal's industry and prior dealings between the parties.").

### iii.     Agency Law in the Context of a Corporate Principal

13.     As the New Hampshire Supreme Court has acknowledged, "A corporation is a jural person, but not a person in fact. It is an artificial creature, acting only through agents . . . ." *Zeta Chi Fraternity*, 696 A.2d at 534; *see also* Restatement § 1.03, cmt c ("[A]n organization manifests its assent to be bound by the acts of individuals through the observable connections between the individual and the organization.").

14.     Actual authority within an organization usually begins with the organization's governing documents.  *See* Restatement § 1.03, cmt c ("In private-sector organizations, actual authority . . . originates both with the statute through which the organization achieves a legally recognized form and with the organization's constitutional documents. These provide the skeleton or essential architecture for beginning to determine which acts committed by human actors should be attributed to the organization.").  An organization's charter or bylaws typically identify "certain key positions within the organization" with authority to act on behalf of the

organization. *See id.*  Most commonly, the key personnel are members of a board of directors that "by statute, must take specified types of actions and that also, by statute, is assigned ultimate supervisory responsibility for the corporation's business and affairs."  *Id.*  Directors in turn appoint officers whose duties "may be defined by statute, by the corporation's constitutional documents, by specific resolutions adopted by the directors, and by custom associating specific functions with a particular position." *Id.* Accordingly, an organization may manifest its assent that an individual act on its behalf "by appointing that person to a position defined by the organization" and either "singling out specific tasks to be accomplished" or "prescribing responsibilities in broad terms that contemplate the substantial use of discretion."  *Id.*

15.     In the context of an organization, agents may appoint sub-agents "to perform functions that the agent has consented to perform on behalf of the agent's principal and for whose conduct the appointing agent is responsible to the principal."  Restatement § 3.15(1). "The relationships between a subagent and the appointing agent and between the subagent and the appointing agent's principal are relationships of agency."  *Id.*

16.     With respect to manifestations by a corporate principal that may give rise to apparent authority, an organization's routine for communicating with those external to the organization, such as by designating specific officers or employees to negotiate with respect to specific topics or channeling communications through certain individuals on certain topics may give rise to the reasonable belief on the part of a third party that the person speaks for or may bind the organization.  *See* Restatement § 1.03 cmt c.

> An organization may create a routine to communicate with those external
> to the organization, designating people with authority to speak as to
> particular types of matters. When the designated person speaks as to a
> matter that is one of the types specified, and in a manner that conforms
> to the established routine, a third party is justified in believing that the
> person speaks for the organization. The representation of reliability made

> through the manifestation cascades over the designated person's statements. The organization may also develop a channel of communications by which information about decisions made within the organization is communicated to persons external to it. An organization's channel of communications may under some circumstances constitute a manifestation of its assent to be bound in accordance with the communication.

*Id.*

17.    Principal-agent relationships in the corporate context must be viewed through the lens of how corporations function as a practical matter:

> Albeit of foundational importance, these formal characteristics do not capture either the practical or the legal reality of how most corporations and other business organizations operate. The ability to delegate with a reasonably reliable sense of the legal consequences is the essence of corporate management. What is delegated often includes the right to make manifestations to subordinates within the organization or to persons external to it. Delegation does not generally constitute abdication by the corporation's board or its officers. An officer granted broad managerial authority to manage a corporation's affairs impliedly has authority to delegate to subordinate agents acting under the officer's supervisory control. In a large corporation, where matters are complex, the implied authority to delegate extends to matters that are discretionary and not wholly or even substantially ministerial. The actual authority of a corporation's employees traces to its officers' power to hire employees and is defined in part by their terms of employment, which may describe authority with varying degrees of breadth or narrowness and specificity or generality. In many corporations, additionally, functions are delegated informally through oral instructions from a superior agent to an inferior one.

*Id.*

**B.  Lisa Duetsch Possessed Actual Authority, Traceable to the Plum Creek Board of Directors, to Reject UM Coverage.**

18.    At each link in the chain from Ms. Duetsch to Plum Creek's Board of Directors, a valid agency relationship existed supporting the delegation of authority to reject UM coverage on the Company's behalf.  *See* Restatement §§ 1.03, cmt. b, 3.15.

18

### i.   Kent Jones Expressly Delegated Authority to Lisa Duetsch to Reject UM Coverage.

19.     Applying New Hampshire principles of agency law, Ms. Duetsch possessed actual, express authority, delegated to her from Mr. Jones, to reject UM coverage on behalf of Plum Creek.  *See Bouffard*, 27 A.3d at 687; *Herman*, 802 A.2d at 1190-91; *In re Contoocook*, 529 A.2d at 1391.

20.     Specifically, with respect to the delegation of authority to reject UM coverage, the trial record contains evidence of all three elements of a valid agency relationship between Mr. Jones and Ms. Duetsch.  *See Bouffard*, 27 A.3d at 687 (requiring express or implied authorization, consent and some degree of control).

21.     First, Ms. Duetsch was expressly authorized by Mr. Jones, both verbally and in writing, to reject UM coverage on behalf of Plum Creek.[70]  Mr. Jones instructed her verbally to execute the UM forms so as to reject coverage where permitted by law.[71]  Mr. Jones also issued her a written delegation of authority memorandum, which provided, in relevant part, that the Risk Manager was authorized to sign "contracts, agreements, statements" including "Auto UI/UnderI forms."[72] *See, e.g.*, *In re Contoocook*, 529 A.2d at 1391 (concluding that agency relationship existed based on evidence of verbal agreement with a real estate broker and written letter memorializing same).  Further, even if Mr. Jones did not expressly delegate authority to reject UM coverage to Ms. Duetsch, Ms. Duetsch likewise possessed implied authority by virtue of Mr. Jones knowing acquiescence to her rejection of UM coverage for ten years.  SOF ¶ 25; *see Lewis v. Washington Metro. Area Transit Auth.*, 463 A.2d 666, 670 n.7 (D.C. App. 1983) ("The doctrine of implied actual authority focuses upon the agent's understanding of his authority:

---

[70] SOF ¶¶ 23, 27
[71] SOF ¶ 27.
[72] SOF ¶ 26.

19

whether the agent reasonably believed, because of conduct of the principal (including acquiescence) communicated directly or indirectly to him, that the principal desired him so to act.").

22.     Second, Ms. Duetsch accepted this responsibility by carrying it out each year in which she was authorized, including in 2013, with respect to the 2013 Umbrella Policy.[73]

23.     Third, Mr. Jones monitored and controlled Ms. Duetsch's performance of her job responsibilities, including the rejection of UM coverage.  In the first year that he delegated this authority to Ms. Duetsch, he verified that she had completed the forms correctly.[74]  Thereafter, Mr. Jones met with Ms. Duetsch weekly.  During these meetings, Ms. Duetsch informed Mr. Jones of the status of her completion of the UM forms.[75]  In addition, Mr. Jones required that Ms. Duetsch save the completed forms in a shared network folder where he could view and access them.[76]  Further, Mr. Jones regularly updated the delegation of authority memorandum in order to make clear the limits of Ms. Duetsch's authority.[77]

24.     Third, Ms. Duetsch was aware that if she had failed to execute the UM Forms so as to reject coverage where permitted by law, such conduct would have reflected poorly on her job performance.[78] *See, e.g.*, *Herman*, 802 A.2d at 1190-91 (finding sufficient evidence of agency relationship in part based on written authorization of instructors to provide courses on behalf of principal and risk of suspension or decertification of instructors who failed to adhere to parameters of authorization).  Accordingly, an actual express agency relationship existed between Mr. Jones and Ms. Duetsch with respect to the rejection of UM coverage.

---

[73]     SOF ¶¶ 37-38.
[74]     SOF ¶ 42.
[75]     SOF ¶ 42.
[76]     SOF ¶ 29.
[77]     SOF ¶¶ 24-25.
[78]     SOF ¶¶ 30, 47.

      **ii.**    **The Plum Creek Chief Financial Officer and Chief Accounting Officer Both Expressly and Impliedly Delegated Authority over Insurance Matters to Kent Jones.**

25.     Applying New Hampshire principles of agency law, Mr. Jones possessed actual, express authority to bind the 2013 Umbrella Policy, delegated from the Plum Creek CFO, Mr. Lambert and actual implied authority to reject UM coverage, delegated from the CFO and the Chief Accounting Officer ("CAO"), Mr. Brown. *See Herman*, 802 A.2d at 1190-91; *In re Contoocook*, 529 A.2d at 1391; Restatement § 1.03; *see also Bouffard*, 27 A.3d at 687-88; *Mannone*, 382 A.2d at 920; Restatement § 2.01, cmt. c.

26.     With respect to both the binding of the 2013 Umbrella Policy and the rejection of UM coverage, the trial record establishes that all three elements of a valid agency relationship between Mr. Jones and both the CFO and CAO were met. *See Bouffard*, 27 A.3d at 687.

27.     The first element was satisfied in that Mr. Jones was granted actual express authority to bind the 2013 Umbrella Policy from the Plum Creek CFO. Following the meetings with Plum Creek's insurance brokers and delivery of the spreadsheet from Mr. Jones to the CFO, Mr. Lambert, and CAO, Mr. Brown, summarizing Plum Creek's policies, premiums and deductibles, Mr. Jones submitted a written request to the CFO, by email, with a copy to the CAO, seeking permission to bind the 2013 Umbrella Policy. The CFO supplied written approval, also by email, for the binding of the 2013 Umbrella Policy.[79] *See Herman*, 802 A.2d at 1190-91 (written agreement authorizing instructors to act in certain manner on behalf of training council was evidence of actual authority); *see also In re Contoocook*, 529 A.2d at 1391; *see also* Restatement (Third) of Agency Law, § 1.03.

---

[79]    SOF ¶¶102-03.

28.    Mr. Jones' further authority to reject the optional UM coverage available under the 2013 Umbrella Policy was implied in at least three ways.  First, the decision to reject UM coverage in certain states was a decision subsidiary to binding the 2013 Umbrella Policy itself. Accordingly, the decision to accept or reject subsidiary, optional coverages to the main policy "follow[ed] as a reasonable incident or construction of the terms of express authority[.]"  *See Bouffard*, 27 A.3d at 687.  Second, Mr. Jones rejected UM coverage in each year from 2002 to 2005 and then his direct report rejected it each year from 2005 through 2015.  At no point did the CFO or the CAO direct him to do otherwise.[80]  Accordingly, Mr. Jones' authority was implied by the acquiescence of his superiors.  *See Mannone*, 382 A.2d at 920 ("authorization for the actions of an agent may be found by acquiescence of the principal in a series of acts performed by the agent in the past" (citing Restatement (Second) of Agency § 43(2)).  Third, Mr. Brown and Mr. Lambert viewed Mr. Jones as an expert on insurance and trusted him to make decisions with respect to insurance on behalf of Plum Creek.[81]  Accordingly, Mr. Jones reasonably understood, based on his prior relations with Mr. Brown and Mr. Lambert, that the decision to reject UM coverage fell within the scope of his implied authority to manage Plum Creek's insurance program.  *See* Restatement § 2.01, cmt. c. (The "focal point for point for determining whether an agent acted with actual authority is the agent's reasonable understanding at the time the agent takes action."). The acquiescence of Mr. Brown and Mr. Lambert to Mr. Jones' actions also resulted in their ratification of his conduct.  *See* Restatement § 4.01 ("A principal may ratify an act by failing to object to it or to repudiate it.").

29.    The second element of the agency relationship was satisfied in that Mr. Jones accepted the authorization he received by rejecting UM coverage in the years 2002 to 2005 and

---

[80]    SOF ¶¶ 22, 38, 110.
[81]    SOF ¶ 96; PFF ¶ 6.

thereafter by directing and monitoring his direct report in doing the same.[82] *See Bouffard*, 27 A.3d at 688 (securing insurance policy with the intent to do so on behalf of the principal was sufficient evidence of the agent's assent to act on behalf of the principal).

30.     The third element was satisfied in that the Plum Creek CFO and CAO monitored and controlled Mr. Jones' performance of his job duties by ensuring Mr. Jones' compliance with the monetary limits of his delegation of authority and requiring that he seek authorization for expenditures over certain dollar amounts; by participating in and asking questions at regular broker meetings with Mr. Jones and AON personnel; through weekly meetings between Mr. Brown and Mr. Jones during which Mr. Jones' performance of his responsibilities was discussed; and through formal reviews of Mr. Jones' performance conducted by Mr. Brown.[83] *See, e.g.*, *Bouffard*, 27 A.3d at 688 (finding sufficient evidence of control where principal and agent discussed the coverage to be purchased in advance and principal had opportunity to review the policy documents should she so choose); *Herman*, 802 A.2d at 1190-91 (finding sufficient evidence of control to support agency relationship where instructors were subject to written parameters for who they could train and were subject to recertification every four years). Accordingly, where each of the three elements of an agency relationship was satisfied, Mr. Jones' possessed express actual authority to bind the 2013 Umbrella Policy and implied actual authority to reject UM coverage on behalf of Plum Creek.

        **iii.**    **The Plum Creek Chief Financial Officer and Chief Accounting Officer Each Possessed Express and Implied Authority to Approve Insurance-Related Transactions and Decisions on Behalf of Plum Creek.**

31.     Applying New Hampshire principles of agency, the Plum Creek CFO, Mr. Lambert, and the CAO, Mr. Brown, each possessed actual authority, delegated to them by the

---

[82]     SOF ¶¶ 22-23, 27-30.
[83]     SOF ¶¶ 76-77, 84, 91, 94, 98-101.

Board of Directors, to approve financial transactions up to certain amounts, including those related to insurance, on behalf of Plum Creek.  *Bouffard*, 27 A.3d at 687-88; *Herman*, 802 A.2d at 1190-91; Restatement § 1.03; *see also Mannone*, 382 A.2d at 920; Restatement § 2.01, cmt b.

32.     With respect to the authority of the CFO and CAO to approve financial transactions, including those related to insurance, the trial record demonstrates that all three elements of an actual agency relationship existed between each of the CFO and the CAO and the Board of Directors.  *See Bouffard*, 687 A.3d at 687-88.

33.     The first element was satisfied in that the written BOD Delegation of Authority granted both the CFO and the CAO express authority to approve transactions on behalf of the Company up to distinct dollar amounts.[84/] *See Herman*, 802 A.2d at 1190-91; *see also Bouffard*, 27 A.2d at 687 ("Express authority arises when the principal … explicitly manifests its authorization of the actions of its agent."); Restatement § 1.03 ("A person manifests assent or intention through written or spoken words or other conduct.").

34.     The CFO and CAO also possessed implied authority, arising out of the BOD Delegation of Authority, to approve insurance-related expenditures.  *See* Restatement § 2.01, cmt b (implied authority encompasses that which is "necessary, usual, and proper to accomplish or perform an agent's express responsibilities" and that which the "agent believes the principal wishes the agent to [do] based on the agent's reasonable interpretation of the principal's manifestation in light of the principal's objectives and other facts known to the agent").  Although the BOD Delegation of Authority listed only approximately fifteen specific types of expenditures, it also allowed for the approval of "normal recurring" expenditures.[85/]  Where insurance fell within the broad scope of the respective responsibilities of the CFO and CAO's

---

[84/]     SOF ¶¶ 70-74.
[85/]     SOF ¶¶ 74.

authority,[86/] the CFO and CAO each possessed implied authority to approve insurance-related expenditures.

35.     The implied authority of the CFO and CAO was bolstered by the acquiescence of the Board and CEO.  Indeed, the Company's delegations of authority and the Company's actual expenditures were audited on a quarterly basis by external auditors and neither the Board nor the CEO ever countermanded the CFO or CAO's insurance approvals.[87/]  *See Mannone*, 382 A.2d at 920 (finding sufficient evidence of actual authority based in part on the principal's acquiescence to the agent's prior practices on behalf of the principal); *see also* Restatement § 4.01 ("A principal may ratify an act by failing to object to it or to repudiate it.").

36.     Further implicit in their authority was the authority of the CFO and CAO to delegate more specific insurance decisions to Mr. Jones.  Restatement § 1.03, cmt c ("An officer granted broad managerial authority to manage a corporation's affairs impliedly has authority to delegate to subordinate agents acting under the officer's supervisory control. In a large corporation, where matters are complex, the implied authority to delegate extends to matters that are discretionary and not wholly or even substantially ministerial.").

37.     The second element of the agency relationship was satisfied in that both the CFO and CAO accepted their responsibilities with respect to insurance by attending regular broker meetings, supervising Mr. Jones, reviewing the materials he provided and (in the case of the CFO) affirmatively authorizing the binding of insurance policies.[88/]  *Bouffard*, 27 A.3d at 688; Restatement § 1.03.

---

[86/]     SOF ¶¶ 88, 89, 96, 97, 102.
[87/]     SOF ¶ 76-77.
[88/]     SOF ¶¶ 94, 97-103.

38.     The third element was satisfied in that both the CFO and the CAO were monitored and controlled in their performance of their responsibilities.  Internal and external audits served to ensure that the CFO and the CAO operated within the confines of their respective delegations of authority.[89/] The CAO met weekly with his supervisor, the CFO to discuss the CAO's duties and activities with respect to the Company.[90/]  The CAO also met routinely with the Audit Committee of the Board and reported to them with respect to his responsibilities.[91/]  The CFO, in turn, was supervised by the CEO, and when requested by the Board, the CEO or the CFO provided presentations to the Board with respect to insurance.[92/] *See, e.g.*, *Herman*, 802 A.2d at 1190-91; *see also* Restatement § 1.03, cmt c.  Accordingly, both the CFO and the CAO possessed actual authority to act on behalf of Plum Creek with respect to its insurance program.

### iv.     The Authority of the Plum Creek Board of Directors Was Expressly Delegated by the Company's Bylaws.

39.      At the final link in the chain, the Plum Creek Board possessed actual authority to act on behalf of the Company.  *See* Restatement § 1.03, cmt. c

40.     The trial record demonstrates that all three elements of an actual agency relationship existed between the Board and Plum Creek as a corporate principal.  *See Bouffard*, 687 A.3d at 687; Restatement § 1.03, cmt. c.

41.     First, Plum Creek was a Delaware corporation with the statutory power to "[a]dopt, amend and repeal bylaws." Del. Code Ann. tit. 8, § 122(6).  The Company's bylaws expressly provide that the Board may act on the Company's behalf, including by executing

---

[89/]       SOF ¶¶ 66, 76-78; PFF ¶ 2.
[90/]       SOF ¶ 84.
[91/]       SOF ¶¶ 67-68.
[92/]       SOF ¶¶ 70-80; PFF ¶¶ 7-8.

contracts.[93/] *See* Restatement § 1.03, cmt. c (pointing to various governing documents, including bylaws, which typically identify "certain key positions within the organization and authority to act on behalf of the organization that is associated with each position" and describing the board of directors as the corporate governing body that must "by statute, must take specified types of actions and that also, by statute, is assigned ultimate supervisory responsibility for the corporation's business and affairs").  Second, the Board accepted the express grant of authority contained in the bylaws by, among other activities, issuing the BOD Delegation of Authority, which provided for the flow of authority among the corporate officers.[94/]  Third, the Board's activities were monitored and controlled by its stockholders, who elect the Board and may enforce the Board's fiduciary duties to the Company. *See* Tr. Ex. 41 (ECF No. 40-1), Art. III, § 1 (election of directors by stockholders); *see also* 1-15 Delaware Corporation Law and Practice § 42.01 (2017) (recognizing right of corporation's stockholders to bring suit to remedy breaches of fiduciary duty by directors that harm the corporation).

42.     Accordingly, the evidence contained in the trial record demonstrates that at each link in the chain of authority from Ms. Duetsch to the Plum Creek Board, each actor possessed actual authority flowing from a superior agent to engage in the financial or insurance-related decision-making that resulted in the rejection of UM coverage in connection with the 2013 Umbrella Policy.  No evidence exists in the trial record to contravene this ultimate fact.

---

[93/]      SOF ¶ 69, Tr. Ex __ (ECF No. 40-1), Art. III, § 4 ("Board of Directors . . . may exercise all such powers of the Corporation and do all such lawful acts and things as are not required by statute or by the Certificate of Incorporation or by these By-Laws required to be exercised or done by the stockholders.").
[94/]      SOF ¶¶ 67-68, 70-77.

**C. In the Alternative, Lisa Duetsch Was Cloaked with Apparent Authority to Reject UM Coverage on Behalf of Plum Creek.**

43.     Even if Ms. Duetsch did not possess actual authority, traceable to the Plum Creek Board, to reject UM coverage, the trial record demonstrates that Ms. Duetsch was cloaked with apparent authority on which Liberty could reasonably rely – both at the time the Umbrella Policies were each issued and later when Mr. Kelly made a claim for UM coverage. *See Horseshoe Fish & Game Club v. Merrimack Vill. Dist.*, 291 A.2d 251, 253 (N.H. 1972) ("Apparent authority exists where the principal so conducts himself as to cause a third party to reasonably believe that the agent is authorized to act.")

44.     First, Plum Creek cloaked Ms. Duetsch with apparent authority by its affirmative conduct. Plum Creek vested Ms. Duetsch with the title "Manager, Risk & Insurance."[95] The Company likewise provided her with business cards that reflected her title, a company email account that she used to communicate with insurers, and an office in Plum Creek's corporate offices in Montana where Ms. Duetsch met with Plum Creek's insurance brokers.[96] *See, e.g.*, *Boynton*, 913 A.2d at 604-05 (concluding that program permitting authorized builders to use company logo, among other factors, gave rise to apparent authority of builder). Mr. Day, having exchanged business cards with Ms. Duetsch, having learned of her title, and having met with her at Plum Creek's offices, relied on these indicia of authority in concluding that Ms. Duetsch was authorized to execute the UM forms on behalf of Plum Creek.[97] Similarly, Liberty personnel exchanged emails with Ms. Duetsch which reflected her title and addressed insurance matters

---

[95]     SOF ¶ 34.  Mr. Day testified that in his eighteen years of experience in the industry, this title signals that this is the person who is typically in charge of insurance matters for an organization she represents.  SOF ¶ 151.
[96]     SOF ¶¶ 33-36.
[97]     PPF ¶¶ 13-15.

and likewise relied on these indicia of her authority in concluding that Ms. Duetsch was authorized to reject UM coverage on behalf of Plum Creek.[98]

45.     Second, by its acquiescence to Ms. Duetsch and Mr. Jones' conduct, Plum Creek likewise cloaked Ms. Duetsch with apparent authority vis-à-vis third parties like AON and Liberty.   Indeed, Plum Creek personnel executed UM rejection forms in each year since at least 2002.[99]   Record of that rejection existed in the underwriting files of AON as well as Liberty, and Plum Creek never provided any documentation to either AON or Liberty to countermand those rejections.[100]   *See, e.g.*, *Horseshoe Fish & Game*, 291 A.2d at 253-54 (finding existence of apparent authority where two purported agents were allowed to operate as officers for a year without objection and organization did nothing to correct outdated documents in circulation giving authority to those purported officers).   Indeed, Mr. Day knew from his review of AON's files that rejection of UM coverage was consistent with Plum Creek's insurance strategy, and Mr. Aguiar similarly relied on Plum Creek's rejection of UM coverage in 2012 to quote a 2013 renewal without UM coverage.[101]   Further, Liberty relied on receipt of the 2012 and 2013 rejection forms to bind the 2012 and 2013 Policies without an additional premium for optional UM coverage.[102]   Accordingly, both Plum Creek's acquiescence to Mr. Jones' and Ms. Duetsch's conduct, as well as the record of Plum Creek's prior course of dealing, gave rise to a reasonable belief on the part of third parties that Plum Creek intended to reject UM coverage where permitted by law.   *See Zeta Chi Fraternity*, 696 A.2d at 536 ("Apparent authority can

---

[98]      Tr. Ex. 14 at Page 10 of 12, Tr. Ex. 28.
[99]      SOF ¶¶ 22, 38.
[100]      SOF ¶¶ 132, 142, 152; PFF ¶ 9.
[101]      PFF ¶ 9; SOF ¶¶ 139, 145.
[102]      Tr. Ex. 2 at L000057 (2012 Umbrella Policy showing total premium of $183,809); Tr. Ex. 2 at L000398 (2012 Umbrella Excess Liability Proposal showing Total Estimated Premium of $183,809); Tr. Ex. 10 (2013 Umbrella Policy showing a Premium of $168,813); Tr. Ex. 2 at L000117 (Umbrella Excess Liability Proposal reflecting Premium Subtotalof $168,813, exclusive of optional Terrorism Coverage Flat Charge).

result when the principal 'fails to disapprove of the agent's act or course of action so as to lead the public to believe that his agent possesses authority to act . . . in the name of the principal.'" (quoting 3 Am. Jur. 2d Agency § 79, at 586 (1986)); *see also* Restatement § 2.03, cmt c (recognizing that apparent authority can arise from prior dealings between the parties).

46.     Third, Plum Creek's affirmative conduct and prior course of dealing with respect to the binding of its insurance policies and the rejection of UM coverage, particularly in light of custom and practice in the insurance industry, further served to cloak Ms. Duetsch with apparent authority to reject UM coverage on its behalf.  Mr. Day testified that based on his eighteen years of experience in the industry, he would not interact with personnel from a client regarding insurance unless that person had been introduced to him and the proper relationship had already been established using appropriate internal protocols.[103]  Based on this protocol, there is typically a specific person or persons at the client with whom the broker interacts.[104]  For Plum Creek, those individuals were Mr. Jones and Ms. Duetsch.  In the underwriting process, Plum Creek channeled its communications with its broker through Ms. Duetsch and Mr. Jones, and Mr. Day handled all communications with Plum Creek's insurers.[105]  As evidenced by Liberty's communication solely with AON throughout the underwriting process in 2012 and 2013, and Liberty's binding of the 2012 and 2013 Umbrella Policies based on binding instructions from AON, Liberty relied on this chain of communication as valid because AON was acting in its capacity as a broker on behalf of Plum Creek.[106]  In light of Plum Creek's practice of channeling

---

[103]     PFF ¶ 10.
[104]     SOF ¶¶ 148-51; PFF ¶ 19.
[105]     SOF ¶¶ 133, 143.
[106]     Under Washington state law (where the 2012 and 2013 Umbrella Policies were bound), "insurance brokers represent insureds." *See* 1-58 Washington Ins. Law § 58.04 (2017).  The same is true in New Hampshire. *See Commercial Cas. Ins. Co. v. Mansfield*, 96 A.2d 558, 566-67 (N.H. 1953) (It is "well settled that brokers do not customarily represent the insurer in negotiating insurance.").

communications with its brokers through Mr. Jones and Ms. Duetsch who in turn channeled their communications with underwriters through Plum Creek's broker, Liberty's reasonably believed that AON supplied Liberty with forms signed by an individual who was duly authorized on behalf of Plum Creek.   *See* Restatement § 1.03, cmt c ("An organization may create a routine to communicate with those external to the organization, designating people with authority to speak as to particular types of matters. When the designated person speaks as to a matter that is one of the types specified, and in a manner that conforms to the established routine, a third party is justified in believing that the person speaks for the organization.").

47.    In addition to the indicia of authority relied upon during the underwriting of the 2012 Umbrella Policy and the 2013 Umbrella Policy, Liberty also reasonably relied upon Plum Creek's cloaking of Ms. Deutsch with apparent authority during the claims handling process. Mr. Covert of Liberty communicated by email with Ms. Duetsch with respect to Mr. Kelly's claim.  Her emails reflected her title of Manager, Risk and Insurance. [107/]  She was also copied on Mr. Covert's email to an ACE claims adjuster stating that the 2013 Umbrella Policy contains an exclusion for UM coverage and that he was "working with our underwriter to confirm we obtained the appropriate rejection forms …"   Ms. Duetsch's signature appeared on the NH UM Form supplied to Mr. Covert from the Liberty underwriting file, and on December 10, 2014, Mr. Covert denied coverage for Mr. Kelly's UM claim on the grounds that Ms. Duetsch rejected UM coverage.[108/]

48.    For all of these reasons, the trial record demonstrates that Plum Creek cloaked Ms. Duetsch with apparent authority upon which Liberty reasonably relied both in issuing the 2012 and 2013 Umbrella Policies and in denying the Plaintiff's claim for UM coverage.

---

[107/]    Tr. Ex. 15.
[108/]    Tr. Ex. 14.

**D. Where Ms. Duetsch Possessed Both Actual and Apparent Authority, Traceable to the Board of Directors, to Reject UM Coverage, the NH UM Form Was Duly Executed by an Authorized Agent of Plum Creek.**

49.     The trial record demonstrates, without contravention, that Ms. Duetsch possessed actual and apparent authority to reject UM coverage on behalf of Plum Creek.  Accordingly, the NH UM Form was duly executed by an authorized agent of Plum Creek and therefore bars coverage for Mr. Kelly's UM claim.

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on January 26, 2018, I electronically filed the foregoing document with the Clerk of the District Court using the CM/ECF system, which sent notification of such filing to counsel of record for the parties.

*/s/  Lavinia M. Weizel*

75278183v.1