## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| **BRENDAN KELLY,**<br><br>  **Plaintiff,**<br><br>**v.**<br><br>**LIBERTY INSURANCE CORPORATION**<br><br>  **Defendant.** | **CIVIL ACTION NO. 15-CV-00234-JL** |

### LIBERTY INSURANCE CORPORATION'S
### OBJECTIONS TO PLAINTIFF BRENDAN KELLY'S
### PROPOSED FINDINGS OF FACT AND RULINGS OF LAW

Pursuant to this Court's Procedural Order dated December 29, 2017, and Local Rule

16.2(d), Defendant Liberty Insurance Corporation ("Liberty") hereby submits the below

objections to Plaintiff Brendan Kelly's Proposed Findings of Fact and Rulings of Law (ECF No.

57).

### OBJECTIONS TO PLAINTIFF BRENDAN KELLY'S
### PROPOSED FINDINGS OF FACT AND RULINGS OF LAW

1.     Plaintiff Brendan Kelly was an employee of Plum Creek Timber Company, Inc.

("Plum Creek") on December 10, 2013.  (Trial Ex. 16.)

**OBJECTION**:  Under Federal Rule of Evidence 401, this Proposed Fact is irrelevant and

of no consequence to this action.  Plaintiff has filed a declaratory judgment action against Liberty

in which his sole claim is a Request for Declaratory Findings as to coverage under a Commercial

Liability Umbrella Policy issued by Liberty to Plum Creek Timber Company, Inc. ("Plum

Creek" or the "Company") with a policy period of June 1, 2013 to June 1, 2014 (the "2013

Umbrella Policy").[1/]  At no point have the underlying facts surrounding Mr. Kelly's alleged

automobile accident or injury been the subject of this litigation.

Moreover, the sole remaining factual issue for trial is whether Plum Creek employee Lisa

Duetsch, the Manager, Risk and Insurance, had actual or apparent authority to reject UM

coverage.  More specifically, on March 28, 2017, in ruling on the parties Cross-Motions for

Summary Judgment, this Court determined that "Plaintiff's Motion for Summary Judgment is

denied (doc. no. 27). Defendant's Motion for Summary Judgment (doc. no. 28) is granted in part

and denied in part. Partial summary judgment is granted in favor of the defendant insofar as

plaintiff's claims are based on RSA 264:15 and/or the language of the relevant insurance policy.

The defendant's motion is denied in so far as it is based on the actual or apparent authority of

Ms. Duetsch to reject coverage."  Indeed, as Plaintiff and Liberty each stated in their respective

Pre-Trial Statements, "the sole factual issue now pending for a bench trial before this Court is

whether Plum Creek employee Lisa Duetsch was authorized to reject uninsured/underinsured

motorist coverage on behalf of Plum Creek."  ECF Nos. 53, 54. Finally, Plaintiff has offered no

admissible evidence of this Proposed Fact in the trial record.  The Trial Exhibit cited is the

Affidavit of Brendan Kelly. Liberty has expressly advised Plaintiff that, although Liberty would

stipulate to the listing of this affidavit as a trial exhibit, Liberty has not and will not stipulate to

the truth of its contents without the opportunity to depose Mr. Kelly – a request to which Plaintiff

previously objected.[2/]

---

[1/]       Petition for Declaratory Judgment, ¶ 40.

[2/]       On April 17, 2017, Liberty filed a Proposed Procedural Plan in which it requested, among other things, that
it be permitted to "complete discovery by taking the deposition of the Plaintiff and other witnesses necessary to
enable Liberty to defend its case and carry its burden as to the issues that remain in dispute."  Liberty further stated
that it expected to seek the deposition of witnesses including Plaintiff, Brendan Kelly.  Liberty stated that "Mr. Kelly
is likely to have information pertinent to the question of Lisa Duetsch's apparent authority based in part on the
representations made by plaintiff's counsel at the summary judgment hearing regarding what Mr. Kelly knew and
did not know of Plum Creek's insurance coverage."  ECF No. 42.  On April 20, 2017, Mr. Kelly objected to
Liberty's request to seek the deposition of Mr. Kelly in part on the basis that the discovery was "disproportionate to

2.      Brendan Kelly was injured in an automobile collision on December 10, 2013.

(Trial Ex. 11, 16.)

**OBJECTION**:  Under Federal Rule of Evidence 401, this Proposed Fact is irrelevant and

of no consequence to this action for the reasons stated in Objection 1, *supra.*  In addition, Liberty

incorporates by reference its objection to Proposed Fact No. 1.

3.      Brendan Kelly was "an insured" under the Commercial Liability Umbrella policy

issued by Liberty to Plum Creek, effective June 1, 2013 – June 1, 2014.  (Trial Ex. 12.)

**OBJECTION**:  Under Federal Rule of Evidence 401, this Proposed Fact is irrelevant to

this action for the reasons stated in Objection 1, *supra.*  In addition, Liberty incorporates by

reference its objection to Proposed Fact No. 1.

4.      At the time of the collision, Brendan was operating a truck owned by Plum Creek,

which Plum Creek registered and garaged in New Hampshire.  (Trial Ex. 11, 16.)

**OBJECTION**:  Under Federal Rule of Evidence 401, this Proposed Fact is irrelevant and

of no consequence to this action for the reasons stated in Objection 1, *supra.*  In addition, Liberty

incorporates by reference its objection to Proposed Fact No. 1.

5.      At the time of the collision, Brendan Kelly was an employee acting within the

scope of his employment for Plum Creek.  (Trial Ex. 16.)

**OBJECTION**:  Under Federal Rule of Evidence 401, this Proposed Fact is irrelevant and

of no consequence to this action for the reasons stated in Objection 1, *supra*.  In addition, Liberty

incorporates by reference its objection to Proposed Fact No. 1.

---

the issue at stake" and would "prejudice the plaintiff." ECF No. 43 at 1, 3.  The Court then issued an order
"approving in part and denying in part [ECF No.] 42 Proposed Discovery Plan Pursuant to the Court's March 28,
2017 Order on the Parties' Cross-Motions for Summary Judgment."  The Court stated in the text of the order: "The
court approves in part and denies in part defendant's proposed plan, as follows: . . . The defendant is not permitted,
at this time, to take plaintiff's deposition. The court will consider revisiting this issue if plaintiff's counsel intends to
call plaintiff as a witness."

6.      At the time of the collision, Brendan Kelly was using a "covered auto" with Plum Creek's permission.  (Trial Ex. 16.)

**OBJECTION**:  Under Federal Rule of Evidence 401, this Proposed Fact is irrelevant and of no consequence to this action for the reasons stated in Objection 1, *supra*.  In addition, Liberty incorporates by reference its objection to Proposed Fact No. 1.

7.      Defendant Liberty Insurance Corporation ("Liberty") did not communicate directly with any employee of Plum Creek when it negotiated and confirmed the purchase of Liberty insurance policies in 2012 and 2013.  All of Liberty's communications were with AON, an insurance broker for Plum Creek. (Fact 133, 143.)

**RESPONSE:**  This Proposed Fact is not disputed by Liberty.

8.      When Liberty's Commercial Liability Umbrella policy went into effect on June 1, 2013, Liberty had not received a New Hampshire Uninsured/Underinsured ("UM") Selection/Rejection form signed by an employee of Plum Creek.  (Fact 141, 142.)

**OBJECTION**:  This Proposed Fact is inconsistent with the evidence contained in the trial record.  Plaintiff has stipulated that, on June 15, 2012, Michael Day of AON delivered to Liberty signed UM rejection forms for the states of Florida, Louisiana, West Virginia, and New Hampshire (the "UM Rejection Forms") all of which were signed by Ms. Duetsch.[3/]  Under the New Hampshire Uninsured or Hit-and-Run Motor Vehicle Coverage statute (N.H. Rev. Stat. § 264:15) ("NH UM Statute"), "[r]ejection of [UM] coverage . . . shall remain effective upon policy amendment or renewal, unless the named insured requests such coverage in writing." N.H. RSA 264:15.  Thus, at the time the 2013 Umbrella Policy incepted, Liberty was in the possession of the UM Rejection Forms.

---

[3/]      Stipulation ¶ 132 (Citations in the form "Stipulation ¶ __" refer to the parties' Joint Statement of Agreed-Upon Facts, dated January 22, 2018, ECF No. 54).

9.      When the Liberty policy went into effect on June 1, 2013, Liberty did not have a written rejection of UM coverage from the named insured as required by R.S.A. 264:15.

**OBJECTION**:  This Proposed Fact is inconsistent with the evidence contained in the trial record for the reasons stated in Objection 8, *supra*.  In addition, this Proposed Fact is premised on a conclusion of law to which Liberty objects.  The statute provides that rejection of UM coverage remains in effect from  year to year unless the named insured requests such coverage in writing.  R.S.A. § 264:15.

10.     The signature on the New Hampshire UM Selection/Rejection form dated May 30, 2013 is illegible.  (Trial Ex. 7.)

**OBJECTION**:  Under Federal Rule of Evidence 401, this Proposed Fact is irrelevant and of no consequence to this action where Plaintiff has expressly stipulated that, "[t]he signature appearing on the [May 30, 2013] NH UM Selection/Rejection Form is the signature of Ms. Duetsch."[4/]  This Proposed Fact is also irrelevant because the Plaintiff has stipulated that Plum Creek's rejection of UM coverage was consistent with its insurance strategy.[5/]   Plaintiff has also stipulated that when Michael Day, the AON broker for Plum Creek, receives a signed form, such as the UM Rejection Forms, "he expects those documents have been signed with the authority of the client, according to the client's own internal protocols."[6/]  Further, the New Hampshire UM Selection/Rejection form dated May 30, 2013 (the "NH UM Rejection Form") lists, in typeface, "Plum Creek Timber Company, Inc." as the "Applicant/Named Insured."[7/]  To the extent the Plaintiff is suggesting that AON or Liberty could not reasonably identify the person who signed

---

[4/]      Stipulation ¶ 37.
[5/]      Stipulation ¶ 115.
[6/]      Stipulation ¶ 146.
[7/]      Tr. Ex 7 (Citations in the form "Tr. Ex. ___" refer to the Trial Exhibits listed on the parties' Joint Agreed-Upon Exhibit List dated January 22, 2018, ECF No. 56).

the NH UM Rejection Form, the UM Rejection Forms previously delivered to Liberty included Ms. Duetsch's printed name.  Moreover, the Terrorism Coverage Election Form, which was also signed by Ms. Duetsch, contained her printed name.[8]  *See* Objection 11, *infra*.

11.    The New Hampshire UM Selection/Rejection form provided to Liberty by AON on June 3, 2013 did not state that it was signed by an authorized representative of Plum Creek. (Trial Ex. 7.)

**OBJECTION**:  This Proposed Fact is irrelevant for the reasons stated in support of Objection 10, *supra*.  Further, the NH UM Rejection Form states that it is signed by the "Applicant/Named Insured."[9]  In addition, the NH UM Rejection Form was supplied to Liberty on June 3, 2013 together with UM selection rejection forms for Florida, Louisiana and West Virginia, all of which were signed and/or initialed by Ms. Duetsch and which stated under her signature "Signature of Applicant/Named Insured"[10] or "Signature of Named Insured or Legal Representative" under which her name was also printed,[11] or "Applicant's/Named Insured's Signature."[12]  Moreover, as with the UM Rejection Forms, the Terrorism Coverage Election Form was signed by Ms. Duetsch and identified the insured as Plum Creek Timber Company, Inc.[13]  Finally, the precise language and form of the NH UM Rejection Form was approved by the New Hampshire Department of Insurance for an effective date of November 1, 2010.[14]

---

[8]    Tr. Ex. 2 at L000096.
[9]    *See Demolle v. Horace Mann Ins. Co.*, 491 So.2d 695, 699 (La. App. 5th Cir. 1986) (holding that, "[w]hile the insurer in Springfield probably was unaware of an agency relationship at [the insured's] address, it was certainly reasonable for [the insurer] to believe someone, if not the insured, at that address signed [the insured's] name and had authority to do so").
[10]    Tr. Ex. 2J at L000083 (Florida).
[11]    Tr. Ex. 2J at L000084 (Louisiana).
[12]    Tr. Ex. 2J at L000087-88 (West Virginia).
[13]    Tr. Ex. 2 a L000096.
[14]    Tr. Ex. 24.

## Lack of Express Actual Authority

12.     There was no evidence showing that the Plum Creek Board of Directors expressly delegated the authority to purchase or reject UM coverage to the corporation's Chief Executive Officer ("CEO") or Chief Financial Officer ("CFO").

**OBJECTION**:  This Proposed Fact is inconsistent with evidence contained in the trial record, which shows that:

- David Brown, the Plum Creek Chief Accounting Officer, by virtue of his responsibility for the Company's internal controls, had personal knowledge of the Board's delegation of authority to corporate officers, including the CFO, (the "BOD Delegation of Authority") as well as delegations of authority that cascaded through the company.[15/]

---

[15/]     Stipulation ¶ 59 ("As Plum Creek's Vice President and Chief Accounting Officer, Mr. Brown's primary job responsibility was to oversee the Company's annual disclosure of financial information in order to meet various SEC requirements."); ¶ 61 ("Mr. Brown was primarily responsible for 'internal controls' at Plum Creek, meaning appropriate protocols and practices to prevent material misstatements in the reported earnings and to ensure that all material transactions were properly approved in accordance with the requirements of the Board.  This responsibility was given to Mr. Brown by the Board, the Chief Financial Officer (the "CFO"), and the President of the Company. It was Mr. Brown's job to take primary responsibility for the Company's internal controls."); ¶ 64 ("Based on his knowledge of federal regulations governing public companies, including the SEC's guidance, along with his educational and professional experience, Mr. Brown understood that adequate internal controls over financial reporting, specifically those intended to ensure all material transactions are properly authorized, required that Plum Creek have adequate delegations of authority in place."); ¶ 65 "As an area within his work on internal controls, Mr. Brown spent much of his time on the area of delegations of authority.  Mr. Brown and a counterpart in the legal group worked together regularly to make sure the Company 'had a good delegation in place.'");  ¶ 75 ("Mr. Brown received a copy of the BOD Delegation of Authority in the first year the Board approved it."); ¶ 93 ("The delegation of authority memorandum, issued by Mr. Jones and attached to the Supplementary Affidavit of Mr. Jones, is consistent with information Mr. Brown had regarding the CFO's level of authority, Mr. Brown's own level of authority, and the authority of Mr. Brown's direct reports.").  Mr. Brown's personal knowledge of Plum Creek's internal controls is further supported by the fact that he signed the Company's Form 10-K Annual Report for the years 2012 and 2013 in his capacity as the Principal Accounting Officer and "[p]ursuant to the requirements of the Securities Exchange Act of 1934." Tr. Exs. 4, 5.  Regulations under the Securities Exchange Act of 1934 require a 10-K Annual Report to be accompanied by a report from management regarding the Company's internal controls, including statements "identifying the framework used by management to evaluate the effectiveness of the registrant's internal control over financial reporting."  17 C.F.R. § 229.308; *see also id.* § 229.10.  The signatory to a 10-K containing material misstatements and omissions faces criminal and civil liability.  *See United States v. Ferrarini,* 9 F. Supp. 2d 284, 297 (S.D.N.Y. 1998), *aff'd* 219 F.3d 145 (2d Cir. 2000).

- Mr. Brown testified based on his personal knowledge that the BOD Delegation of Authority expressly authorized Mr. Lambert, the Plum Creek CFO to approve payments, of which insurance was one,[16] that Mr. Lambert expressly authorized the binding of Plum Creek's insurance program,[17] and that Mr. Lambert chose to "manage that area" by attending regular meetings with Mr. Brown, Mr. Jones and Plum Creek's brokers.[18]

- The authority to delegate subsidiary insurance-related decisions, including regarding UM coverage, was encompassed in the express authority granted to Mr. Lambert to approve insurance-related payments up to a certain amount.[19]

13.     There was no evidence showing that the Board of Directors expressly delegated the decision whether to purchase or reject UM coverage to the corporation's Chief Accounting Officer David Brown.

---

[16]     Stipulation ¶ 75 ("Mr. Brown received a copy of the BOD Delegation of Authority in the first year the Board approved it."); ¶ 72 ("The BOD Delegation of Authority addressed the power of individual corporate officers to approve payments to third parties on behalf of the Company."); ¶ 74 ("The BOD Delegation of Authority did not contain a separate line for insurance.  Insurance fell under approval for payments. Mr. Brown 'guessed' that there were approximately fifteen categories of payments, and insurance would have been one of the normal recurring expenditures.").

[17]     Stipulation ¶ 96 ("Mr. Brown reported to the CFO with respect to insurance. . . . Mr. Lambert, provided the authorization in 2012 and 2013 for the binding of Plum Creek's insurance program.")

[18]     Stipulation ¶ 96-101.

[19]     Stipulation ¶¶ 70-74.  Delegation of authority by the Board of a complex organization such as Plum Creek must be considered in the context of how organizations of this scale function as a practical matter.  As the Restatement provides:  "The ability to delegate with a reasonably reliable sense of the legal consequences is the essence of corporate management. What is delegated often includes the right to make manifestations to subordinates within the organization or to persons external to it. Delegation does not generally constitute abdication by the corporation's board or its officers. An officer granted broad managerial authority to manage a corporation's affairs impliedly has authority to delegate to subordinate agents acting under the officer's supervisory control. In a large corporation, where matters are complex, the implied authority to delegate extends to matters that are discretionary and not wholly or even substantially ministerial. The actual authority of a corporation's employees traces to its officers' power to hire employees and is defined in part by their terms of employment, which may describe authority with varying degrees of breadth or narrowness and specificity or generality. In many corporations, additionally, functions are delegated informally through oral instructions from a superior agent to an inferior one."  Restatement (Third) of Agency Law, § 1.03 cmt. c (Am. Law Inst. 2006) (hereinafter "Restatement").  Here, Ms. Duetsch was hired by Plum Creek for the express purpose of handling insurance-related matters.  Stipulation ¶ 87.

**OBJECTION**:  This Proposed Fact is inconsistent with evidence contained in the trial record, which shows that:

- David Brown, the Plum Creek Chief Accounting Officer, by virtue of his responsibility for the Company's internal controls, had personal knowledge of the BOD Delegation of Authority to corporate officers, including himself, as well as delegations of authority that cascaded through the Company.[20]

- Mr. Brown testified based on his personal knowledge of, and responsibility for, the Company's internal controls, including its delegations of authority, that the BOD Delegation of Authority expressly authorized him to approve payments, of which insurance was one.[21]

- The authority to delegate subsidiary insurance-related decisions, including regarding UM coverage, was encompassed in the express authority granted to Mr. Brown to approve insurance-related payments up to a certain amount.[22]

14.    There was no evidence showing that the Board of Directors expressly delegated the authority to Kent Jones to decide whether to purchase or reject UM coverage for Plum Creek's fleet vehicles.

**OBJECTION**:  This Proposed Fact is inconsistent with evidence contained in the trial record, which shows that:

- David Brown, the Plum Creek Chief Accounting Officer, by virtue of his responsibility for the Company's internal controls, had personal knowledge of the

---

[20]    *See supra* n.15.
[21]    Stipulation ¶ 84.
[22]    Stipulation ¶¶70-74, 84.

BOD Delegation of Authority to corporate officers, including the CFO, as well as delegations of authority that cascaded through the company.[23]

- Mr. Brown testified based on his personal knowledge, and Plaintiff has stipulated, that subject to the limits of Mr. Jones' authority to approve payments, Mr. Jones had "full authority" with respect to "anything having to do with insurance."[24]

- The authority to delegate subsidiary insurance-related decisions, including regarding UM coverage, was encompassed in the scope of authority of Mr. Jones as well as in his authority to approve insurance-related payments up to a certain amount.[25]

15.     Lisa Duetsch's testimony that she believed she had authority to reject UM coverage for Plum Creek is not determinative on the issue of whether Plum Creek's Board of Directors in fact delegated that authority to her.

**OBJECTION**:  This Proposed Fact is a legal conclusion.  Further, Ms. Duetsch's beliefs are directly relevant to show that she possessed implied authority flowing through the corporate chain of authority from the Board through the corporate officers and Mr. Jones to her.  *See, e.g.*, *Lewis v. Wash. Metro. Area Transit Auth.*, 463 A.2d 666, 670 n.7 (D.C. 1983) (cited favorably in *Sinclair v. Town of Bow*, 480 A.2d 173, 177 (N.H. 1984)) ("The doctrine of implied actual authority focuses upon the agent's understanding of his authority: whether the agent reasonably believed, because of conduct of the principal (including acquiescence) communicated directly or

---

[23]     *See supra* n.15.
[24]     Stipulation ¶ 91 ("Anything having to do with insurance, except for authorizing payments, was within the full authority of Mr. Jones. Mr. Jones was responsible for ensuring that Plum Creek was buying the correct amount of insurance, subject to whether the payments were within his delegation. For any payments above the level of his delegation of authority, Mr. Jones was required to seek approval from someone senior to him with the requisite authority, such as Mr. Brown or the CFO.").
[25]     Stipulation ¶¶ 91, 93.

10

indirectly to him, that the principal desired him so to act.").  Plaintiff has stipulated that Ms. Duetsch understood that she was authorized to reject UM coverage where permitted by law.[26/]

16.     Kent Jones' testimony that he believed that he was authorized to make the decision to select or reject UM coverage is not determinative on the issue of whether Plum Creek's Board of Directors in fact delegated that authority to him.

**OBJECTION**:  This Proposed Fact is a legal conclusion.  Further, and as stated in support of Objection 15, *supra*, Mr. Jones' beliefs are directly relevant to show that he possessed implied authority flowing through the corporate chain of authority from the Board through the corporate officers to him.  *See, e.g.*, *Lewis*, 463 A.2d at 670 n.7 (cited favorably in *Sinclair*, 480 A.2d at 177) ("The doctrine of implied actual authority focuses upon the agent's understanding of his authority: whether the agent reasonably believed, because of conduct of the principal (including acquiescence) communicated directly or indirectly to him, that the principal desired him so to act.").  Plaintiff has stipulated that Mr. Jones understood that he was authorized to accept or reject UM coverage on behalf of Plum Creek.[27/]

17.     David Brown's belief that Kent Jones had the authority to decide to select or reject UM coverage does not prove that the Plum Creek Board of Directors actually granted that authority to Kent Jones.

**OBJECTION**:  This Proposed Fact is a legal conclusion.  Further, and as stated in support of Objections 15 and 16, *supra*, Mr. Brown's beliefs are directly relevant to show that both he and Mr. Jones possesses implied authority flowing through the corporate chain of authority from the Board.  Moreover, and as stated in support of Objections 12-14, *supra*, Mr. Brown's testimony was offered for his personal knowledge of the internal controls of Plum

---

[26/]     Stipulation ¶ 44.
[27/]     Stipulation ¶ 21.

Creek, including its delegations of authority, and the manner in which those delegations operated within the Company.  His testimony was not limited to his own "beliefs" as to his role or that of Mr. Jones (or Mr. Lambert or Ms. Duetsch).  Rather it was based on his extensive personal knowledge of, and responsibility for, Plum Creek's internal controls and delegations of authority.[28]

18.     Plum Creek had a system of internal controls which employed written "delegations of authority" to assign authority and responsibilities from the Board of Directors to the officers and employees below the Board.

**RESPONSE:**  Liberty does not dispute this Proposed Fact.[29]

19.     Liberty did not produce any documentary evidence of any written Delegation of Authority from the Plum Creek Board of Directors, the CEO, the CFO David Lambert, or the Chief Accounting Officer David Brown.

**OBJECTION**:  This Proposed Fact is not consistent with evidence contained in the trial record. Liberty produced documentary evidence reflecting Mr. Jones' authority as well as that of Ms. Duetsch in the form of delegation of authority memoranda issued by Mr. Jones to his department.[30]  Mr. Brown then testified based on his personal knowledge, obtained through his twenty-one years of work for Plum Creek, during which he devoted at least twenty-five percent of his time to internal controls,[31] that the information contained in these memoranda issued by Mr. Jones was consistent with Mr. Brown's knowledge of the Company's internal controls and delegations of authority,[32] for which he was responsible.  Further, Liberty is under no obligation

---

[28]     *See supra* n.15.
[29]     *See, e.g.*, Stipulation ¶¶ 61-66.
[30]     *See* Tr. Ex. 6 (containing delegation of authority memoranda from 2005 through 2015).
[31]     Stipulation ¶¶ 51, 63.
[32]     Stipulation ¶ 93 ("The delegation of authority memorandum, issued by Mr. Jones and attached to the Supplementary Affidavit of Mr. Jones, is consistent with information Mr. Brown had regarding the CFO's level of authority, Mr. Brown's own level of authority, and the authority of Mr. Brown's direct reports.").

to produce documentary evidence in addition to, or instead of, Mr. Brown's sworn testimony based on personal knowledge. *See, e.g.*, *R & R Assocs., Inc. v. Visual Scene, Inc.*, 726 F.2d 36, 38 (1st Cir. 1984) ("No evidentiary rule, however, prohibits a witness from testifying to a fact simply because the fact can be supported by written documentation" particularly where the party opponent "had ample opportunity to undercut the testimony through a rigorous cross-examination.").

20.     Liberty did not produce any documentary evidence of any written Delegation of Authority giving David Brown or Kent Jones the authority to make decisions about choosing or rejecting UM coverage for Plum Creek's vehicles.

**OBJECTION**:  This Proposed Fact is inconsistent with the evidence contained in the trial record for the reasons set forth in Objection 19, *supra*.  Further, the authority of Mr. Brown and Mr. Jones to make decisions regarding UM coverage was encompassed within both the scope of their authority to approve insurance-related payments up to certain amounts[33] and Mr. Jones' "full authority" regarding "anything having to do with insurance."[34]

21.     The mere fact that Lisa Duetsch was an employee of Plum Creek did not prove that her execution of the New Hampshire UM Selection/Rejection form was an authorized act of Plum Creek.

**OBJECTION**:   This Proposed Fact states a legal conclusion.  Further, Ms. Duetsch's position as the Manager, Risk & Insurance of Plum Creek is relevant to show her apparent authority vis-à-vis third parties such as AON and Liberty in light of custom and practice in the insurance industry.[35]  Moreover, Plaintiff has stipulated that "the rejection of UM coverage

---

[33]     Stipulation ¶¶ 83, 92.
[34]     Stipulation ¶ 91.
[35]     *See* Stipulation ¶ 151 ("In Mr. Day's [eighteen years of] experience risk managers are typically in charge of the insurance matters for the organization that they represent. If there is a risk manager in an organization, that is the

[was] consistent with Plum Creek's strategy regarding insurance."[36/]  Plaintiff has further

stipulated that (i) when Mr. Day "receives signed forms from a client, he expects that those

documents have been signed with the authority of the client, according to the client's own

protocols;[37/] and (ii) Mr. Day understood that Ms. Duetsch was the risk manager for Plum Creek

and that, in his experience, risk managers are in charge of insurance for their organization.[38/]

Finally, Ms. Duetsch was hired for the express purpose of assisting Mr. Jones with respect to

insurance-related matters for Plum Creek.  *See* n.19, *supra*.

### Lack of Implied Actual Authority and/or Apparent Authority

22.     There was no evidence showing that Kent Jones reported his decision to reject

UM coverage to Plum Creek's Chief Accounting Officer David Brown, CFO David Lambert, the

CEO, or any Director on the Board of Directors.

**OBJECTION**:  Under Federal Rule of Evidence 401, this Proposed Fact is irrelevant and

of no consequence where reporting of one's actions to a principal is not a requirement in the

analysis of implied actual or apparent authority.  Thus Mr. Jones was not obligated to "report"

his decision to Mr. Brown or Mr. Lambert.  *See, e.g.*, *Mannone v. Whaland,* 382 A.2d 918, 920

(N.H. 1978) (finding existence of valid agency relationship based on implied authority without

requiring principal's knowledge of the agent having carried out an authorized act).  Further, Mr.

---

person Mr. Day typically interacts with on insurance matters and questions that may come up regarding contracts.");
*see also* Liberty Proposed Ruling ¶ 46. (Citations in the form "Liberty Proposed Ruling ¶ __" refer to the Proposed
Rulings of Law contained in Liberty Insurance Corporation's Proposed Findings of Fact and Rulings of Law dated
January 26, 2018, ECF No. 60.  Citations in the form "PFF ¶___" refer to the Proposed Findings of Fact contained
in Liberty Insurance Corporation's Proposed Findings of Fact and Rulings of Law dated January 26, 2018, ECF No.
60 ).
[36/]       Stipulation ¶ 145.
[37/]       Stipulation ¶ 146.
[38/]       Stipulation ¶¶ 150, 151.

Brown testified that he was "not surprised to learn that Plum Creek did not purchase UM coverage" and that in his view "Mr. Jones purchased the correct amount of insurance."[39]

23.     There was no evidence showing that the Plum Creek Board of Directors, CEO, CFO, or Chief Accounting Officer David Brown knew that Kent Jones had decided to reject UM coverage for Plum Creek's fleet vehicles in 2012 or 2013.

**OBJECTION**:  Under Federal Rule of Evidence 401, this Proposed Fact is irrelevant and of no consequence for the reasons stated in support of Objection 22, *supra*.

24.     There was no evidence showing that the Plum Creek Board of Directors, CEO, CFO, or Chief Accounting Officer David Brown knew that Lisa Duetsch had signed a UM Selection/Rejection form to reject UM coverage for Plum Creek's vehicles.

**OBJECTION**:  Under Federal Rule of Evidence 401, this Proposed Fact is irrelevant and of no consequence.  Mr. Brown testified, and Plaintiff stipulated that, "[a]nything having to do with insurance, except for authorizing payments over a certain amount, was within the full authority of Mr. Jones, and to the extent Mr. Jones delegated that authority to Ms. Duetsch, Mr. Brown was 'totally comfortable' with either Mr. Jones or Ms. Duetsch 'signing on behalf of the [C]ompany.'"[40]  Further, as stated in support of Objection 22, *supra* the existence of a valid agency relationship does not depend on the principal's knowledge that an agent has in fact carried out a duty the agent was authorized to do.

25.     Plum Creek's CFO David Lambert had to authorize certain coverages and premium costs that were outside of David Brown's and Kent Jones' authority.  (Trial Ex. 3, p. 37:15-17.)

---

[39]     Stipulation ¶ 108.
[40]     Stipulation ¶ 110.

**RESPONSE**:  This Proposed Fact mischaracterizes the evidence in the trial record. Plaintiff has stipulated that the BOD Delegation of Authority authorized corporate officers to approve payments up to specified amounts and that insurance was one of the "normal recurring expenditures" to which the BOD Delegations of Authority applied.[41]  Accordingly, Mr. Lambert's authority was not based on "coverages" but on payment amounts.  Consistent with this, Plaintiff has stipulated that, because the premium payment for Plum Creek's insurance program exceeded Mr. Brown's and Mr. Jones' level of authority, Mr. Lambert's authorization for the premium payment was sought and obtained.[42]

26.     There was no evidence as to whether the decision to purchase or reject UM coverage for Plum Creek's vehicles was or was not among the coverages that required separate authorization from the CFO, David Lambert.

**OBJECTION**:  This Proposed Fact mischaracterizes the evidence in the trial record. Plaintiff has stipulated that the BOD Delegation of Authority authorized corporate officers to approve payments up to specified amounts and that insurance was one of the "normal recurring expenditures" to which the BOD Delegations of Authority applied.[43]  Accordingly, Mr. Lambert's authority was not based on "coverages" but on premium payment amounts.

27.     There was no evidence that the Plum Creek Board of Directors, CEO, CFO or Chief Accounting Officer exercised control over Kent Jones' decision to select or reject UM coverage.

**OBJECTION**:  This Proposed Fact mischaracterizes the evidence in the trial record. The CFO and CAO monitored and controlled Mr. Jones' performance of his job duties by

---

[41]     Stipulation ¶¶ 70-74.
[42]     Stipulation ¶¶ 96-97.
[43]     Stipulation ¶¶ 70-74.

ensuring Mr. Jones' compliance with the monetary limits of his delegation of authority and requiring that he seek authorization for expenditures over certain dollar amounts; by participating in and asking questions at regular broker meetings with Mr. Jones and AON personnel; through weekly meetings between the CAO and Mr. Jones during which Mr. Jones' performance of his responsibilities was discussed; and through formal reviews of Mr. Jones' performance conducted by the CAO.[44] Moreover, as set forth in Plum Creek's SEC filings, and stipulated by Plaintiff, the Board of Directors and management conducted internal audits and Ernst & Young conducted external audits to ensure compliance with Plum Creek's internal controls.[45]

28.     Because Liberty did not attach any signed UM Selection/Rejection form to the policy, a Plum Creek Director or officer would not be able to tell from examining the policy that UM coverage had been rejected by Lisa Duetsch and/or Kent Jones.

**OBJECTION**:  This Proposed Fact is irrelevant to the agency issue, and is incorrect as a matter of fact and law.  First, a Plum Creek director or officer examining the 2013 Umbrella Policy would be able to tell that UM coverage was expressly excluded by the text of Exclusion 2(f)(2) of the policy, which bars coverage for UM claims.[46] An examination of the 2013 Umbrella Policy also reveals that no endorsement is attached to the policy to amend or alter that exclusion; nor does the policy contain an endorsement affirmatively providing New Hampshire UM coverage.[47] Further, as the New Hampshire Supreme Court has held, "every person is presumed to know the law." *Lennartz v. Oak Point Assocs., P.A.*, 1112 A.2d 1159, 1163 (N.H. 2015).  This rules extends to the directors and officers of Plum Creek.  Thus, a director or officer examining the 2013 Umbrella Policy, and knowing the requirements under New Hampshire law,

---

[44]        Stipulation ¶¶ 76-77, 84, 91, 94, 98-101.
[45]        Stipulation ¶¶ 76-78; Tr. Exs. 4-5.
[46]        Tr. Ex. 10 at 46.
[47]        Tr. Ex. 10.

would know that UM coverage was rejected because no endorsement was attached to amend the UM exclusion.[48]

29.     There was no evidence showing that the Plum Creek Board of Directors knew of and acquiesced in Duetsch's and Jones' rejection of UM coverage in 2012 and 2013.

**OBJECTION**:  This Proposed Fact mischaracterizes the evidence in the trial record and is premised on an incorrect statement of the law.  Indeed, the Company's delegations of authority and its finances were audited on a quarterly basis by external auditors and neither the Board nor the CEO ever countermanded the CFO or CAO's insurance approvals, nor does the record contain any evidence that the Board countermanded the CFO or CAO's management in the area of insurance.[49] Further, to establish the existence of an agency relationship based on implied authority, Liberty need not present evidence of the Board's actual knowledge of its agents (Mr. Jones and Ms. Duetsch) having acted within the scope of their authority.  *See, e.g.*, *Mannone,* 382 A.2d at 920 (finding existence of valid agency relationship based on implied authority without requiring principal's knowledge of the agent having carried out an authorized act).

30.     The premium statement on the June 1, 2013 Liberty policy did not indicate whether or not it included any amount for UM coverage.  (Trial Ex. 12, p. 2.)

**OBJECTION**:  This Proposed Fact mischaracterizes the evidence in the trial record. On May 23, 2013, Liberty issued an Umbrella Excess Liability Proposal (the "2013 Proposal") which offered $5M in umbrella coverage for certain underlying insurance maintained by Plum

---

[48]     Further, a Plum Creek director or officer would know that Plum Creek's primary auto policy does not afford UM coverage with the exception of six states, including New Hampshire, which mandate minimum amounts of UM coverage by statute.  With respect to each of these states, Plum Creek purchased only the statutory minimum. *See* Tr. Ex. 13 at L000834, L000872, L00089, L000903, L000908, L000913, L000929, L000929, L000938; *see also* Me. Stat. tit. 24-A, § 2902; N.H. R.S.A. § 264:15; Or. Rev. Stat. §§ 742.502, 806.070; S.C. Code Ann. §§ 38-77-140, 38-77-150, 38-77-160; W. Va. Code § 33-6-31.
[49]     Stipulation ¶¶ 76-78, 112-13, 115; PFF ¶ 2, 5, 8.

Creek for a premium of $168,813.[50]  In the 2013 Proposal, Liberty provided preliminary

quotations to provide UM coverage in certain states, (Florida, Louisiana, New Hampshire and

West Virginia), for an additional premium.[51]  At that time, Liberty informed AON that, if Plum

Creek was interested in purchasing UM coverage ("they rejected it last year"), then AON would

need to  provide Liberty with Plum Creek's "actual fleet list" (as opposed to the summary in the

renewal submission) to determine whether any changes would need to be made to the UM offer

of coverage.[52]  On May 30, 2013, AON instructed Liberty to bind the 2013 Umbrella Policy

pursuant to the 2013 Proposal's terms, which did not include UM coverage.[53]  Relying upon

AON's representation that Plum Creek was (again) rejecting UM coverage, Liberty issued the

2013 Umbrella Policy per the 2013 Proposal for a premium of $168,813.[54]

31.     There was no evidence as to whether Plum Creek paid its insurance premium to

its broker AON who then paid Liberty, or whether Plum Creek paid Liberty directly.

**OBJECTION**:  This Proposed Fact is not consistent with the evidence in the trial record.

The Liberty underwriting file contains a National Markets Sold Plan Notification which provides

that the premium invoice should be in the amount of $168,813 and sent to Michael Day at

AON.[55]

32.     Aside from the forms indicating the selection or rejection of UM and Terrorism

Risk Insurance Act ("TRIA") coverage which were forwarded by AON to Liberty, there was no

evidence that Liberty received any communications or materials from Plum Creek.

---

[50]     Tr. Ex. 2 at L000030-44.
[51]     *Id.* at L000034.
[52]     *Id.* at L000090.
[53]     *Id.* at L000089.
[54]     Tr. Ex. 10 (2013 Umbrella Policy showing a Premium of $168,813); Tr. Ex. 2 at L000117 (Umbrella Excess Liability Proposal reflecting Premium Subtotal of $168,813, exclusive of optional Terrorism Coverage Flat Charge).
[55]     Tr. Ex. 2 at L000092-94.

**OBJECTION**:  This Proposed Fact mischaracterizes the trial evidence for the reasons stated in support of Objection 34, *infra*.

33.     Liberty produced no testimony, via affidavit, deposition testimony, or otherwise, from any Liberty employee or witness.

**OBJECTION**:  This Proposed Fact is incorrect and mischaracterizes the trial record. First, the Liberty underwriting file, including the communications – between Liberty and AON – described in support of Objection 34, *infra*, is evidence in this case.[56]  In addition, the trial record contains other evidence of Liberty's actions, including communications with the New Hampshire Department of Insurance regarding its approval of the NH UM Rejection Form.[57] Second, Plaintiff has stipulated to numerous facts regarding Liberty's conduct in the negotiation and issuance of the policies.  Third, Liberty is not required to provide live testimony. Nevertheless, anticipating this Proposed Fact, Liberty identified two potential witnesses from Liberty in its Final Pre-Trial Statement (ECF No. 53).  Fourth, the applicable standard is an objective one.  New Hampshire case law provides that apparent authority is "that authority which a reasonably prudent man, induced by the principal's acts or conduct, and in the exercise of reasonable diligence and sound discretion, under similar circumstances with the party dealing with the agent, and with like knowledge, would naturally suppose the agent to have." *Atto v. Saunders*, 93 A. 1037, 1039 (N.H. 1915) (internal quotation marks omitted).  A "reasonable person standard" such as this is the "hallmark of an objective inquiry."  *EnergyNorth Natural Gas, Inc. v. Cont'l Ins. Co.*, 781 A.2d 969, 974 (N.H. 2001).

34.     Liberty provided no evidence that it relied on any communication or conduct of Plum Creek in connection with its issuance of its 2012 and 2013 policies.

---

[56]     Tr. Ex. 2.
[57]     Tr. Ex. 24, 32.

**OBJECTION**:  The Proposed Fact mischaracterizes the evidence in the trial record. Throughout the underwriting process for both the 2012 Umbrella Policy and the 2013 Umbrella Policy – from the insurance submission through the instruction to bind – Liberty relied upon the communications and conduct of Plum Creek, which were directed through AON, Plum Creek's broker and intermediary with respect to the purchase of insurance.[58]

More specifically, as a result of these communications and conduct, Liberty provided an insurance proposal and quote for the 2012 and 2013 policy periods; Liberty issued a binder of insurance for the 2012 Umbrella Policy and 2013 Umbrella Policy; and Liberty declined to provide both UM coverage and TRIA coverage – both of which required Plum Creek to pay an additional premium – under the 2012 Umbrella Policy and the 2013 Umbrella Policy.   These communications, included but are not limited to the following:

<u>For the negotiation and issuance of the 2012 Umbrella Policy</u>:

- On May 14, 2012, Paulo Aguiar (Liberty) sent an email to Michael Day (AON).  Mr. Aguiar writes:[59]

    *Here's your lead umbrella quote for the Plum Creek Timber Company.*

    *I can offer the following:   $25m for $183,809 plus an additional $4,595 for TRIA, which the insured can accept or reject, with 15% commission on admitted Liberty Insurance Corporation paper.*

    *Please note that this is being quoted with our new Crisis Management Coverage endorsement.  A copy of the form is attached for you to review.  A separate $50k limit is included.  It can be increased to a $250k limit for an additional $1,000 in premium.*

---

[58]    Mr. Day testified at his deposition that, as a broker, he was the intermediary between the client (Plum Creek) and the insurer (Liberty).  Tr. Ex. 1, Transcript of the Deposition of Michael Day, at 8-9, 13, 67.
[59]    Tr. Ex. 2 at L000018-19.

> *Also please see pages 3, 9, 10, 11, 12, and 13 of the attached quote letter for our offers of UM/UIM Coverage in the states of Florida, Louisiana, New Hampshire, and West Virginia.*
>
> *Take a look at the attached quote letter and let me know if you need anything else.  Thanks Mike.*

- On May 23, 2012, Michael Day (AON) sent an email to Paulo Aguiar (Liberty) wherein Mr. Day writes:[60]

> *Quick question on your Uninsured Motorists options.  The way I read that in your quote is that if the insured rejects UM wherever possible and/or only subject to minimums where required, then there are no applicable premiums under your policy.  Just want to make sure there are no minimum charges since the insured does not buy this coverage in their primary.*
>
> *Thanks and we may have some additional questions as we discuss with the client.*

- On May 24, 2012, Michael Day (AON) sent an email to Paulo Aguiar (Liberty) instructing Mr. Aguiar to bind the umbrella proposal.  Mr. Day writes:[61]

> *Following our phone conversation, **you have the insured's order to bind your quotation along with the supplemental endorsements that you have provided.**  Per our phone conversation, the per occurrence underlying GL limit written by ACE is $1,000,000 and the Foreign GL underlying general aggregate limit written by ACE is $1,000,000.*
>
> *The insured is declining Terrorism and UM.  If you need the rejection forms signed, please let me know.*
>
> *On the Named Peril Time Elemental Pollution endorsement, following is a list we would offer for your consideration as respects the named perils:*
>
> *Bodily Injury or Property Damage arising out of any discharge, dispersal, seepage, migration, release or escape of Pollutants directly or indirectly caused by fire, explosion, lightning, windstorm, vandalism or malicious mischief, riot*

---

[60] *Id.* at L000018.
[61] *Id.* at L000010 (emphasis added).

> *or civil commotion, flood, automatic sprinkler leakage,*
> *collision or upset of an Auto Mobile Equipment or aircraft.*
>
> *Let me know if you have a different set of named perils that*
> *you typically apply with this endorsement.*
>
> *If you could please acknowledge binding of the coverage*
> *along with an assigned policy number, it will be much*
> *appreciated.*
>
> *Thanks Paulo for your time and consideration in working*
> *through our policy form questions.*

- On May 25, 2012, Paulo Aguiar (Liberty) sent an email to Michael Day (AON) the "official lead umbrella binder letter for Plum Creek Timber company." Mr. Aguiar also provides the applicable policy number, TH7-661-066340-012. In addition, Mr. Aguiar requests the following information from Mr. Day:[62]

  > 1. *Underlying policy numbers from ACE for the*
  >    *domestic and foreign packages, as well as Chubb's*
  >    *non-owned aircraft liability policy number*
  > 2. *A signed copy of the TRIA rejection form*
  > 3. *Signed copies of the UM/UIM offer letters for FL,*
  >    *LA, NH, and WV.  Please note that for some states,*
  >    *not having a signed copy in the file indicates*
  >    *automatic acceptance so we really need the letters to*
  >    *be signed and returned ASAP.*

- June 12, 2012, Michael Day (AON) sent an email to Evelyn Surban (Liberty) attaching UM rejection forms for Florida, Louisiana, New Hampshire, and West Virginia.[63]

  o The forms are signed by Lisa Duetsch in Florida (Signature of Applicant/Named Insured); in Louisiana (Signature of Named Insured or Legal Representative); in New Hampshire (Signature of Applicant/Named Insured); and in West Virginia (Applicant's/Named Insured's Signature).

  o Each of the four forms identified "Plum Creek Timber Company, Inc." as the "Applicant/Named Insured."

  o For Louisiana, Ms. Duetsch was required to also "print" her name.

---

[62] *Id.* at L000009.
[63] *Id.* at L000001-000006.

- On June 15, 2012, 2012, Michael Day (AON) sent an email to Evelyn Surban (Liberty) where he writes:[64]

  > Attached are the binding documents in response to item 1 – Non-Owned Aviation and Foreign Liability.

  > I am following up with the client service team to see about the status of the signed TRIA and UM rejection forms.  I will let you know as soon as I hear.   We may need to circle back with the client if we don't have them back yet.

  > Hopefully the binding documents will help in the meantime.

  Mr. Day's email was in response to Ms. Surban's request of June 15, 2012 for the underlying policy numbers for the ACE policies and Chubb's non-owned aircraft liability policy.[65]

For the negotiation and issuance of the 2013 Umbrella Policy:

- On March 15, 2013, Martie Kuykendall (Liberty) sent an email to Michael Day (AON) with respect to the renewal of the 2012 Umbrella Policy and asking for Mr. Day to "forward the umbrella/excess renewal specifications and/or an application" along with certain information.  Ms. Kuykendall notes that "[r]eceipt of the renewal information will allow us to continue to serve both you and the insured efficiently".[66]

- On May 3, 2013, Michael Day (AON) sent an email to Connie Cameron (Liberty) attaching an umbrella renewal submission.  Mr. Day explains that "the limits requested in the submission are the total limits including layers attaching above your $5M lead … we will be in touch shortly with the underlying quotes in order to finalize the excess pieces."[67]

- On May 21, 2013, Michael Day (AON) provides Connie Cameron (Liberty) with the primary casualty quotation, including a description, for Liberty to issue a renewal quote for the expiring 2012 Umbrella Policy.[68]   Upon receiving Ms. Cameron's out of office message, Mr. Day emails Paulo Aguiar (Liberty) and Evelyn Surban (Liberty) to obtain a renewal quote as Liberty is the lead umbrella insurer and Mr. Day needs to build the remainder of the insurance tower.  In the email, Mr. Day asked

---

[64] *Id.* at L000008.
[65] *Id.*
[66] *Id.* at L000144.
[67] *Id.* at L000142.
[68] *Id.* at L000136

for Liberty to provide a quote during the week "in order to complete the excess tower above your lead".[69]

- On May 23, 2013, Paulo Aguilar (Liberty) sent an email to Michael Day (AON).   Mr. Aguiar writes:[70]

  *I can offer the following:   $5m for $168,813 plus an additional $4,220 for TRIA, which the insured can accept or reject, on admitted Liberty Insurance Corporation paper.*

  *Terms and considerations are per expiring with two exceptions:*

  1. *I added a Designated Operations Exclusion to specifically exclude any and all aerial chemical applications*

  2. *I added the Bumbershoot excess limits to our underlying schedule per your request*

  *Also to confirm – I have quoted this renewal net of commission per your request.*

  *Please note that this is being quoted with our Crisis Management Coverage endorsement.  A copy of the form is attached for you to review.   A separate $50k limit is automatically included.  It can be increased to a $250k limit for an additional $1,000 in premium.*

  *Finally – just like last year I am offering UM/UIM coverage for vehicles garaged in the states of FL, LA, NH, and WV.  I realized that we don't have an actual fleet list in the renewal submission (just a summary) so I used the expiring numbers for each state.  Can you send over a detailed fleet list for the 2013 policy year so we have it on file?  If there are any changes that you need made to the UM/UIM offer we can amend it later if the insured's interested in the coverage this year (they rejected it last year…).*

  *Take a look at the attached quote letter and let me know if you need anything else.  Thanks Mike.*

---

[69] *Id.* at L000135
[70] *Id.* at L000028-29.

- On May 29, 2013, Connie Cameron (Liberty) sent an email to Michal Day (AON) wherein Ms. Cameron writes:[71]

  > *Here is Liberty's lead umbrella quote again.  Paulo did the quotation for us because Connie Cameron was out.  You can see that Connie was copied and she was due back on Tuesday, the 28th.  When it is time for the order, I would copy both of them to be sure.  Paulo's contact information is below and here is Connie's contact information:*

- On May 30, 2013, Jacquie Brissey (AON) provides Connie Cameron (Liberty) with a copy of the underlying binder for the ACE primary program to assist Liberty in issuing the renewal umbrella policy.[72]

- On May 30, 2013, Jacquie Brissey (AON) sent an email to Connie Cameron (Liberty) and Paulo Aguiar (Liberty) with an instruction to bind the renewal quote.   At that time, she said that she "urgently need[ed] the assigned policy number so we can begin renewing the certificates of insurance."[73]

  o In response, Ms. Cameron provided the renewal policy number but said that she needed to know whether Plum Creek was "accepting or rejecting the TRIA" before she could issue the formal binder.[74]

  o Ms. Brissey informed Ms. Cameron that Plum Creek was rejecting TRIA and would "send the form" when she received it.[75]

  o Ms. Cameron then issued the formal binder for the Plum Creek umbrella policy without TRIA coverage.[76]

- On May 30, 2013, Connie Cameron (Liberty) sent an email to Jacquie Brissey (AON) attaching the "formal binder" for Plum Creek Timber Company.[77]

- On June 3, 2013, Jacquie Brissey (AON) sent the executed UM Rejection Forms dated May 30, 2013 to Connie Cameron (Liberty).[78]

---

[71] *Id.* at L000028.
[72] *Id.* at L000137
[73] *Id.* at L000138.
[74] *Id.* at L000089
[75] *Id.* at L000088
[76] *Id.*
[77] *Id.*  at  L000088.
[78] Stipulation ¶ 142.

- On June 4, 2013, Evelyn Surban (Liberty) is seeking information from AON regarding Plum Creek's underlying insurance for Bumbershoot Liability Excess coverage in order to issue the 2013 Umbrella Policy.[79/]

- On June 18, 2013, Evelyn Surban (Liberty) emails Michael Day (AON) following up on her prior request for information as Liberty was issuing the policy that day.[80/]

All of these communications and conduct demonstrate that Plum Creek relied upon AON, Plum Creeks' broker and intermediary, regarding the negotiation and issuance of the 2012 Umbrella Policy and the 2013 Umbrella Policy.  With respect to UM coverage, in particular, Liberty communicated directly with Plum Creek (Ms. Duetsch) regarding Plaintiff's claim for UM coverage.[81/]

### Lack of Ratification

35.     There was no evidence that the Plum Creek Board of Directors, CEO, CFO or Chief Accounting Officer ratified the rejection of UM coverage by Lisa Duetsch after the fact.

**OBJECTION**:  This Proposed Fact, which is a mixed question of law and fact, mischaracterizes evidence in the trial record and overlooks that where ratification can take place by failure to object to the conduct of a putative agent.  *See* Restatement § 4.01 ("A principal may ratify an act by failing to object to it or to repudiate it.").  Indeed, Mr. Jones rejected UM coverage in each year from 2002 to 2005 and then his direct report, Ms. Duetsch rejected it each year from 2005 through 2015.[82/]  Despite quarterly and annual audits of the Company's internal controls, including its delegations of authority, as well as audits of the Company's actual expenditures, at no point did the Board of Directors, CFO or the CAO direct Mr. Jones to alter

---

[79/]     Tr. Ex. 2 at  L000133
[80/]     *Id.* at L000133.
[81/]     Tr. Ex. 14 at 10 of 12; Tr. Ex. 28.
[82/]     Stipulation ¶¶ 22, 38, 110.

his insurance-related decisions.[83/]  Moreover, Plum Creek's SEC filings, including the Form 10-K for 2012 and 2013, contained express representations regarding Plum Creek's internal controls and, in particular, representations that Plum Creek's internal controls were effective.[84/]

36.     Because there was no evidence that Plum Creek's Board of Directors, CEO, CFO or Chief Accounting Officer knew that Kent Jones and Lisa Duetsch had rejected UM coverage for Plum Creek's vehicles, Plum Creek did not ratify their conduct in purporting to reject UM coverage for Plum Creek after the fact.

**OBJECTION**:  This Proposed Fact misstates the evidence in the trial record and is otherwise an incomplete statement of the law for the reasons stated in support of Objection 35, *supra*.[85/]

### RULINGS OF LAW

37.     Liberty bears the burden of proving that it is not obligated to provide UM coverage to the plaintiff. R.S.A. 491:22-a.

**RESPONSE**:  Liberty acknowledges that it bears the burden to demonstrate the applicability of the UM exclusion in the 2013 Umbrella Policy.

38.     Pursuant to R.S.A. 264:15, the Liberty Commercial Liability umbrella policy must provide uninsured motorist coverage equal to the limits of liability purchased, unless the named insured rejects such coverage in writing.

---

[83/]     Stipulation ¶¶ 66, 76-78; *see Nationwide Mut. Ins. Co. v. Prioleau*, 597 S.E.2d 165 (S.C. Ct. App. 2004) ("Indeed, the law creates the relationship of principal and agent where the parties, in the conduct of their affairs, actually place themselves in such position as requires the relationship to be inferred by the courts.").

[84/]     Tr. Ex. 4 at 253 of 264; Tr. Ex. 5 at 231 of 242.

[85/]     *See Goode v. Daughtrey*, 694 S.W.2d 314, 317 (Tenn. Ct. App. 1985) ("Under the facts of this case, we find that [the wife] clearly acted as her husband's agent in applying for the insurance on her family's cars. There is no evidence that [the husband], at any time, objected to her action in this regard. Moreover, even were it able to be said that she originally acted without her [husband's] authority, by renewing the policies year after year he would be held to have ratified her action.").

**OBJECTION**:  This Proposed Ruling of Law is irrelevant to the sole factual issue before this Court.  Moreover, this Court has already granted partial summary judgment in favor of Liberty with respect to Plaintiff's claims based on RSA 264:15.  *See* Objection 1, *supra*.

39.     As the proponent of a form which purports to reject UM coverage for Plum Creek, Liberty bears the burden of proving that the form was signed by an authorized agent of the named insured, Plum Creek.  *Bouffard v. State Farm Fire & Cas. Co.*, 162 N.H. 305, 313 (2011).

**RESPONSE**:  Liberty admits that it bears the burden with respect to the agency question.  However, Liberty maintains that it has satisfied its burden as in *Bouffard*, 27 A.3d 687-88.

40.     Actual authority requires proof of:  (1) authorization from the principal that the agent shall act for him or her; (2) the agent's consent to so act; and (3) the understanding that the principal is to exert some control over the agent's actions.  *Case v. St. Mary's Bank*, 164 N.H. 649, 657 (2013).

**RESPONSE**:  Liberty admits that actual authority requires a three-pronged analysis.  *See Bouffard*, 27 A.3d at 687.

41.     An agent's belief that he had authority to act is not determinative of whether the principal authorized him to so act.  *VanDeMark v. McDonald's Corp.*, 153 N.H. 753, 660-661 (2006).

**OBJECTION**:  This Proposed Ruling is an incomplete statement of the law.  An agent's beliefs are relevant to an evaluation of the agent's implied actual authority as stated in support of Objections 15 and 16, *supra*.

42.     Testimony from individuals claiming to have been granted authority by the corporate principal does not prove that the principal did, in fact, grant that authority. *VanDeMark v. McDonald's Corp.*, 153 N.H. 753, 660-661 (2006).

**OBJECTION**:  This Proposed Ruling is an incomplete statement of the law.  An agent's beliefs are relevant to an evaluation of the agent's implied authority as stated in support of Objections 15, 16 and 41, *supra*.  Moreover, testimony from individuals such as Mr. Brown, who have extensive personal knowledge of, and responsibility for, ensuring that a company have internal controls relating to the delegation of authority[86/] can demonstrate, as here, that the principal granted and/or delegated authority.  *Compare Stinton v. Old Republic Ins. Co.*, 159 F. Supp. 3d 928, 934 (N.D. Iowa 2016) (holding in the context of a large corporation, Archer Daniels Midland, that the combination of the rejection form and the testimony of the vice-president of insurance and risk management that he was acting within the company's express authority when he signed the UM rejection form, established "beyond dispute" that the named insureds under the policy rejected UM coverage) *with Shirley v.  Centennial Ins. Co.*, 829 So.2d 593, 597 (La. App. Ct. 5th Cir 2002) (holding that, where the board of trustees of a charitable trust made all decisions itself regarding the purchase of insurance, and employee, who was instructed only to sign whatever documents were necessary to the implement the trustees' decision, lacked authority to make independent decisions regarding UM coverage).

43.     Apparent authority requires proof that some manifestation by the principal caused a third party to reasonably believe that the agent was authorized to act for the principal. *Boynton v. Figueroa*, 154 N.H. 592, 604 (2006).

---

[86/]     *See supra* n.15.

**RESPONSE**: Liberty does not dispute this Proposed Ruling. Indeed, in *Boynton*, the New Hampshire Supreme Court held that a jury could reasonably have found that a home builder had apparent authority to act on behalf of a modular home manufacturer based on facts such as an advertising program that permitted the builder to use the modular home manufacturer's logo. *See Boynton*, 913 A.2d at 707-08.

44. There can be no conclusion of apparent authority where there was no conduct or communications between Plum Creek and Liberty on which Liberty could have relied.

**OBJECTION**: This Proposed Ruling is based upon an inaccurate factual statement and an inaccurate legal statement. As an initial matter, the Proposed Ruling disregards the fact that Plum Creek hired AON as its broker. A broker (here, AON) acts as the agent of the insured (here, Plum Creek). 3 Lee R. Russ & Thomas F. Segalla, Couch on Insurance 3d § 45:1 at 45-2 (2007) ("A representative of the insured is known as an 'insurance broker.' A broker represents the insured by acting as a middleman between the insured and the insurer, soliciting insurance from the public under no employment from any special company, and, upon securing an order, places it with a company selected by the insured, or if the insured has no preference, with a company selected by the broker. In contrast, an 'insurance agent' represents an insurer under an exclusive employment agreement by the insurance company."); *see also Broad v. Randy Bauer Ins. Agency, Inc.*, 749 N.W.2d 478, 483 (Neb. 2008) (same); *Essex Ins. Co. v. Zota*, 985 So. 2d 1036, 1046-47 (Fla. 2008) (same). Here, Plum Creek, through AON, provided an insurance submission, obtained a quote from Liberty, instructed Liberty to bind the quote, and purchased the 2012 Umbrella Policy and 2013 Umbrella Policy. And, with respect to UM coverage, specifically, as stated in support of Objection 34, *supra*, AON informed Liberty that Plum Creek

was rejecting UM coverage and, consistent with that representation, AON provided to Liberty the UM Rejection Forms, which were signed by Ms. Duetsch, the "Applicant/Named Insured."

45.     There can be no conclusion of apparent authority where there was no evidence that Liberty relied on any conduct or communication from Plum Creek.

**OBJECTION**:  This Proposed Ruling mischaracterizes the trial record and is premised on an incorrect statement of the law.  First, as stated in support of Objection 34, *supra*, there is ample evidence that Liberty relied on AON – Plum Creek's broker and intermediary – throughout the underwriting of the 2012 Umbrella Policy and 2013 Umbrella Policy. Specifically, and relevant here, Liberty issued umbrella policies without TRIA and UM coverages, which would have resulted in an additional premium.  *See* Objections 30, 34. Second, as stated in support of Objection 33, *supra*, although Liberty has demonstrated subjective reliance, the test for reliance with respect to apparent authority is an objective one.

46.     The UM rejection forms, delivered to Liberty by AON without reference or copy to any Plum Creek employee and without any statement that they were signed with authority by a Plum Creek representative, are not sufficient to permit Liberty to believe that they were executed as a properly authorized act of Plum Creek.

**OBJECTION**:  This Proposed Ruling is premised upon inaccurate factual statements and legal conclusions as stated in support of Objections 34 and 44, *supra*.  *See Stinton*, 159 F. Supp. 3d at 934; *Demolle*, 491 So.2d at 699.

47.     Effective ratification requires that the principal act with full knowledge of what the agent has done, and with the intent to adopt the agent's acts.  *De Rochemont v. Holden*, 99 N.H. 80, 83 (1954).

**OBJECTION**:  This Proposed Ruling is an incomplete statement of the law.  The doctrine of ratification applies only where an act was unauthorized in the first instance.  Here, where Ms. Duetsch possessed both actual and apparent authority that flowed through the corporate chain of authority from the Board, Liberty does not need to demonstrate ratification to prevail.  Moreover, as stated in support of Objection 35, *supra*, ratification can be evidenced by a failure to object to conduct of a putative agent.  *See* Restatement § 4.01 ("A principal may ratify an act by failing to object to it or to repudiate it.").  To the extent there was no actual or apparent authority, which Liberty denies, the Board of Directors, CEO and CFO ratified Mr. Jones' and Ms. Duetsch's conduct by their failure to object for ten years.  *See* Objection 35, *supra*.

48.     A principal cannot ratify the act of an agent who acts without authority, where the principal does not know of the agent's conduct.  *De Rochemont v. Holden*, 99 N.H. 80, 83 (1954).

**OBJECTION**:  This Proposed Ruling is an incomplete statement of the law for the reasons stated in support of Objections 15 and 48, *supra*.

49.     Liberty is required to provide UM coverage to plaintiff Brendan Kelly because it did not meet its burden of proving that it had a written rejection of UM coverage from the named insured, Plum Creek.

**OBJECTION**:  This Proposed Ruling is not supported by the facts or law.  Moreover, this Proposed Ruling presumes that Mr. Jones and Ms. Duetsch did not have authority – whether actual or apparent – to obtain insurance for Plum Creek, which they did.  Accordingly, Liberty has demonstrated by a preponderance of the evidence that, consistent with Plum Creek's

insurance strategy, Ms. Duetsch was authorized to sign the UM Rejection Forms.  As such,

Liberty is not required to provide UM coverage to Plaintiff.[87]

---

[87]    In the event the Court determines that Mr. Jones and Ms. Duetsch did not have authority to obtain insurance for Plum Creek, the 2013 Umbrella Policy itself is void for lack of authority to bind it.  *See Bouffard,* 27 A.3d at 686-87 ("[W]e decline to allow a principal to accept the benefits of an insurance policy as negotiated by an agent on the one hand, but at the same time claim that one unbeneficial aspect of the policy should not apply.").  *See Nationwide*, 597 S.E.2d at 168 (holding that, while there was no express agency relationship, "the facts clearly demonstrate an implied agency existed between the parties for the purpose of acquiring automobile insurance . . . [b]y making a claim under the policy, [Plaintiff] has essentially placed herself in such a position that the court must infer an agency relationship. Otherwise, no policy would exist under which [Plaintiff] could claim UIM coverage"); *Messerly v. State Farm Mut. Ins. Co.*, 277 Ill. App. 3d 1065, 1070 (Ill. App. Ct. 1996) (holding that the rejection of UM coverage by one insured was applicable to all insureds and explaining that it would be "inconsistent for plaintiff to argue (1) she was covered by the policy procured exclusively by her husband but admittedly for her benefit; (2) she was entitled to recover from defendant under the terms of the policy, but (3) with respect to one aspect of the policy, her husband acted without her authority and his decision cannot bind her. To allow such an argument would permit the plaintiff to accept the benefit of the bargain her husband made on her behalf but not the burden").

Dated: January 29, 2018

**LIBERTY INSURANCE CORPORATION**
By its attorneys,

*/s/ Lavinia M. Weizel*
Nancy D. Adams, Esq. (admitted *pro hac vice*)
Lavinia M. Weizel, Esq. (NH Bar #265351)
Mintz, Levin, Cohn, Ferris, Glovsky and
Popeo, PC
One Financial Center
Boston, MA 02111
Telephone:  (617) 542-6000
Fax: (617) 542-2241
nadams@mintz.com

John B. Schulte, Esquire (NH Bar #9376)
Law Offices of John B. Schulte
Two Bedford Farms Drive, Suite 202
Bedford, NH 03110
Telephone:  (603) 623-8413
Fax:  (603) 623-8517
Johnb.schulte@libertymutual.com

## CERTIFICATE OF SERVICE

I hereby certify that on January 29, 2018, I electronically filed the foregoing document with the Clerk of the District Court using the CM/ECF system, which sent notification of such filing to counsel of record for the parties.

*/s/   Lavinia M. Weizel*

75294774v.1