UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

Brendan Kelly

    v.                                   Civil No. 15-cv-234-JL
                                          Opinion No. 2018 DNH 107

Liberty Insurance Corp.,
d/b/a Liberty Mutual

## **FINDINGS OF FACT AND RULINGS OF LAW AFTER BENCH TRIAL**

This insurance coverage case requires the court to determine whether a named insured validly rejected uninsured motorist coverage. The dispute arises from a motor vehicle accident in which plaintiff Brendan Kelly was seriously injured. Kelly, an employee of Plum Creek Timber Co., was driving a company truck when an oncoming vehicle crossed a double-yellow line and caused a head-on collision. After collecting the liability insurance policy limit from the other driver's insurance carrier, Kelly sought underinsured motorist (UM) coverage under an umbrella policy defendant Liberty Mutual issued to Plum Creek. New Hampshire law requires that umbrella policies include UM coverage unless rejected by the named insured. See N.H. Rev. Stat. Ann. § 264:15. Liberty Mutual denied the claim on the basis that Plum Creek had expressly rejected UM coverage. Claiming that Plum Creek's rejection is invalid under New Hampshire law, Kelly filed a petition for declaratory judgment seeking coverage under the Liberty Mutual

policy.  See N.H. Rev. Stat. Ann. 491:22.  This court's subject matter jurisdiction is premised on diversity of citizenship.  28 U.S.C. § 1332.

After granting partial summary judgment to Liberty Mutual on plaintiff's claim that New Hampshire law required Liberty Mutual to attach Plum Creek's written rejection of UM coverage to the policy,[1] the court held a one-day bench trial on the remaining issue of whether the Plum Creek representative who executed the rejection form was properly authorized to do so. The parties each submitted proposed findings of fact and rulings of law, pre-trial briefs, as well as a jointly-submitted statement of agreed facts and a timeline of events.  Relying on these materials, the court makes the following findings of fact and rulings of law, see Fed. R. Civ. P. 52(a), resulting in judgment for Liberty Mutual.

---

[1] The court ruled from the bench on the parties' cross motions. See Endorsed Order, Mar. 28, 2017.  A written Order on Liberty's motion is issued this day under separate cover.

I.   **Findings of fact**[2]

A.   Underlying accident and insurance

1.   In December 2013, plaintiff Kelly, a Plum Creek employee driving a truck Plum Creek owned, was en route to a job site when a vehicle driven by George Motard crossed into Kelly's lane of travel and struck Kelly's truck head-on, killing Motard and injuring Kelly.  The New Hampshire State Police determined that Motard was entirely at fault for the collision.

2.   At the time of the collision, Progressive Casualty Insurance covered Motard under a policy containing a $100,000 auto liability limit.  Progressive tendered its policy limits to Kelly.

3.   Plum Creek carried its primary auto liability insurance through ACE American Insurance Company ("ACE"), with auto liability limits of $1,000,000.

4.   The ACE policy provided UM coverage with limits of $1,000,000.  ACE tendered its policy's UM coverage limits, minus credit for the payment from Progressive, to Kelly.

---

[2] Unless otherwise indicated, the court's findings of fact are drawn directly from the parties' joint statement of agreed-upon facts.  Doc. no. 54.

B.   Liberty umbrella policy

5.   At the time of the collision, Plum Creek was also insured under a Commercial Liability Umbrella policy issued by Liberty, ("the Liberty policy") with effective dates of June 1, 2013 to June 1, 2014.

6.   Kelly is an "insured" under the Liberty policy because he was acting within the scope of his employment for the named insured, Plum Creek, at the time of the accident, and because he was using a "covered auto" with Plum Creek's permission.

7.   The Liberty Policy provides auto liability umbrella coverage with limits of $5,000,000 for each occurrence and a $5,000,000 general aggregate.

8.   Kelly sought UM coverage under the Liberty policy.  As part of his claim, he submitted medical records and bills showing the serious and permanent injuries that resulted from the collision.  The bills exceeded $440,000.

9.   Liberty denied Kelly's claim for coverage under the Liberty Policy because Plum Creek had rejected UM coverage.

10.  A "New Hampshire Excess Uninsured Motorists Coverage Selection or Rejection Form" was not attached to the Liberty Policy.

C.   Authority for rejecting UM coverage

    1.   Lisa Duetsch

    11.   Lisa Duetsch signed the UM rejection form on behalf of Plum Creek.

    12.   Duetsch began working at Plum Creek in January of 2005.  In 2008, she assumed the title of Manager, Risk & Insurance.  Plum Creek provided Duetsch with an office in its corporate offices in Montana where Duetsch met with Plum Creek's insurers and insurance brokers.

    13.   Plum Creek also provided Duetsch with a company email address, which she used to communicate with insurers and insurance brokers.  The email address and her business cards included her title.

    14.   Duetsch executed UM coverage forms on behalf of Plum Creek so as to reject coverage annually from 2005 to 2015.

    15.   On May 30, 2013, Duetsch completed and signed the New Hampshire UM selection/rejection form, rejecting UM coverage. Duetsch likewise rejected UM coverage in Florida, Louisiana and West Virginia.  Duetsch completed and signed UM coverage forms for the same states the previous year.

    16.   Duetsch's supervisor, Kent Jones, issued Duetsch delegation of authority memoranda throughout her employment.

The memoranda authorized Duetsch to sign "contracts, agreements, statements" including "Auto UI/UnderI forms."  Duetsch regularly referred to the delegation memoranda to ensure she was acting within the scope of her authority.

17.  On or about June 1, 2005, Jones verbally instructed Duetsch to complete the UM forms associated with Plum Creek's casualty insurance policy renewals.  Jones reviewed the forms before Duetsch sent them to Plum Creek's insurer(s).  During a scheduled weekly meeting with Duetsch the following year, Jones verbally instructed Duetsch to complete the UM forms.  He indicated that he was comfortable not reviewing them, given Duetsch's demonstrated comprehension of Plum Creek's intent to reject UM coverage, as well as the accuracy of the prior years' forms.  Until Jones updated the delegation of authority memorandum explicitly to grant Duetsch authority to complete the UM forms, she always notified Jones of her intent to complete the UM forms and received his verbal authority to do so.  After Jones updated the delegation memorandum, Duetsch informed Jones of the status of her completion of these forms during their scheduled meetings.

18.  Based on conversations with Jones, Duetsch understood that Plum Creek wished to reject UM coverage in states in which

it was permitted to do so because Plum Creek had already secured insurance coverage for its employees in the form of workers' compensation insurance.

19.   Duetsch understood that the delegation of authority memoranda she received, together with Jones's verbal instructions, authorized her to reject UM coverage where permitted by law.

20.   Duetsch understood that Jones was aware of her execution of UM forms because it was one of her job responsibilities for over 10 years.

21.   Duetsch understood that failure to reject UM coverage on behalf of Plum Creek would have been inconsistent with Plum Creek's judgment and with Jones's instructions.

22.   Duetsch and Jones met annually with Plum Creek's primary casualty insurer's underwriter.  During these meetings Duetsch and the underwriter discussed the execution of the UM rejection forms in Jones's presence.

   2.   <u>Kent Jones</u>

23.   Kent Jones began working at Plum Creek in May of 1999 as a Resource Accounting Manager.

24.   In 2001, Jones assumed the role of Director of Accounting-Shared Services, Manufacturing and Risk Management.

He reported directly to David Brown, Plum Creek's Vice President and Chief Accounting Officer.

25.   Brown authorized Jones to decide whether to accept UM coverage on behalf of Plum Creek.

26.   Beginning in 2002, and based on Jones's understanding of Plum Creek's past practice and his own professional judgment, Jones annually rejected UM coverage on behalf of Plum Creek in each state in which such rejection was permitted.

27.   Thereafter, Jones delegated the responsibility of executing UM rejection forms to Lisa Duetsch.  Jones furnished Duetsch with a written delegation of authority memorandum.

28.   Jones maintained similar memoranda in his files delegating authority to Duetsch for the years 2004, 2005, 2007, 2010, 2011, 2012, 2013, 2014 and 2015.  He updated them as needed.

29.   The delegation of authority memorandum in effect in May 2013 stated in paragraph five that the Risk Manager, Duetsch, was authorized to sig\n "contracts, agreements, statements" including "Auto UI/UnderI forms."[3]

---

[3] Although the memorandum is dated September 20, 2016, the parties agree it is the document furnished to Duetsch prior to May 2013.

30.   When Jones first assigned Duetsch the responsibility of executing UM coverage selection/rejection forms on behalf of Plum Creek, he verbally instructed Duetsch to reject such coverage where permitted by law.

31.   In Jones's view, Duetsch's failure to reject coverage would have been a direct deviation from Jones's instructions and would have reflected poorly on Duetsch's performance.

32.   Jones was aware that Duetsch rejected UM coverage on behalf of Plum Creek in each of the years in which she was authorized to do so.

33.   Jones was aware of Duetsch's execution of the UM coverage forms because an electronic file so indicating was placed in a shared access folder, and because the invoice or premium cost for the Liberty policy reflected a cost which did not include uninsured or underinsured motorist coverage for any of the four applicable states.

3.   David Brown

34.   In 2012 and 2013, Brown was Plum Creek's Vice President and Chief Accounting Officer.  He began working for Plum Creek in 1994.  Brown earned Bachelor's and Master's Degrees in accounting, and Master's Degrees in Business and Taxation.

35.   Between 1994 and 2016, Brown held multiple titles with Plum Creek, including Controller; Vice President, Controller; Vice President, Controller (Chief Accounting Officer); and Vice President and Chief Accounting Officer.  Regardless of his title, in Brown's view, he was responsible for the Plum Creek's accounting.  Brown retired following Weyerhaeuser's acquisition of Plum Creek in 2016.  He was never on the Plum Creek Board of Directors (the "board").

36.   During the relevant time period, the Plum Creek Board of Directors elected Brown to the position of Vice President and Chief Accounting Officer.  Brown signed Plum Creek's Form 10-K filing with the United States Securities and Exchange Commission ("SEC") in his capacity as Vice President and Chief Accounting Officer.

37.   Plum Creek was the largest private landowner in the United States, deriving revenue from selling trees, manufacturing wood products, selling and/or developing its land, and mineral rights.  Brown understood that, as a publicly-traded company, Plum Creek was subject to oversight by the SEC.

38.   As Plum Creek's Vice President and Chief Accounting Officer, Brown's primary job responsibility was to oversee the Company's annual disclosure of financial information in order to

10

meet various SEC requirements.  He worked with various accountants, attorneys, and board members to make sure "we got it right."[4]

39.  Brown was also responsible for internal controls at Plum Creek.  Those controls included protocols and practices to prevent material misstatements in earnings reports and to ensure that all material transactions were properly approved in accordance with the requirements of Plum Creek's Board of Directors.  The board and Chief Financial Officer ("CFO") David Lambert gave Brown these responsibilities.

40.  After implementation of the Sarbanes-Oxley Act of 2002, the SEC issued guidance to public companies regarding internal controls.  The SEC directed management of public companies to focus on verifying that all accounting transactions were properly recorded and executed in accordance with delegations of authority.  Delegations of authority were specifically included in the SEC's definition of proper internal controls.

41.  Brown spent approximately 25 percent of his time ensuring that Plum Creek had proper internal controls in place

---

[4] Brown Dep., Trial Exhibit ("Tr. Ex.") 3, at 8.

and approximately 75 percent of his time ensuring that "the numbers were correct."[5]

42.   Based on his knowledge of federal regulations governing public companies and his educational and professional experience, Brown understood that adequate internal controls over financial reporting, specifically those intended to ensure all material transactions are properly authorized, required that Plum Creek have adequate delegations of authority in place.

43.   Beginning in approximately 2004 and continuing through the relevant time period, Plum Creek's Audit Committee met nine times per year.  Brown attended each meeting.  Brown provided the committee with an update on his responsibilities related to financial reporting, including internal controls and delegations of authority.

44.   At all relevant times, Brown understood that his authority came from his direct superior, CFO Lambert.

45.   CFO Lambert delegated to Brown the primary responsibility of ensuring that "all of the accounting was correct" for the Company.[6]  Brown also understood that, based on

---

[5] Id. at 17.

[6] Id. at 23.

the BOD Delegation of Authority, he had a "specific level of
authority for certain transactions that he was allowed to
approve."[7]

46.  Brown had different levels of financial authority
depending on the category of payment involved, and he maintained
a file to review whenever he was asked to approve a payment in
order to ensure the payment was within his authority.

47.  Brown met weekly with his direct supervisor, Lambert.
During these meetings, Brown discussed "basically anything and
everything that [Brown] thought was important to [Lambert]
relating to financial reporting," which included accounting for
transactions, the annual audit, internal controls, and
personnel-related matters.[8]

48.  Brown was Kent Jones's direct supervisor.  Insurance
was within Jones's job description and the description of those
who reported to him.

---

[7] Id. at 23.

[8] Id. at 44.

49.   As Plum Creek grew, Jones hired Duetsch so that Jones would have someone to whom he "could delegate some of his insurance responsibilities."[9]

50.   Brown viewed Jones as the "top person in the company to make sure that all of [Plum Creek's] insurance decisions were done correctly."[10]   Brown believed that Jones was an expert in the area of insurance and did not want to micromanage Jones.

51.   Jones's authority encompassed anything having to do with insurance, except for authorizing payments beyond a certain sum.   Jones was responsible for ensuring that Plum Creek was buying the correct amount of insurance, subject to whether the payments were within his delegation.   For any payments above the level of his delegation of authority, Jones was required to seek approval from someone senior to him with the requisite authority, such as Brown or the CFO.

52.   A delegation of authority in effect in 2013 gave Jones authority to approve insurance payments under $1 million. Payments greater than $1 million required Brown's approval.

---

[9] Id.

[10] Id. at 24.

14

53.   Brown worked for Plum Creek in Seattle and Jones worked out of a Montana office.  They had a one-hour call each week during the period in which Jones reported to Brown.  Each prepared an agenda in advance of their call.

54.   Brown conducted an annual evaluation of Jones beginning in 2001 and continuing through the relevant time period.  He also received external feedback that, with respect to insurance, risk management, manufacturing and accounting, and shared services, Jones was "about as good as any employee in the industry."[11]

55.   Brown reported to CFO Lambert with respect to insurance, asking Lambert how he wanted to manage that area. Lambert provided the authorization in 2012 and 2013 for purchasing Plum Creek's insurance.

56.   Because the annual policy premiums for Plum Creek's insurance generally exceeded Brown's authority, Jones asked Lambert to approve the premium payments to insurers.

57.   Lambert, Brown, Jones and Plum Creek's insurance brokers attended several meetings each year at Plum Creek's Seattle office regarding insurance purchases.  Duetsch

_____

[11] Id. at 27-28.

occasionally attended as well.  Prior to each broker meeting,
the participants received written materials, including a
spreadsheet with a summary of the different coverages, premiums,
and deductibles.  During these meetings, Jones and the brokers
walked through Plum Creek's insurance renewals, reviewed
premiums, coverages, and deductibles, and discussed the "prudent
thing to do."[12]  Meeting participants had an opportunity to
question Jones and other company experts.

58.  After these meetings, and once Plum Creek received the
final premium quotes from its insurers, Jones emailed Lambert to
ask for approval of various coverages and payments.  Jones
copied Brown on the email.  Lambert emailed his approval back to
Jones, copying Brown, who could not recall seeing any instance
in which Lambert did not provide such approval to Jones.

59.  During the relevant time period, Brown and Jones
discussed Plum Creek's automobile insurance coverage, which
included a Powerpoint presentation summarizing the level of
coverage, the deductible and generally the "prudent thing to
do."[13]

---

[12] Id. at 24.

[13] Id. at 28.

16

60.   Brown never expressly discussed UM coverage with Jones.  He never directed Jones to accept or reject UM coverage in the umbrella policy.  Although he and Jones met weekly, the topic of UM coverage never came up.  Brown did not know whether Plum Creek purchased UM coverage in 2012 or 2013.  He did not know of any reason why that would be something he would have needed to know.

61.   Brown fully authorized Jones to decide whether to accept or reject UM coverage for Plum Creek.  Jones made that decision based on his training and experience.

62.   Jones's full authority encompassed anything having to do with insurance, except for authorizing payments over a certain amount.  To the extent Jones delegated his authority to Duetsch, Brown was "totally comfortable" with either Jones or Duetsch "signing on behalf of the company."[14]

63.   Brown was not surprised to learn that Plum Creek did not purchase UM coverage.  In Brown's view, Jones purchased the correct amount of insurance, and the premium was within Jones's delegation of authority.

---

[14] Id. at 37.

64.   Brown did not know how many vehicles Plum Creek owned during the 2012-2013 period, or how many vehicles Plum Creek had in New Hampshire.

65.   Brown was always aware of the agenda for board meetings because he wanted to know if the board was discussing anything significant in the areas of internal control or financial reporting.  Brown also received copies of the materials provided to the board during their meetings and copies of the meeting minutes after the fact so that he could determine whether anything significant had come up regarding financial reporting.

66.   Insurance was not a standard item on a board meeting agenda.  Periodically, Jones sent Brown Powerpoint presentations that would then be included in the materials sent to the Board. The board was always more interested in the directors' and officers' insurance coverage, rather than automobile liability coverage.

67.   In the relevant time period, Jones never appeared in front of the Board of Directors and none of Jones's memos were ever presented to the Board or the Board's Audit Committee.

4.   <u>By-laws and corporate governance</u>

68.   The Plum Creek by-laws provide (and provided during the relevant time period) that the "Board of Directors . . . may exercise all such powers of the Corporation and do all such lawful acts and things as are not by statute or by the Certificate of Incorporation or by these By-Laws required to be exercised or done by the stockholders."[15]

69.   In 2003 or 2004, in connection with Sarbanes-Oxley, the Plum Creek Board of Directors issued a written delegation of authority ("BOD delegation").  Under the BOD delegation, Brown reported to the CFO, Lambert, who in turn reported to the Chief Executive Officer who in turn reported to the Board of Directors.

70.   The BOD delegation addressed the power of individual corporate officers to approve payments to third parties on behalf of the Company.  Payments above certain thresholds required Board approval, while authority over smaller amounts was delegated to others.  From there, the delegations would "cascade down throughout the [C]ompany."[16]

---

[15] Plum Creek by-laws, Tr. Ex. 41.

[16] Brown Dep., Tr. Ex. 3, at 36.

71.   The BOD delegation did not contain a separate line for insurance.  Insurance fell under the general category of approval for payments.  Brown "guessed" that there were approximately 15 specific categories of payments, and insurance would have been one of the normal recurring expenditures.[17] Brown received a copy of the BOD delegation in the first year the board approved it.

72.   Internal and external auditors reviewed the BOD delegation quarterly.  If the auditors raised any issues, they would first bring them to Brown's attention, then Brown and the auditors would bring the issues to the attention of the board's audit committee.

73.   Plum Creek's external auditor, Ernst & Young, reported on its audit of Plum Creek in its 2013 10-K.  Ernst & Young reported no material weaknesses in the Company's internal controls, including its BOD delegation.

74.   Brown received feedback from both internal and external auditors that they "weren't really aware of any company that did [internal controls] better than Plum Creek."[18]

---

[17] Id.

[18] Id. at 35.

5.   <u>AON insurance broker</u>

75.   AON Risk Services ("AON") was Plum Creek's insurance broker.   AON serves as an intermediary between its clients and various insurance carriers.

76.   Michael Day is an Account Executive, Senior Vice President at AON.   He has served as a Senior Vice President at AON since 1999 and has worked in the insurance industry for over 30 years.

77.   During the relevant time period, Day had two primary responsibilities.   First, as an account executive, he was the direct client service contact, with day-to-day interaction with his AON clients.   Second, as a casualty broker, he sought casualty insurance within the marketplace on behalf of his own clients and clients of other account executives at AON.

78.   Day began working with Plum Creek in June of 2009 when AON's previous casualty broker retired.   AON had an internal client service team that worked with Plum Creek.   The team included Day, Donna Keane and Jacquie Brissey.

79.   In 2012, Plum Creek became a new customer of Liberty for purposes of umbrella coverage.   In 2012 and 2013, Paulo

21

Aguiar was a Liberty senior underwriter.  His assistant was Evelyn Surban.

80.  In May 2012, Aguiar and Day exchanged emails regarding Plum Creek's umbrella coverage.  Day asked Aguiar to confirm that Liberty would charge no additional premiums if Plum Creek rejected UM coverage where permitted.  Day noted that he "[j]ust wanted to make sure there are no minimum charges since the insured does not buy this coverage in their primary."[19]  Neither Jones nor Duetsch was copied on this email.

81.  Later in May 2012, Day provided instructions to Liberty on behalf of Plum Creek with respect to Plum Creek's umbrella coverage for the policy effective June 1, 2012 to June 1, 2013.  These instructions were provided by telephone to Aguiar and were documented in a follow-up email.  Among other things, this email stated, "The insured is declining Terrorism and UM. If you need the rejection forms signed, please let me know."[20]  Neither Jones nor Duetsch was copied on this email. This email was stored in Liberty's underwriting file for Plum Creek.

---

[19] Tr. Ex. 2A.

[20] Tr. Ex. 2B.

82.  Liberty issued a Commercial Umbrella Policy to Plum Creek with an effective date of June 1, 2012 to June 1, 2013.

83.  On June 15, 2012, Day sent an email to Liberty's Surban, attaching signed UM rejection forms for the states of Florida, Louisiana, New Hampshire and West Virginia for the year 2012.  Neither Jones nor Duetsch was copied on this email which was stored in Liberty's Plum Creek underwriting file.

84.  Liberty's underwriting file for the 2012 underwriting of Plum Creek's umbrella coverage reflects that Liberty personnel did not communicate directly with Plum Creek personnel.  Rather, all communications relating to the negotiation and issuance of the policy were relayed through AON personnel, including Day.

85.  In May 2013, Day emailed Aguiar, Surban and Liberty Executive Underwriter Connie Cameron requesting that Liberty provide a quote to renew its umbrella coverage.  Neither Jones nor Duetsch were copied on this email.

86.  Aguiar provided the quote to Day a short time later (with a copy to Cameron).  Aguiar stated that "just like last year I am offering [UM] coverage for vehicles garaged in the states of FL, LA, NH, and WV . . . . If there are any changes that need to be made to the [UM] offer we can amend it later if

23

the insured's interested in the coverage this year (they rejected it last year . . .)."[21]  Neither Jones nor Duetsch were copied on this email.

87.  Liberty issued a Commercial Umbrella Policy to Plum Creek with an effective date of June 1, 2013 to June 1, 2014.

88.  On June 3, 2013, AON sent an email to Liberty, attaching signed UM rejection forms for Florida, Louisiana, New Hampshire and West Virginia for the year 2013.  Neither Jones nor Duetsch was copied on this email.  This email and its attachments were stored in Liberty's Plum Creek underwriting file.

89.  Liberty's underwriting file for the 2013 policy reflects that Liberty personnel did not communicate directly with Plum Creek personnel.  Rather, all communications relating to the negotiation and issuance of the policy were relayed through AON personnel.

90.  During the relevant time period, Day did not recall any specific conversations with Plum Creek regarding UM coverage.  He worked off of his renewal files and from those files understood that UM coverage had been rejected in the past.

---

[21]  Tr. Ex. 2H.

91.   Day understood the rejection of UM coverage to be consistent with Plum Creek's strategy with respect to insurance.

92.   When Day receives signed forms from a client, he expects that those documents have been signed with the authority of the client, according to the client's own internal protocols.

93.   Day has never seen a written document or delegation of authority giving a risk manager the authority to purchase coverage.

94.   The protocol within AON is that the people with whom AON works are established in their role.  AON does not "have someone coming in and declaring themselves authorized without the proper relationship already having been established."[22]

95.   Day understood Jones's role at Plum Creek to be that of "director in risk management."  He understood Duetsch's role at Plum Creek to be that of "risk manager."[23]

96.   In Day's experience, risk managers are typically in charge of the insurance matters for the organization that they represent.  If there is a risk manager in an organization, that

---

[22] Day Dep., Tr. Ex. 1, at 93.

[23] Id. at 18, 56.

is the person Day typically interacts with on insurance matters
and questions that may come up regarding contracts.

97.  The "New Hampshire Excess Uninsured Motorists Coverage
Selection or Rejection Form" Duetsch signed on May 30, 2013, was
at all relevant times stored in the Liberty underwriting file in
the ordinary course of Liberty's business.

      6.   <u>Liberty's UM Selection/Rejection Form</u>

98.  Liberty submitted the forms for its commercial
umbrella product to the New Hampshire Insurance Department for
approval in June 2010.  Liberty included the "New Hampshire
Excess Uninsured Motorists Coverage Selection or Rejection Form"
in its list of "Form Attachments."  The Department subsequently
approved Liberty's commercial umbrella product.

99.  On August 26, 2014, Liberty claim representative
Joseph Covert provided plaintiff's counsel with a copy of the
Liberty Policy.  A "New Hampshire Excess Uninsured Motorists
Coverage Selection or Rejection Form" was not attached to the
Policy.

100. On September 15, 2014, Covert emailed Paul Stuart of
ACE and Lisa Duetsch of Plum Creek stating "[o]ur policy is not
a 'follow form' policy and it contains an exclusion for UM/UIM
benefits.  I am working with our underwriter to confirm we

obtained the appropriate rejection forms and will be issuing a coverage position [regarding Kelly's claim] shortly."[24]  Also on that day, Covert supplied a copy of the NH UM Selection/ Rejection Form to plaintiff's counsel by email, stating that "the attached form confirms that the coverage was rejected by the insured."[25]

101. The New Hampshire UM Selection/Rejection form Covert provided Covert identified the "Applicant/Named Insured" as "Plum Creek Timber Company, Inc."

102. Duetsch signed the form on May 30, 2013.  Duetsch's initials are written on a line next to the sentence "I reject Uninsured Motorists Coverage."  The signature line does not state Duetsch's title.

103. Liberty received the signed NH UM Selection/Rejection Form on June 3, 2013.

## II.  Rulings of Law

107. The parties agree that New Hampshire law controls this dispute.  Therefore, the insurer, Liberty, bears the burden of proving by a preponderance of the evidence that Kelly's claim is

---

[24] Tr. Ex. 28.

[25] Tr. Ex. 15.

not covered by the applicable policy.  N.H. Rev. Stat Ann. §
491:22-a (2010); Carter v. Concord. Gen. Mut. Ins. Co., 155 N.H.
515, 517 (2011).

108. Plaintiff agrees that Plum Creek authorized Duetsch to
purchase insurance.[26]  He argues only that she was not authorized
to reject UM coverage.[27]

A.  Rejection of UM coverage

109. New Hampshire law requires umbrella policies to
"provide [UM] coverage equal to the limits of
liability purchased, <u>unless the named insured rejects
such coverage in writing</u>.  Rejection of such coverage
by a named insured shall constitute a rejection of
coverage by all insureds . . . and shall remain
effective upon policy amendment or renewal, unless the
named insured requests such coverage in writing."

N.H. Rev. Stat. Ann. § 264:15 (emphasis added).  The parties
agree that Plum Creek is the "named insured," and that Kelly is
"an insured" by virtue of the fact that he was operating the
truck in the course of his employment at the time of the
accident.

110. "[S]ettled principles of agency law . . . apply to the
rejection of UM coverage."  Bouffard v. State Farm Fire & Cas.

---

[26] Transcript, doc. no. 65, at 14.

[27] Id.

Co., 162 N.H. 305, 310 (2011).  Accordingly, "an agent may waive
UM coverage on behalf of a principal so long as the insurer
proves the existence of an agency relationship, whether actual
or apparent."  Id. at 311.  The question of an agency
relationship is one of fact.  Id. (citing Dent v. Exeter Hosp.,
155 N.H. 787, 792 (2007)).

111. Liberty argues that Plum Creek rejected UM coverage.
It supports this claim with a copy of the rejection form Lisa
Duetsch signed.[28]  In response, plaintiff argues that Liberty has
not proven that Duetsch was authorized by Plum Creek's board of
directors to reject the coverage.  As explained below, the court
finds that Plum Creek has met its burden under New Hampshire law
and proven by a preponderance of the evidence that Duetsch was
properly authorized to reject UM coverage on Plum Creek's
behalf.  Specifically, Plum Creek's bylaws expressly authorized
the company's board of directors to act on the company's behalf.
The board, in turn, authorized Chief Financial Officer Lambert
and Chief Accounting Officer Brown to approve financial
transactions, including those related to insurance.  Brown and
Lambert, in turn, authorized Risk Management Director Kent Jones

---

[28] Tr. Ex. 7.

to handle Plum Creek's insurance matters, including the decision
whether to reject UM coverage.  Finally, Jones authorized
Duetsch to execute, <u>inter alia</u>, the UM rejection form.

    1.  <u>Actual Authority</u>

    112.  "[T]he necessary factual elements to establish agency
involve:  (1) authorization from the principal that the agent
shall act for him or her; (2) the agent's consent to so act; and
(3) the understanding that the principal is to exert some
control over the agent's actions."  <u>Dent, 155 N.H. at 792</u>
(quotation omitted).  "The granting of actual authority and
consent to act with such authority may be either express or
implied from the parties' conduct or other evidence of intent."
<u>Id.</u>  "Express authority arises when the principal . . .
explicitly manifests its authorization of the actions of its
agent."  <u>Demetracopoulos v. Strafford Guidance Ctr., 130 N.H.</u>
<u>209, 213 (1987)</u>.  "Implied authority, on the other hand, follows
as a reasonable incident or construction of the terms of express
authority, or results from acquiescence by the principal in a
course of dealing by the agent."  <u>Bouffard, 162 N.H. at 311-12</u>
(quoting <u>Demetracopoulos, 130 N.H. at 215</u>)); <u>see</u> <u>also</u>, <u>Mannone</u>
<u>v. Whaland, 118 N.H. 86, 89 (1978)</u> (citing <u>Restatement (Second)</u>
<u>of Agency § 43, cmt b</u> ("If the agent performs a series of acts

of a similar nature, the failure of the principal to object to
them is an indication that he consents to the performance of
similar acts in the future under similar conditions.")).

   a.   Duetsch's authority

   113. The trial evidence, comprised of affidavits,
deposition transcripts and stipulations, establishes that
Duetsch had both implied and express actual authority to reject
UM coverage.

   114. With respect to the first element of agency --
authorization from the principal -- Plum Creek's Director of
Accounting -- Shared Services, Manufacturing and Risk Management
Kent Jones stated unequivocally that he expressly delegated the
responsibility of executing the UM rejection to Duetsch.  Jones
instructed Duetsch to reject the coverage in each state where it
was permitted, just as he had done when the responsibility was
his, beginning in 2002.  He also issued a written delegation of
authority memorandum giving Duetsch authority to sign contracts,
including "Auto UI/Under I forms."

   115. Even if Jones did not expressly delegate authority to
reject UM coverage to Duetsch, she nevertheless possessed
implied authority by virtue of Jones's knowing acquiescence to

Duetsch's rejection of UM coverage for the previous 10 years.
Mannone, 118 N.H. at 89.

116.   The second factor pertinent to Duetsch's actual
authority, the agent's consent to act, is demonstrated by
Duetsch's execution of her duties in compliance with Jones's
instructions.

117.   Liberty proved the third factor in the authority
analysis, the principal's control over the agent's actions, with
evidence that Jones monitored and controlled Duetsch's
performance of her job responsibilities, including the rejection
of UM coverage.   In the first year that he delegated this
authority to Duetsch, Jones verified that she had completed the
forms correctly.   Thereafter, the two met weekly, during which
time Duetsch informed Jones of the status of her completion of
the UM forms.   In addition, Jones required that Duetsch save the
completed forms in a shared network folder where he could review
them.   Jones also regularly updated the delegation of authority
memorandum in order to delineate the limits of Duetsch's
authority.   This is sufficient to establish Jones's control over
Duetsch.   See Herman v. Monadnock PR-24 Training Council, Inc.,
147 N.H. 754, 759 (2002) (holding that control by the principal
does not mean actual control at every moment; rather, it turns

upon the principal manifesting some continuous prescription of what the agent shall or shall not do).

### b.  Jones's authority

118. Chief Accounting Officer Brown, and Brown's superior, Chief Financial Officer Lambert expressly authorized Jones to purchase the Liberty umbrella policy.  After the meetings with Plum Creek's insurance brokers, Jones delivered a spreadsheet to Lambert and Brown summarizing Plum Creek's policies, premiums and deductibles.  Jones then submitted a written request to Lambert, by email, copied to Brown, seeking permission to purchase the 2013 umbrella policy, which Lambert supplied.

119.  In addition to the Jones's express authority to purchase the 2013 Liberty umbrella policy, several factors support the conclusion that Jones possessed implied actual authority to reject UM coverage for the 2013 policy year. First, the decision to reject UM coverage in certain states was a decision subsidiary to binding the 2013 umbrella policy itself.  Accordingly, the decision to accept or reject optional coverages "follow[ed] as a reasonable incident or construction of the terms of express authority[.]"  See Bouffard, 162 N.H. at 307.  Next, Jones rejected UM coverage in each year from 2002 to 2005 and Duetsch, his direct report, rejected it each year from

33

2005 through 2015.  Yet at no point did any superior at Plum Creek direct him to do otherwise.  Their acquiescence implied Jones's authority.  See Mannone, 118 N.H. at 89 ("authorization for the actions of an agent may be found by acquiescence of the principal in a series of acts performed by the agent in the past" (citing Restatement (Second) of Agency § 43(2)).  Moreover, Brown and Lambert viewed Jones as an expert on insurance and trusted him to make decisions with respect to insurance on behalf of Plum Creek.  Thus, Jones reasonably understood, based on his interactions with his superiors, Brown and Lambert, that the decision to reject UM coverage fell within the scope of his authority to manage Plum Creek's insurance program.  See Restatement (Third) of Agency § 2.01, cmt. c. (The "focal point for determining whether an agent acted with actual authority is the agent's reasonable understanding at the time the agent takes action.").  The acquiescence of Brown and Lambert to Jones's actions also constituted ratification of his conduct.  See id., § 4.01 ("A principal may ratify an act by failing to object to it or to repudiate it.").

120. The second element related to Jones's actual authority -- his consent to act on behalf of the principal -- was satisfied when Jones acted upon Brown and Lambert's

authorization by rejecting UM coverage in the years 2002 to 2005, by subsequently directing his direct report, Duetsch, to do the same, and by monitoring Duetsch to ensure she had done so.  See Bouffard, 162 N.H. at 312 (intentionally securing insurance policy on behalf of the principal was sufficient evidence of the agent's assent to act on principal's behalf).

121. The final requirement to establish Jones's actual authority, control by the principal, was satisfied by the several ways in which Lambert and Brown monitored Jones's compliance with the limits of his authority, including: ensuring adherence to monetary limits; requiring that he seek authorization for expenditures in excess of those limits; participating in and asking questions at regular broker meetings with Jones and AON personnel; Brown's and Jones's weekly meetings during which they discussed Jones's performance; and through Brown's formal reviews of Jones's performance.  See id. (finding sufficient evidence of control where principal and agent discussed the coverage to be purchased in advance and principal had opportunity to review the policy documents should she so choose).

c.    Lambert and Brown

122. The next link in the chain of authority requires the court to ascertain whether Plum Creek's Board of Directors authorized CFO Lambert and CAO Brown to reject UM coverage. Dent, 155 N.H. at 792; see also, Daniel Webster Council, Inc. Boy Scouts of America v. St. James Ass'n, Inc., 129 N.H. 681, 683 (1987) (observing that corporate officers have "only those powers conferred on them by the bylaws of the corporation or by the resolution of the directors").  The evidence points only to the conclusion that Lambert and Brown were so authorized.

123. The first required element -- grant of authority -- is satisfied by the BOD delegation, which expressly empowered both the CFO and the CAO to approve transactions within their respective limits of financial authority.

125. More specifically, the Board's written delegation granted the two officers, Lambert and Brown, actual authority regarding insurance matters.  While that document did not include "insurance" among its distinct categories of authorized expenditures, that authority can be implied from the express grant of authority for the approval of "normal recurring expenditures."  The plaintiff does not dispute that annual insurance premiums fit comfortably into that category.

36

126. Lambert's and Brown's implied authority to act on insurance matters is also reflected in the Board's acquiescence to their actions.  It is uncontradicted that the Board raised no objection to Plum Creek's insurance expenditures, including the repeated rejections of UM coverage.

127. Next, Liberty established the second element necessary to prove Lambert's and Brown's authority:  that they accepted the responsibilities of agency.  See id.  The two officers demonstrated their acceptance of authority by, inter alia, undertaking responsibility for insurance expenditures, meeting with insurance brokers, and by supervising Kent Jones.

128. Liberty also established the final element necessary to prove Lambert's and Brown's authority, the principal's control over the agent's actions.  Id.  Brown's and Lambert's action were subject to internal and external audits, they met regularly with the Plum Creek board's audit committee regarding insurance expenditures, and Lambert made presentations regarding insurance to the board.  Taken together, these facts are sufficient to establish that the Plum Creek Board "exert[ed] some control" over the officers' actions.  Id.

d.    Board's authority

129. The final issue related to Duetsch's authority is
whether Plum Creek's Board possessed the authority to delegate
insurance matters to corporate officers.  The court finds that
the Board was authorized to do so.

130. Plum Creek's bylaws easily satisfy the first element
of agency -- authorization.  Id.  The corporate bylaws provide
that the board may act on the company's behalf, including the
execution of contracts.

131. The court also finds that Liberty has demonstrated
that the board unquestionably consented to act on its authority
when it executed the delegation of authority and delegated
insurance-related decisions to officers such as Brown and
Lambert.  This satisfies the second element necessary to prove
the Board's actual authority, its consent to act on the
principal's behalf.  Id.

132. Finally, in addition to being governed by Plum Creek's
bylaws, the Board's actions could be monitored and controlled by
voting shareholders, thus satisfying the final element required
to establish the Board's actual authority to delegate insurance
matters.

2.   Apparent authority

133. Even if Duetsch lacked actual authority to reject UM
coverage, the court finds that she had apparent authority to do
so.

134. Apparent authority is "authority which a reasonably
prudent [person], induced by the principal's acts or conduct,
and in the exercise of reasonable diligence and sound
discretion, under similar circumstances with the party dealing
with the agent, and with like knowledge, would naturally suppose
the agent to have." Record v. Wagner, 128 A.2d 921, 922 (N.H.
1957). Apparent authority can result when the principal "fails
to disapprove of the agent's act or course of action so as to
lead the public to believe that his agent possesses authority to
act . . . in the name of the principal." State v. Zeta Chi
Fraternity, 142 N.H. 16, 24 (1997) (quoting 3 Am.Jur.2d Agency §
79, at 586 (1986)). Several factors support the conclusion that
Duetsch possessed apparent authority to reject UM coverage on
behalf of Plum Creek.

135. First, Plum Creek cloaked Duetsch with apparent
authority by its affirmative conduct. Plum Creek vested Duetsch
with the title "Manager, Risk & Insurance." The company
likewise provided her with business cards noting her title, a

company email account, and an office in Plum Creek's corporate

offices in Montana where Ms. Duetsch met with Plum Creek's

insurance brokers.  See Boynton v. Figueroa, 154 N.H. 592, 604-

05 (concluding that program permitting authorized builders to

use company logo, among other factors, could support jury

finding of apparent authority of builder).  Duetsch's title

signaled to Day, the AON representative, that Duetsch was the

person in charge of Plum Creek's insurance matters.  Day

exchanged business cards with Duetsch, learned of her title, and

met with her at Plum Creek's offices.  Based on his 18 years of

experience in the insurance industry, Day relied on these

indicia of authority in concluding that she was authorized to

execute the UM forms on behalf of Plum Creek.

136. In addition, by its acquiescence to Duetsch's and

Jones's conduct, Plum Creek cloaked Duetsch with apparent

authority vis-à-vis third parties like AON and Liberty.  As

previously noted, AON and Liberty were aware that Plum Creek

rejected UM coverage every year since at least 2002, and Plum

Creek never provided any documentation to either AON or Liberty

to countermand those rejections.  See Horseshoe Fish & Game Club

v. Merrimack Vill. Dist., 112 N.H. 94, 97-98 (1972) (finding

apparent authority where two purported agents were allowed to

operate as officers for a year without objection and
organization did nothing to correct outdated documents in
circulation giving authority to those purported officers).

137. Day also knew from his review of AON's files that
rejection of UM coverage was consistent with Plum Creek's
insurance practices, and Aguiar similarly relied on Plum Creek's
rejection of UM coverage in 2012 to quote a 2013 renewal without
UM coverage.  Further, Liberty relied on Plum Creek's previous
rejection forms to offer the 2012 and 2013 policies without an
additional premium for optional UM coverage.

138. Both Plum Creek's acquiescence to Jones's and
Duetsch's conduct, as well as the record of Plum Creek's prior
course of dealing, gave rise to AON's and Liberty's reasonable
belief that Plum Creek intended to reject UM coverage where
permitted by law and that Duetsch was authorized to effectuate
that intent.  See Zeta Chi Fraternity, 142 N.H. at 25 ("Apparent
authority can result when the principal 'fails to disapprove of
the agent's act or course of action so as to lead the public to
believe that his agent possesses authority to act . . . in the
name of the principal.'")(quoting 3 Am. Jur. 2d Agency § 79, at
586 (1986)); see also Restatement (Third) of Agency § 2.03, cmt

41

c (recognizing that apparent authority can arise from prior dealings between the parties).

139. Plum Creek's affirmative conduct and prior course of dealing with respect to its insurance policies and the rejection of UM coverage, particularly in light of custom and practice in the insurance industry, is further evidence of Duetsch's apparent authority to reject UM coverage.  Day testified that based on his experience in the industry, he would not interact with personnel from a client regarding insurance unless that person had been introduced to him and the proper relationship had already been established using appropriate internal protocols.  According to Day, brokers ordinarily interact only with certain client personnel.  For Plum Creek, those individuals were Jones and Duetsch.

140. In the insurance purchasing process, Plum Creek channeled its communications with its broker through Duetsch and Jones, while Day, the broker, communicated directly with Plum Creek's insurers.  Liberty relied on this chain of communication as valid because AON was Plum Creek's insurance broker.  Liberty corresponded solely with AON throughout the insurance underwriting process in 2012 and 2013, and relied on AON's

instructions with respect to Plum Creek's policies in those
years.

141. Liberty reasonably believed that AON supplied Liberty
with forms signed by Plum Creek's duly authorized
representative.  See Restatement (Third) of Agency § 1.03, cmt c
("When [an organization's] designated person speaks as to a
matter that is one of the types specified [by the organization],
and in a manner that conforms to [an] established routine, a
third party is justified in believing that the person speaks for
the organization.").

142. Plaintiff argues that the lack of direct communication
between Plum Creek and Liberty about rejecting UM coverage is
fatal to any claim of agency.  The court disagrees.

143. An insurance broker such as AON is "employed by the
insured to procure insurance from one of many potential
insurers." Mut. Benefit Life. Ins. Co. v. Gruette, 129 N.H.
317, 322 (1987).  "Ordinarily, when employed to procure
insurance, the broker becomes the agent of the person for whom
the insurance is procured at least to the extent matters
connected with the procurement itself are concerned . . . ." 43
Am.Jur. 2d Insurance § 116.  Plaintiff does not argue, nor is
there any evidence to suggest, that AON was not acting as Plum

43

Creek's agent, and that Liberty recognized AON's agency.  That Liberty personnel did not speak directly with Plum Creek personnel about rejecting UM coverage has no bearing on Duetsch's apparent authority to reject UM coverage on behalf of Plum Creek.

## IV.   <u>Conclusion</u>

As noted, plaintiff concedes that Duetsch had authority to make Plum Creek's insurance purchasing decisions.  He confines his argument that Duetsch lacked authority to the sub-category of rejecting UM coverage.[29]  He provides no authority for this proposition -- in the form of cases from New Hampshire or any other jurisdiction, treatises, or law review commentaries -- pursuant to which an agent already authorized to make insurance decisions requires a special grant of authority with respect to a particular aspect of coverage.  <u>Cf.</u> Bouffard, 162 N.H. at 311 ("[W]e decline to allow a principal to accept the benefits of an insurance policy as negotiated by an agent on the one hand, but at the same time claim that one unbeneficial aspect of the policy should not apply.").

---

[29] Trial Transcript at 14.

The court finds that Plum Creek granted Lisa Duetsch express and implied actual authority to reject UM coverage in the Liberty umbrella policy, and that, in the alternative, she had the apparent authority to do so.  Accordingly, Liberty has met its burden of proving that Plum Creek validly rejected the coverage, in compliance with N.H. Rev. Stat. Ann. § 264:15, I. The court therefore finds in favor of the defendant.  The clerk shall enter judgment accordingly and close the case.

**SO ORDERED.**

_____
Joseph N. Laplante
United States District Judge

Dated:     May 18, 2018

cc:  Robert A. Stein, Esq.
     Diane P. Hock, Esq.
     Nancy D. Adams, Esq.
     Lavinia M. Weizel, Esq.
     John B. Schulte, Esq.